VERITEXT LEGAL SOLUTIONS

Deposition of:

# Nadia Corsello

*February 26, 2019*

In the Matter of:

# Glenn, Robert v. HMD Trucking

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT GLENN, )
Plaintiff, )
vs. ) No. 1:18-cv-04410-ELR
HMD TRUCKING, INC., )
CRISTIAN GISCA, and )
RLI INSURANCE COMPANY, )
Defendants. )

The video deposition of NADIA CORSELLO, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jeanette A. Sandei, Certified Shorthand Reporter in the State of Illinois, at 10031 Virginia Avenue, Chicago Ridge, Illinois, on February 26, 2019, at the time of 9:02 a.m.

Reported By: Jeanette A. Sandei, CSR
License No.: 084-003685

APPEARANCES:

FRIED ROGERS GOLDBERG
BY: MR. BRIAN T. MOHS
3550 Lenox Road, N.E.
Suite 1500
Atlanta, Georgia 30326
(404) 591-1800
brian@frg-law.com
Representing the Plaintiff

COOPER F. SPENCE LAW
BY: MR. COOPER F. SPENCE
5447 Roswell Road, N.E.
Atlanta, Georgia 30342
(678) 310-6127
cooper@cooperspencelaw.com
Representing the Plaintiff

O'DANIEL McDONALD
BY: MR. CLAY S. O'DANIEL
8010 Roswell Road
Suite 210
Atlanta, Georgia 30350
(404) 419-6300
codaniel@odmclaw.com

Representing the Defendants

* * * * *

ALSO PRESENT: Ross Colby, videographer

I N D E X


| WITNESS | EXAMINATION |
|---|---|
| NADIA CORSELLO | |
| By Mr. Mohs | 7 |
| By Mr. O'Daniel | 97 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 25 | Dep notice | 10 |
| Exhibit 26 | HMD Company Policy and Operating Procedures | 19 |
| Exhibit 27 | HMD on USDOT website | 24 |
| Exhibit 28 | Safety performance history records request | 36 |
| Exhibit 29 | DQ file | 42 |
| Exhibit 30 | HMD written hiring criteria | 43 |
| Exhibit 31 | FMCSR 391.25 (b) | 44 |
| Exhibit 32 | Cell phone policy | 56 |
| Exhibit 33 | Drug and alcohol testing policy | 57 |
| Exhibit 34 | FMCSR 382.303 (a) & (b) | 84 |
| Exhibit 35 | HMD company safety profile | 88 |
| Exhibit 36 | RLI declarations page | 89 |
| Exhibit 37 | FMCSA printout for HMD insurance history and filing history | 92 |
| Exhibit 38 | Form MCS-82 | 93 |
| Exhibit 39 | Form BMC-40 | 95 |

E X H I B I T S (Continued)


| NUMBER | PAGE |
|---|---|
| Previously marked and referred to: | |
| Exhibit 5 | 31 |
| Exhibit 6 | 31 |
| Exhibit 7 | 32 |
| Exhibit 8 | 48 |
| Exhibit 10 | 74 |
| Exhibit 11 | 75 |
| Exhibit 12 | 75 |
| Exhibit 13 | 75 |
| Exhibit 14 | 75 |
| Exhibit 16 | 66 |
| Exhibit 19 | 78 |
| Exhibit 20 | 78 |

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:02 a.m. on February 26th, 2019.

Please note that the microphones are sensitive and may pick up whispering, private conversations, and cellular interference. Please turn off all cell phones or place them away from microphones, as they can interfere with deposition audio. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of Nadia Corsello taken by counsel for the plaintiff in the matter of Glenn versus HMD Trucking, Inc., Cristian Gisca, and RLI Insurance Company, filed in the United States District Court for the Northern District of Georgia, Atlanta Division, Case Number 1:18-cv-04410-ELR.

This deposition is being held at HMD Trucking located at 10031 Virginia Avenue in Chicago Ridge, Illinois.

My name is Ross Colby from the firm Veritext Legal Solutions, and I am the videographer. The court reporter is Jeanette Sandei from -- also from Veritext. I'm not related to any party in this

action, nor am I financially interested in the outcome.

Counsel and all present in the room will now state their appearances and affiliations for the record.

MR. MOHS: Brian Mohs and Cooper Spence on behalf of the plaintiff, Robert Glenn.

MR. O'DANIEL: Clay O'Daniel on behalf of the defendants.

THE VIDEOGRAPHER: Thank you. Jeanette, will you please swear the witness.

(Witness sworn.)

MR. MOHS: This will be the deposition of HMD Trucking, Inc. and Nadia Corsello taken pursuant to notice and agreement of counsel.

It is being taken for purposes of discovery, cross-examination, and all other purposes allowable under the Federal Rules of Civil Procedure and Evidence.

All objections except form of the question and responsiveness of the answer will be reserved until first use, if that's still agreeable.

MR. O'DANIEL: It is.

NADIA CORSELLO,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MOHS:

Q. Will you please state your full name for the record.

A. Nadia Corsello, N-a-d-i-a, C-o-r-s-e-l-l-o.

Q. Ms. Corsello, we met yesterday.

A. Yes.

Q. I represent Mr. Glenn in this lawsuit that's been filed against HMD Trucking and Mr. Gisca. I know that you attended the deposition yesterday. I still want to go over the ground rules just to make sure we're on the same page.

Same rules apply. We need verbal answers today. Uh-huhs or nods of the head don't pick up on the transcript. So if I ask you if that's a yes or a no, I'm not trying to be rude. I just need to make sure the transcript is clear. Okay?

A. Okay.

Q. And then we'll do our best -- we need to each do our best to try to not talk over each other. Let me finish the whole question before you answer, and I'll let you finish your whole answer before I

ask another question. Okay?

A. Okay.

Q. Please let me know if you don't understand any of my questions, and I will do my best to repeat or rephrase them. If you do answer my questions, can we have an agreement that that meant you understood my question?

A. Okay.

Q. And breaks, any time you want to take a break, just let us know. You just need to answer whatever question is pending at the time before we take a break.

A. Okay.

Q. Okay. And let's have the same agreement as well, when you and I refer to the collision or the accident or the incident, we're referring to the collision that occurred on September 6th of 2016 in Georgia involving Mr. Gisca. Okay?

A. Yes.

Q. Have you ever given a deposition or sworn testimony before?

A. Yes.

Q. When -- how many times have you given sworn testimony?

A. That's my third time.

Q. Okay. And were the first two times in your capacity as a corporate representative for HMD?
A. Yes.
Q. Okay. Tell me about those two cases.
A. First one -- hold on, let me think. So the driver lost -- he basically fainted. He started coughing really hard and he choked, he lost conscious, and he drove over the road. That was the first case.
Q. And do you know where that happened?
A. I don't remember.
Q. Okay.
A. The second one was -- I also don't remember the location, but the driver was on the truck -- at the truck stop, and he backed up to another truck. So it was really minor damages, but we had some injuries in that case.
Q. Okay. And do you remember what state that happened in?
A. No, I don't remember.
Q. When did you give your testimony in these two cases?
A. Both 2018.
Q. Okay. Do you remember any of the attorneys that were involved?

A. No, I don't. I don't remember the names.
Q. Okay. And so you're here today -- this is your third time testifying under oath --
A. Yes.
Q. -- at a deposition.
And you understand that we've noticed this deposition for HMD Trucking pursuant to Rule 30(b)(6). Do you understand what that means?
A. No.
Q. Okay. A lot of lawyers don't understand what it means either.
What that means is you're designated to act on behalf and testify on behalf of the company today, so you're not here just individually as Nadia. You're also here to bind the company. Do you understand that?
A. Yes.
MR. MOHS: Okay. Can you hand me whatever the notice is?
Let me go ahead and mark as Exhibit Number 25.
(Whereupon, Plaintiff's Deposition Exhibit No. 25 was marked for identification.)

BY MR. MOHS:
Q. This is a copy of the deposition notice for today.
Have you seen this document before?
A. Yes.
Q. And if you flip to Page 4, starting on Page 4 there are a list of topics that are included in this notice.
Have you seen those topics before today?
A. Yes.
Q. And do you agree to bind -- to be able to testify on behalf of the company and bind the company on those topics today?
A. Yes.
Q. And have you done everything that you need to do in order to gather all the information regarding those topics to be able to testify here today?
A. Yes.
Q. Okay. Was there anything that you wanted to do that you were unable to do in preparation for your deposition today?
A. No.
Q. Did you do anything to prepare for your deposition today? And let me preface that by saying

I don't want to know about any conversations you had with any attorneys.

Other than that, have you done anything to prepare for your deposition today?

A. We had several phone calls with the attorney and meetings collecting all the documents.

Q. Okay. Do you -- and did you review documents in preparation for today?

A. Yes.

Q. What documents have you reviewed in preparation for today?

A. I went through the DQ file, the police report, the driving records, the pictures of the accident.

Q. Anything else you can remember?

A. The court documents like these ones. That's about it.

Q. Okay. Ms. Corsello, where do you currently live?

A. I live in Bolingbrook, Illinois.

Q. Can you give me your address?

A. [redacted] Bolingbrook, Illinois.

Q. Glenbrook?

A. Bolingbrook.

Q. Bolingbrook?
A. B-o-o-l, Bolingbrook.
Q. Okay. And what's the zip there?
A. [redacted].
Q. And how long have you lived at that address?
A. A year and a half.
Q. Okay. Do you have any relatives or friends or personal connections in Georgia?
A. I don't.
Q. Okay. Have you ever served in the military?
A. No.
Q. Have you ever been involved in any other lawsuits personally?
A. No.
Q. And I understand that you've been designated to act as HMD's corporate representative on two separate occasions. Have you testified in any other lawsuits professionally in terms of your work or career?
A. No. Just those two.
Q. Okay. Do you have a commercial motor vehicle driver's license?
A. I don't.
Q. Okay. Have you ever received any commercial motor vehicle training?

A. No.
Q. Have you received any training to be a safety director?
A. Yes.
Q. Okay. What training have you received?
A. The initial training was done by the previous safety director here at HMD. I've worked at another trucking company for two years. I also had some trainings at that company. Our insurance agent, Cottingham & Butler, they organize the safety training once a year, this three-day course covering multiple topics. Also, I've been in few safety trainings from NATMI, N-A-T-M-I.
Q. Okay. Have you received any certification as a certified safety director?
A. Yes.
Q. Okay. From NATMI?
A. From NATMI.
Q. Okay. How long was that training?
Was it classroom and a test?
A. It was a two- or three-day course at the -- with the test at the end.
Q. Okay. You also said you as a company have your insurance company, Cottingham & Butler, come in once a year to provide training -- safety training

to everybody; is that correct?

A. They have the offices in Dubuque, Iowa. That's where they're organizing the training once a year. It's normally three-day course, like I said, covering multiple topics on safety, and the last one was three months ago.

Q. Okay. And that's -- they do that annually?

A. Annually in Dubuque. I don't want to say I go there every year, but I've been in quite a few of those.

Q. Okay. And so you go on behalf of HMD?

A. Me and some of my safety officers.

Q. Okay. And then do you take what you learn there and try to implement it here at HMD?

A. Yes.

Q. Okay. And was that going on in 2016 at the time of this collision?

A. I believe so.

Q. Okay. Have you received any traffic citations yourself in the last 10 years?

MR. O'DANIEL: I'll object to the form of the question. You can answer.

THE WITNESS: I think a few years ago, it was a speeding ticket.

MR. MOHS: Okay.

THE WITNESS: I can't remember the year. It was long time ago.

BY MR. MOHS:

Q. Any other citations that you can remember in the past 10 years?

A. No.

Q. Did they -- when you go to that training with Cottingham & Butler, do they give you materials that you bring back?

A. Yes.

Q. Okay. Do you still have those materials?

A. Yeah, I should have them.

Q. As a result of attending any of those training sessions, have you implemented new written policies and procedures at HMD at any time?

A. I would say yes.

Q. Okay. Can you think of any off the top of your head?

A. No.

Q. Okay. Have you been personally involved in any motor vehicle collisions?

A. No.

Q. Okay. Have you ever been arrested or charged with any crime?

A. No.

Q. Can you tell me about your education, how far you've gone in school?

A. I graduated from university in Russia. The major was the languages, linguist. And I moved here 14 years ago. I graduated from Prairie State College in liberal arts. And also I have unfinished Governors State University in international business.

Q. And have you stayed in the U.S. since you came over and started your studies here 14 years ago?

A. Yes.

Q. Whichever way is easiest for you -- we can either go in reverse order or start from when you left college -- I want to go through your employment history.

A. Okay.

Q. You're currently employed with HMD.

A. Yes.

Q. As the safety director; is that correct?

A. Yes.

Q. And how long have you been with HMD?

A. Nine years.

Q. Okay. So that would -- approximately 2010 or 2011?

A. '10 maybe.
Q. To current? Okay.
What other -- how long have you been the safety director?
A. Six years.
Q. Were you the safety director at the time of this collision that occurred in 2016?
A. Yes.
Q. Okay. What was your position before becoming the safety director?
A. Safety officer.
Q. Okay. Did you have any other positions besides that?
A. At HMD?
Q. Yes.
A. No.
Q. What does a safety officer at HMD -- what are their job duties?
A. Safety officers are auditing the logbooks, helping the drivers to fill out application, going through the company regulations, working with the DQ file, running the records, working with pre-employment history.
Q. And how many safety officers does HMD have?
A. One, two, three, four, five, six, seven.

Q. Okay. And what about at the time of this collision in 2016?

Strike that.

What about at the time Mr. Gisca was hired in August of 2016?

A. I cannot tell you the exact number, but it was less than that.

Q. Okay. And you are the safety director. What is -- what do you -- what are your job duties?

A. Supervising my safety team, the safety officers, working with the accidents, insurance claims, monitoring the drivers' safety performance, working with State permits, quarterly filing taxes.

Q. Have you personally had any role in creating any of the policies that HMD has in place that were in effect at the time of this collision?

A. I would be one of them.

MR. MOHS: Okay. Like, for instance, I'll mark as 26 a document titled HMD Company Policy and Operating Procedures.

(Whereupon, Plaintiff's Deposition Exhibit No. 26 was marked for identification.)

BY MR. MOHS:

Q. Have you seen that document before?

A. Yes.
Q. And that was provided to us as one of the policies that HMD has in place at the time of this collision?
A. Yes.
Q. Did you have a role in creating that document or was it already in place when you took over?
A. I -- the majority of the policy was in place before I started my employment here.
Q. Okay.
A. I want to say that I was involved in the charges that talks about on Page 7.
Q. And what you're referring to there, is it the section titled Consequences of Non-Compliance?
A. Yes.
Q. Okay. So you helped develop this system of punishment for hours of service violations or unsafe driving/moving violations?
A. Yes, I was involved.
Q. Okay. You mentioned that you had prior experience at other motor carrier -- at another motor carrier or several motor carriers? I can't remember.
A. One motor carrier. The name was Unlimited

Carrier.
Q. And where were they located?
A. Lansing, Illinois.
Q. And what did you do at Unlimited Carrier?
A. I was mostly involved in the DQ file, helping to go through the -- filling out the application, the orientation process, the employment verification.
Q. Basically the things you need to do at the hiring stage of getting a driver, make sure they're qualified?
A. Yes.
Q. Okay. And when did you work at Unlimited Carrier?
A. Right before HMD.
Q. Do you know how long you worked there?
A. Probably little bit less than two years.
Q. Okay. So maybe approximately 2008 to 2010?
A. Yes.
Q. And what did you do before you worked at Unlimited Carrier?
A. I was going to college.
Q. Okay. When did you graduate -- was it Prairie State you said?
A. Yes.

Q. When did you graduate from Prairie State?
A. Let's say 2013. I'm not sure of the year.
Q. Okay.
A. It took me two, three years.
Q. So were you going to school and working at the same time?
A. Yes, I believe so.
Q. Because I think earlier -- I just want to make sure we're on the same page -- you said that you started at HMD around 2010, 2011, somewhere around there.
A. Nine years ago, yes.
Q. Were you still going to Prairie State at that time?
A. No. I was done with that.
Q. Okay. I think earlier you said you came here about 14 years ago to America? Does that sound right?
A. I said so, but let me think.
Q. Because that would put us --
A. Maybe 15.
Q. That would put us back --
A. I was 19 years old.
Q. Okay.
A. Now, I'm 34.

Q. Okay. And that would put us back about 2004, 2005 --
A. Yeah.
Q. -- somewhere around there?
A. Yes.
Q. And you went to school two or three years, three or four years?
A. For two, three years.
Q. Okay. That brings us to '06 or '07. And is that when you -- was your first job out of school working at Unlimited Carrier?
A. Yes.
Q. Okay.
A. No. Hold on. I worked at the Toys 'R' Us or Baby 'R' -- Babies 'R' Us for few months.
Q. And what did you do for Babies 'R' Us or Toys 'R' Us?
A. I was to help people to register for baby shower, I think.
Q. Okay. In the store.
A. Yes.
Q. All right. HMD Trucking, Inc. is an Illinois corporation; is that correct?
A. Yes.
Q. And it's also a motor carrier registered

with the United States Department of Transportation?
A. Yes.
MR. MOHS: If we could pull up number 51.
(Whereupon, Plaintiff's Deposition Exhibit No. 27 was marked for identification.)
BY MR. MOHS:
Q. I'm marking as 27 a copy of the company snapshot from the USDOT website.
A. Yes.
Q. This was printed back in October of 2018. This shows HMD has 150 power units, which means trucks. Does that sound about right?
A. Yes.
Q. And 138 drivers?
A. Yes.
Q. And are most of those drivers employees or are they independent contractors?
A. We have a mix of drivers. I would say we have majority of them the independent contractors.
Q. Okay. Do you have an idea of the percentage?
A. Let's say 70 percent.
Q. Okay. And it says on there below -- it says you're authorized for hire.
A. Yes.

Q. And for interstate operations.
A. Yes.
Q. And you guys are registered for general freight, building materials, garbage and refuse, beverages and paper products; is that correct?
A. Yes.
Q. Do you operate across the United States?
A. Yes.
Q. HMD understood that in order to become a motor carrier with authority to operate across the country, it had to take on certain legal duties and responsibilities.
A. Yes.
Q. And among those are to comply with Federal and State law.
A. Yes.
Q. Including complying with the Federal Motor Carrier Safety Regulations.
A. Yes.
Q. You also need to act in a reasonable and safe manner as a motor carrier.
A. Yes.
Q. And you need to know and comply with industry standards.
A. Yes.

Q. And you have to take reasonable steps to make sure that your drivers are qualified to operate in a safe and reasonable manner commercial motor vehicles on public roadways.

A. Yes.

Q. And you do this because HMD as a company only wants to put drivers on the roadway who are able to safely and reasonably operate commercial motor vehicles.

A. Yes.

Q. You have a duty at the time you hire a driver, whether they're your employee or an independent contractor, to make sure they meet the minimum requirements for safe driving.

Do you agree with that?

A. Yes.

Q. And you as a company have a duty to consider the driver's driving record and any evidence that they have violated the Federal Motor Carrier Safety Regulations or any State laws governing operation of commercial motor vehicles.

A. Yes.

Q. And the idea is that when you're hiring somebody, you're trying to decide, based on looking at their history, are they a person who we think

is qualified to drive and can safely operate a commercial motor vehicle.

A. Yes.

Q. When you hire someone and put them in an HMD truck on the road, you're telling the public that HMD believes this person is safe to drive a commercial motor vehicle.

A. Yes.

Q. When someone who has a laundry list of violations in their history, especially in a short period of time before you've hired them, is that indicative to you of someone who is not able to safely operate a commercial motor vehicle?

MR. O'DANIEL: Object to form.

THE WITNESS: We have policy in place that regulates the hiring process and termination process.

BY MR. MOHS:

Q. And can you point me to that policy?

A. Each violation has certain amount of points.

Q. Okay.

A. And the driver cannot have more than 10 points in order to start working here.

Q. Okay.

A. Same as termination policy.

Q. And where is that policy written?

A. It is -- we have it.

Q. Okay. Do you know where it is? Like is it -- it's not in the document we marked earlier, correct, as exhibit --

A. It was --

MR. O'DANIEL: What period of time are we talking about, I guess, may be a relevant question.

BY MR. MOHS:

Q. Well, first, it's not written -- the policy we're talking about is not written in Exhibit 26.

A. No.

Q. And Mr. O'Daniel makes a good point. Was there a hiring criteria in place at the time Mr. Gisca was hired in August of 2016?

A. Yes.

Q. And is that the policy you're talking about?

A. Probably that's not the same one as we have now.

Q. Okay. So let's break it up. At the time Mr. Gisca was hired, was there -- there was a written hiring criteria from HMD.

A. Yes.

Q. And do you know where that is written down?

Do you know if that's been provided to us as part of this case?

A. I'm not sure.
Q. And what about -- there is a current hiring criteria policy in place I think that you said is based on points?
A. Yes.
Q. And is that written down in any of the materials that we have here today?
A. I am not sure.
Q. Okay. Is that something that you could get today if we took a break?
A. The current policy? Yeah.
Q. Yes. What about the past policy?
A. I would -- it probably will take me some time to locate that.
Q. Okay. When HMD is looking into a potential applicant who's going to drive for them either as an employee or as an independent contractor, you're looking at their driving history to see whether or not they're a safe driver.
A. Yes.
Q. And if someone has 20 violations in a year-and-a-half period, is that ever -- is there ever a situation where you look at a driver who has that many violations and say, you know what, they're safe, we can hire them?

MR. O'DANIEL: Object to form.
THE WITNESS: We go by the policy.
BY MR. MOHS:
Q. On Exhibit 26 -- this is number 21 -- Page 7, the bottom half of that page there we were talking about earlier, consequences of non-compliance. And is this -- are these policies -- do they only apply to drivers after they've been hired by HMD?
A. Yes.
Q. And what it says under the category of unsafe driving/moving violations, the first offense the driver will be required to attend the safety training and receive a fine; is that --
A. Okay.
Q. Is that correct?
A. Yes.
Q. The second offense, the driver will receive one-week suspension and a fine; is that correct?
A. Okay.
Q. Is that correct?
A. Yes.
Q. And then the third offense, they will be disqualified.
A. Yes.
Q. Does that mean they'll be terminated?

A. Yes.
Q. And is there a timeframe that HMD uses or is this just any time a driver reaches their third infraction, they'll be disqualified?
A. We look at the last three years.
Q. And so if a driver had 20 violations within the last three years --
MR. O'DANIEL: Object.
Q. -- they would most certainly be disqualified under this policy.
MR. O'DANIEL: Object to form. It says unsafe driving and moving violations.
THE WITNESS: It depends on the violation.
BY MR. MOHS:
Q. Okay. So yesterday, we -- you were here, and we deposed Mr. Gisca. And we marked as exhibits -- Exhibit 5 is the annual review of his driving record when he was first hired; is that correct?
A. Yes.
Q. And Number 6 is the PSP report that was part of his driver qualification file.
Did HMD obtain that as part of its hiring of Mr. Gisca?
A. Yes.

Q. And then we've also made this chart, which is Exhibit Number 7, showing the violations that Mr. Gisca's driving record -- showing the violations on his driving record in the time period leading up to his time of being hired at HMD.

Do you see that?

A. Yes.

Q. Do you agree with Exhibit 7 that HMD was aware of all of those violations at the time he was hired?

A. I don't see the U-turn ticket that was received on June 19, 2015.

Q. Okay. So number two on that list, HMD was not aware of that; is that correct?

A. Yes.

Q. Any other ones that HMD was not aware of?

A. All good.

Q. Okay. So Exhibit Number 7 that you have in front of you, HMD was aware of all of those violations except for number two, which is the U-turn violation in Washington that occurred on June 19th of 2015.

A. Yes.

Q. Okay. And after being aware of all of those violations by Mr. Gisca, HMD still decided to

hire Mr. Gisca to operate trucks under their motor carrier authority.

A. Yes. He was qualified.

Q. Okay. Can you explain to us how he was qualified given that you knew of 19 violations in the less-than-two-year period before you hired him?

A. In order to be qualified at HMD, you cannot have more than 10 points. So if you look at the list of the violations, we have the seat belt, which would have one point, and following too close is six points. The rest of the violations are maintenance problems.

We still hired the driver since we have new equipment, and how he explained all his violations is that he was working for the company with the old equipment.

Q. So HMD does not place any concern or assign any points to any out-of-service violation?

A. Again, all of the out-of-service violation were maintenance issues.

Q. Does HMD Trucking contest the validity of any of these violations?

A. Again, we -- at HMD, we have new equipment. We don't have anything older than 2016, so we believe that the driver will not have any of these

violation while working with us.

Q. Did anybody at HMD actually have a discussion with Mr. Gisca about these violations?

A. Yes. We always discuss all the violations before the hiring process.

Q. Was it you or was it somebody else?

A. I cannot recall.

Q. And your understanding was Mr. Gisca explained to you that he worked for a company with old equipment and that was his reason for a lot of these violations.

A. Yes. I remember that.

Q. But you knew as a company that Mr. Gisca received these citations. And his only explanation was, well, it's not my fault, it was the company I worked for's fault.

A. I cannot recall the whole conversation, but, again, since we have the new equipment, we believe that the driver will not have more violation working with us.

Q. But the fact of the matter is when you hired him, you knew of 19 violations within a year-and-a-half period before you hired him.

A. Yes.

Q. And you hired him in August of 2016; is

that correct?
A. I think so.
Q. And he was involved in this collision less than two months later.
A. Yes.
Q. And HMD believes that Mr. Gisca's driving history as reflected on Exhibit 7 is indicative of a person who would be able to safely operate a commercial motor vehicle.
A. Yes. The driver was qualified to start working at HMD.
Q. And under the guidelines we went through, the policy that we identified on Page 7 of exhibit -- what is that exhibit?
MR. O'DANIEL: Twenty-six.
Q. Twenty-six.
A. Um-hum.
Q. Is it your understanding that Mr. Gisca would be qualified even under those policies at the time you hired him?
A. As we talked before, these are the violation that he would receive while working at HMD.
Q. Okay. So that just doesn't factor into when you're hiring somebody.
A. No.

Q. That's only after they've been hired.
A. Yes.
Q. And if after somebody has been hired and they receive a citation for a equipment violation, that's something that HMD is going to discipline them for, correct?
A. Yes.
Q. Okay. Because at the end of the day, the driver is responsible for making sure the equipment is reasonably safe before they go out on the roadway.
A. Yes.
Q. And the company is also responsible. It's a dual responsibility. Is that a fair statement? It's not just the company's responsibility or just the driver's responsibility.
A. Yes, I agree.
Q. Now, when you hired Mr. Gisca, as part of his application, you asked him -- pursuant to Federal Motor Carrier Safety Regulations, you asked him to provide you with employment history; is that correct?
A. Yes.
(Whereupon, Plaintiff's Deposition Exhibit No. 28 was marked for identification.)

BY MR. MOHS:
Q. I'm marking as Plaintiff's Exhibit Number 28 the excerpt of Mr. Gisca's file. It's titled Safety Performance History Records Request?
A. Yes.
Q. And my understanding of these documents is Mr. Gisca identified his prior employers, and this is the documentation of HMD attempting to contact those prior employers to get information about his driving and safety history.
A. Yes.
Q. And that's what's required of HMD under the Federal Motor Carrier Safety Regulations.
A. Yes.
Q. And he identified three prior employers, United Trans Logistics, Inc., MMJ Transportation, and Infinity, Inc.
A. Yes.
Q. And of those three prior employers, you received no response from United Trans Logistic. If you flip to Page 3 of that exhibit on the bottom, does that detail three different attempts to contact them?
A. Yes.
Q. And HMD could not get a response from United;

is that correct?
A. Yes.
Q. And then from MMJ, you received a response that says Cristian Gisca we have not record for him.
A. Yes.
Q. And then for Infinity, you received no response from them too.
A. Yes.
Q. So when you decided to hire Mr. Gisca, you had no confirmation of any prior employment or safety history of him, correct?
A. We had the safety history by performing driving record, PSP.
Q. Other than the PSP -- what I'm asking is a little different question.
HMD Trucking at the time you decided to hire Mr. Gisca to operate under your motor carrier authority, you had no verification of prior employment from anybody.
A. Yes.
Q. And of the three employers he identified, two never responded and one said that he never worked for them.
Did that cause you any concern as a company?
A. I don't remember off the top of my head,

but if we have a situation like that, we would talk to the driver and discuss the history of -- in each company. And I'm pretty sure he could -- he gave us the good explanation on each company.

Q. All right.

A. That was the reason that we hired him.

Q. So at the time you hired Mr. Gisca, you as a company were aware of 19 violations in the two years prior to hiring him, and you accepted his explanation that it wasn't his fault, it was his prior employers' fault, correct?

MR. O'DANIEL: Object to form.

THE WITNESS: No, I didn't say that.

BY MR. MOHS:

Q. Okay. Explain to me.

A. Are we talking about the maintenance violations?

Q. I'm talking about any of those violations.

A. As I explained before, we go by the point system. He was qualified. He was under 10 points. As far as the employment history, we did everything what we supposed to do by the rules. We attempted three times. And if we don't get the response, we just file it in his DQ file. And, again, I don't remember, but I'm pretty sure we discussed the

employment with the other companies with him. That's the normal procedure.

Q. So I guess what you're telling me is HMD doesn't consider any maintenance or vehicle violations at all when looking at a driver's history when you're trying to decide whether or not you're going to hire them.

A. The points system go by the accidents, the moving violations, and logbook violations.

Q. But not other violations.

A. No.

Q. I mean, those are the rules that your drivers have to follow as well, correct?

A. Yes.

Q. I mean, it's not like HMD gets to decide which Federal Motor Carrier Safety Regulations and which State laws its drivers have to follow, correct?

A. Correct, but we have -- again, we have the new equipment. And we don't have many violations on that area. We don't have problem with -- in that area.

Q. And if you did have violations in that area, you would punish or discipline your drivers for having those violations, correct?

A. It depends on the violation.

Q. What if your driver had those 19 violations after you hire them?

Let's just assume instead of --

MR. O'DANIEL: At one time?

Q. -- those violations being before you hired Mr. Gisca, what if instead he got those violations in the two-year period after you hired him? Would you keep him on as a driver?

A. The maintenance issues if we have with the drivers, we sit down with the shop manager and discuss each violation with him.

If he tells me that that's something that the driver could have prevent, then we do the post violation retraining. We have the videos on PTI, the test, the quiz.

If the violation was not -- something the driver could not see, then there is no punishment for that.

Q. And if it was a situation where you did that and you had a driver who was a repeat violator, at some point you would have to increase the discipline and the punishment, correct?

A. Yes.

Q. And if they continued to violate the policy, at some point you as a company would have

to decide to terminate their employment because that's indicative of a driver who is not safe, who is not following the rules.

A. Yes. It depends on the violations.

MR. MOHS: Okay. I've also brought with us today -- is this the whole thing?

MR. O'DANIEL: That's what you gave me today.

MR. MOHS: Let's go ahead and mark this as Plaintiff's Exhibit 29.

(Whereupon, Plaintiff's Deposition Exhibit No. 29 was marked for identification.)

MR. MOHS: HMD has provided us through the course of this litigation with Mr. Gisca's files. And I put those together as what we think is the driver qualification file.

We're going to go off the record and give you a chance to review that. I want to make sure we've accurately collected all the documents that consist of his driver qualification file.

So let's go off the record real quick.

THE VIDEOGRAPHER: We'll go off the record. The time is 9:50 a.m.

(Recess taken.)

(Whereupon, Plaintiff's Deposition Exhibit No. 30 was marked for identification.)

THE VIDEOGRAPHER: We are back on the record at 10:03 a.m. This is media unit two.

BY MR. MOHS:

Q. Ms. Corsello, first of all, I want to confirm with you, were you able to review Exhibit 29?

A. Yes.

Q. And does that appear to be a full copy of Mr. Gisca's driver qualification file?

A. Yes, I believe so.

Q. You've also -- your attorney has provided us during the break a copy of a set of documents I've marked as Exhibit 30.

A. Yes.

Q. Is that the written hiring criteria for HMD that is currently in place?

A. Yes.

Q. And do you know whether or not this was in place at the time Mr. Gisca was hired?

A. I don't believe so.

Q. Okay. And that's something that it will take you a little bit more time to find.

A. Yes.

MR. MOHS: Okay. So we've been talking about driver hiring and driver qualification. I'm marking as Exhibit Number 31, this is 52.

(Whereupon, Plaintiff's Deposition Exhibit No. 31 was marked for identification.)

BY MR. MOHS:

Q. This is a copy of one of the Federal Motor Carrier Safety Regulations, 391.25, subsection (b). And what it says is that motor carriers shall, at least once every 12 months, review the motor vehicle record of each driver it employs to determine whether that driver meets the minimum requirements for safe driving.

And there's two subsections. The motor carrier must consider any evidence that the driver has violated any applicable Federal Motor Carrier Safety Regulations.

Did I read that correctly?

A. Yes.

Q. And the motor carrier must consider the driver's accident record and any evidence that the driver has violated laws governing the operation of motor vehicles.

Did I read that correctly?

A. Yes.

Q. And that's what you're required to do as a motor carrier when you're hiring somebody and when you're reviewing their record on an annual basis.

MR. O'DANIEL: Object to form. It says annual inquiry and review of driving record.

BY MR. MOHS:

Q. You can answer the question.

A. Annually, yes.

Q. And that doesn't start after you hire a driver. You have to look at their record when you first hire them too, right?

A. Yes.

Q. And you have to consider their driving record.

A. Yes.

Q. Not just the violations that HMD considers to be important. You have to look at all violations.

A. Yes.

Q. And HMD -- I want to make sure I understand your testimony earlier when we were looking at Mr. Gisca's driving history.

HMD did not consider any of the violations related to vehicle maintenance or vehicle compliance in assessing Mr. Gisca's driving history and whether

or not he would be a safe driver.

MR. O'DANIEL: Object to form.

THE WITNESS: We did look through them, of course. We always review each violation. But according to the policy, the driver was qualified.

BY MR. MOHS:

Q. Okay. Ms. Corsello, you were here yesterday for Mr. Gisca's deposition.

A. Yes.

Q. And he went through that violation -- that same list of violations yesterday and provided his explanations for those violations, correct?

A. Yes.

Q. If Mr. Gisca received those violations after he was hired by HMD and he gave the same explanations yesterday as he gave -- that he would give to you, would HMD allow him to continue driving a truck under HMD's motor carrier authority?

MR. O'DANIEL: Object to form.

THE WITNESS: We would have to review the whole file in order to make a decision.

BY MR. MOHS:

Q. I guess what I'm saying, you have the whole file. You heard his explanations yesterday. And so would that be a driver that you would allow

to continue to drive an HMD truck?
MR. O'DANIEL: Object to form. You're asking her -- I guess we need to clarify if he's getting 19 violations on one day or they have a violation and then another day another one. How is -- I don't understand your question.
BY MR. MOHS:
Q. Let me rephrase it.
If Mr. Gisca was hired by HMD and then over the course of the next two-year period he received those violations, all 19 of the violations you were aware of, and he gave the explanations that he gave yesterday to you when you asked him about it as a company, would that be someone that you would allow to continue to drive for HMD?
A. He would have -- he would have to go through the certain trainings after those accidents.
Q. But you would still allow him to continue to drive?
A. I cannot answer this question.
Q. Okay. Also, the one violation -- Exhibit 7. I might have it right here. You have it. Okay. Exhibit 7.
The violation that you weren't aware of, the U-turn violation, number two.

A. I don't see it at the PSP, so I would assume that, yeah.
Q. Okay. And we provided -- well, first, how many points would that be under the new system, a U-turn violation?
A. I believe it's a one-point.
Q. And just -- I handed you Exhibit 8 just to show you that that's the U-turn ticket that we were able to obtain --
A. Okay.
Q. -- from the State of Washington.
That's something -- that document, Exhibit Number 8, that's something that HMD did not obtain as part of its investigation into Mr. Gisca's driving history.
A. We run the MVR, the PSP. And if it didn't show up, then we don't know about this violation.
Q. Okay. And that's not a violation that Mr. Gisca disclosed to you guys.
A. I don't believe so.
Q. Okay. And your testimony is under the new system, that would be a one-point violation?
A. I believe so.
Q. All right. And where is that document? Can you show me on there where it goes through the

point system?
A. This is not specified in this policy.
Q. Okay. Earlier I thought you testified -- and correct me if I'm wrong -- a moving violation like following too closely is a six-point violation.
A. Yes. Following the policy, he has six points.
Q. And I thought your explanation was a moving violation is a six-point violation. Is that --
A. Following too close, yes.
Q. Just following too close.
A. Yes.
Q. A U-turn violation is a different point value?
A. I have to take a closer look. I don't remember the exact amount of points, but I believe it's one. I'm not sure.
Q. And what you have to look at is Exhibit 30 that's in front of you there, correct?
A. It's not in this policy.
Q. So as you sit here right now, you don't know what points you would assign to that U-turn violation if you had known about it when you hired Mr. Gisca.

A. I am not sure right now.
Q. All right. I think we confirmed this. Mr. Gisca was operating within the course and scope of his agency with HMD at the time of this collision.
A. Yes.
Q. And he was operating under HMD's motor carrier authority at the time of the collision.
A. Yes.
Q. HMD agrees that if a jury determines that Mr. Gisca was negligent, HMD would be legally responsible for his actions via respondeat superior or vicarious --
MR. O'DANIEL: Can you repeat your question? I'm sorry.
MR. MOHS: Sure.
BY MR. MOHS:
Q. Does HMD agree that if a jury determines that Mr. Gisca was negligent, HMD would be legally liable via vicarious liability?
MR. O'DANIEL: Object to form.
THE WITNESS: I -- I'm not -- I cannot answer this question.
BY MR. MOHS:
Q. Okay. I guess I'm just trying to find out, you're not claiming that you're not vicariously

liable for your driver.

MR. O'DANIEL: Object to form.

THE WITNESS: Say it again.

BY MR. MOHS:

Q. HMD as a company is not trying to claim that you're not vicariously liable for your drivers' -- including your independent contractors -- negligence, if they are negligent.

MR. O'DANIEL: Same objection.

THE WITNESS: No, that's not what I said.

BY MR. MOHS:

Q. Okay. I just wanted to confirm that.

As a motor carrier, HMD has a legal duty to train its drivers?

A. Yes.

Q. And what training did you provide to Mr. Gisca?

A. The training course has multiple topics, such as driving construction, speed and space management, defensive driving. We have a hazmat video. We have a course of -- we providing the training on logbook rules.

And this year we added additional training on ELD. We have emergency maneuvers course. Each topic has a video and a test and a quiz at the end.

The driver must complete all of those in order to start driving.

Plus, we have additional -- well, we're not talking about the trainings, right -- I mean, the -- like the road test and logbook test also included in that process.

Q. Okay. The training that Mr. Gisca was provided, did that last over a day period?

A. Normally it's three-day course.

Q. Okay. Do you know whether or not he went -- underwent a three-day course or was -- I think he said yesterday it was a one-day.

A. I heard him say in one day, but normally it takes three days. It's -- first day we do the road test, the drug test. It takes time. Then the driver must fill out the application, then the whole training course, introduction to dispatch, to safety officers. So the driver leaves on the third day, so it's full two days and probably two and a half.

Q. Okay. And during the courses, I think you said there's videos and then there's quizzes. Are there any written materials that go along with the courses?

A. Tests after each video.

Q. Other than the test, there's no -- there's not a manual that . . .
A. Well, the driver must complete the logbook test. He gets the simple week trips, and he must put it on seven sheets of logbooks.
Q. Okay. So after Mr. Gisca went through that process, did he receive any other training from HMD at any time?
A. No, I don't think so.
Q. Does HMD conduct regular safety meetings?
A. We used to, not now. I can't recall if we used to have it in 2016.
Q. Okay. Mr. Gisca did not receive any in-truck training or orientation other than his road test.
A. We do a quick PTI training.
Q. Okay. Professional Truck Institute?
A. Pre-trip inspection.
Q. Oh, okay. And that's done by --
A. Currently --
Q. -- a current driver?
A. No. It's by recruiter. He's a CDL holder.
Q. Does HMD ever publish and disseminate any safety bulletins to its drivers?
A. Normally if we have something to publish,

it goes via Viber.
Q. Via . . .
A. Viber.
Q. And what is that?
A. It's application for texting.
Q. Okay.
A. Viber.
Q. Is it --
A. You know, like Skype and Viber.
Q. V --
A. V-i-b-e-r.
Q. Okay.
A. So almost every driver has that --
Q. Okay.
A. -- so if we have something to tell them. And, again, that's currently. I can't recall if it was back in 2016 the same application.
Q. And that's how you currently communicate as a company with your drivers?
A. Yes.
Q. Okay. Is that a system you can go into and check the history?
A. Yes.
Q. Have you gone in and checked the history of your communications with Mr. Gisca?

A. I don't remember. Sorry.
Q. Okay. Was Mr. Gisca ever disciplined or punished or retrained or counselled at any time at HMD?
A. Yes.
Q. All right. Tell me about those times.
A. I believe he received -- the following too close ticket, that's where he was given a verbal warning.
Q. Okay. Any other discipline at HMD?
A. No.
Q. And that was a ticket he received after the collision we're here to talk about.
A. No. The one that was -- I don't see the date.
Q. These -- Exhibit 7 shows all violations from before he was hired. And it includes a following too close violation from January of 2016. That's before he was hired at HMD.
Do you think there was another following too closely violation?
A. Yes, I think so.
Q. And you think it was before the collision or after the collision?
A. After.

Q. Okay. Any other discipline from HMD?
A. No.
Q. So I want to make sure we've identified all of HMD's policies and procedures. We've marked already as an exhibit the company policy.
A. Okay.
Q. We've also marked as an exhibit the current hiring criteria.
A. Yes.
Q. Does HMD have a written cell phone policy?
A. Yes.
(Whereupon, Plaintiff's Deposition Exhibit No. 32 was marked for identification.)
BY MR. MOHS:
Q. And is it this document, what I've marked as 32?
A. It looks different now.
Q. Okay.
A. But, yes, I recognize this.
Q. Was there a different policy in place at the time Mr. Gisca was involved in this collision or is --
A. No. This was the one.
Q. And that is Exhibit 32.

A. Yes.
Q. That was in place.
A. Yes.
Q. And there's a new cell phone policy in place?
A. It's not new. It just looks a little bit different.
Q. Okay.
A. Different format, but it basically is the same thing.
Q. There was also a contractor and cargo security policy?
A. Yes.
Q. I'm not going to mark that. I just want to make sure we're -- we also got a list of company regulations?
A. Yes.
Q. And a drug and alcohol testing policy?
A. Yes.
MR. MOHS: We'll mark that one. That's Exhibit 33.
(Whereupon, Plaintiff's Deposition Exhibit No. 33 was marked for identification.)

BY MR. MOHS:
Q. Exhibit 33 was the policy in place at the time Mr. Gisca was involved in the subject collision?
A. Yes.
Q. And then does HMD also provide copies of J.J. Keller materials to its drivers, like an hours of service manual and a --
A. Yes, we do have several. CSA.
Q. CSA driver's guide?
A. Yes.
Q. Roadside inspections driver's handbook?
A. Yes.
Q. And a copy of the Federal Motor Carrier Safety Regulation Pocketbook?
A. Yes.
Q. Okay. Were there any other policies in place at the time of this collision that we have not identified or discussed today?
A. No, I don't think so.
Q. Okay. And HMD, you implement these policies that we've discussed in order to help your drivers understand what you as a company expect of them in operating commercial motor vehicles for your company.

A. Yes.
Q. And you want to take steps in order to be as safe a company as possible.
A. Yes.
Q. And safety is very important to HMD.
A. Yes.
Q. And HMD wants to follow industry standards.
A. Yes.
Q. And what is HMD's cell phone policy at the time of this collision in terms of being able to drive and use a cell phone?
A. We allow the drivers to use the hands-free device.
Q. And what was the thinking behind that as a company?
Why are drivers allowed to -- well, strike that.
First, let me confirm, does HMD allow its drivers to talk on a bluetooth cell phone device while operating HMD trucks on the road?
A. Yes.
Q. Does HMD think that that is at all distracting?
A. We believe -- we allow the drivers to do so.
Q. Does HMD think that engaging in a phone

call while operating a commercial motor vehicle is distracting?

A. Not necessarily.

Q. But it can be.

A. Not if you are on bluetooth.

Q. It can never be a distraction when you're on bluetooth?

A. It depends on the situation.

Q. Has HMD looked towards industry standards and what other motor carriers do in this regard in terms of their policies related to cell phone use?

A. Yes. A lot of companies using hands-free device.

Q. And there are also a lot of companies that don't allow their drivers to use their cell phones at all while driving. Are you aware of that?

MR. O'DANIEL: Object to form.

THE WITNESS: Every company has different policies.

BY MR. MOHS:

Q. Does HMD agree that in order to be a reasonably safe commercial motor vehicle driver, a driver needs to give a hundred percent of his or her attention to the task of driving?

A. Yes.

Q. And anything less would be unacceptable.

A. I would agree.

Q. And engaging in a personal phone call while driving down the road is not giving a hundred percent of your attention to the task of driving.

A. I don't believe so.

Q. Okay. Has HMD gone to any sources either in the government or in the industry to determine what the industry thinks about whether or not engaging in phone calls even on a bluetooth device is distracting?

A. I cannot answer this question.

Q. Are you familiar with the National Safety Council?

A. No, not sure.

Q. Sorry?

A. No, I'm not sure.

Q. Okay. Are you familiar with some of the larger motor carriers like Schneider or R&L or FedEx or CSX? Have you heard of any of those motor carriers?

A. Yes.

Q. Are you aware that all of those motor carriers have policies in place that prohibit their drivers from using a cell phone at all while driving?

MR. O'DANIEL: Object to form.

THE WITNESS: No, I'm not sure. I don't know about those companies.

BY MR. MOHS:

Q. Okay. Does that cause you concern that maybe you should change your policy as a company?

A. No.

Q. HMD wants to make sure it has safe drivers.

A. Yes.

Q. It expects its drivers to exercise ordinary care while operating commercial motor vehicles.

A. Yes.

Q. It expects its drivers to know and comply with Federal and State law.

A. Yes.

Q. Including the Federal Motor Carrier Safety Regulations.

A. Yes.

Q. You expect your drivers to keep accurate and truthful logs.

A. Yes.

Q. You expect your drivers to know and comply with the CDL manual.

A. Yes.

Q. You expect your drivers to know and comply with industry standards.

A. Yes.
Q. And you expect your drivers to know and comply with HMD's policies.
A. Yes.
Q. Yesterday I had a discussion with Mr. Gisca about how driving a truck is different than driving a car.
Do you remember that?
A. Yes.
Q. Does HMD agree that driving a truck is not like driving a car?
A. Yes.
Q. And is that why there are certain duties and rules that truck drivers have to follow that someone who's driving a car doesn't necessarily have to follow in order to be reasonably safe?
A. Agree.
Q. And that's why they need specialized training and specialized certifications to become a commercial motor vehicle driver.
A. Correct.
Q. And one of the duties in order to be a reasonable and safe commercial motor vehicle driver, they need to be defensive drivers.
A. Right.

Q. And they need to keep a lookout ahead as they're driving down the road.
A. Yes.
Q. And they need to make sure they're looking far enough ahead.
A. Yes.
Q. And they're looking ahead for potential hazards; is that correct?
A. Yes.
Q. And the idea is you're looking out for potential hazards so that you can have enough time and space to react to those hazards in the event they become an emergency.
A. Right.
Q. And another rule they have to follow in order to be reasonably safe is they need to adjust their driving to the conditions present in the roadway.
A. Yes.
Q. For instance, if it's heavier traffic, you need to slow down.
A. Right.
Q. Another important duty commercial motor vehicle drivers have is they need to drive at a safe and reasonable speed.

A. Yes.
Q. It's never acceptable for a commercial motor vehicle driver to exceed the speed limit.
A. Right.
Q. It's never acceptable for a commercial motor vehicle driver to be distracted while driving.
A. Right.
Q. It's never acceptable for a commercial motor vehicle driver to use a handheld device while driving.
A. Right.
Q. Including taking videos while driving?
A. Right.
Q. What is HMD's understanding of what happened in this collision?
A. The driver was -- Mr. Gisca was travelling in the middle lane. He saw the broke-down vehicle on the right side -- on the right lane. He started slowing down. And two or three vehicles cut right in front of him. And he tried to avoid the collision. He swerved to the left.
Q. So is it your understanding that he actually intentionally swerved to the left to avoid the collision?
A. It was either him swerving to the left or

the vehicle automatically moved to the left.

Q. Do you remember yesterday when I asked him about that, he said he never intended to swerve to the left, he just hit the brakes, and the vehicle moved to the left I think because of the curve in the roadway?

A. Yes.

MR. O'DANIEL: Object to form.

BY MR. MOHS:

Q. Is that a fair summary of what he said yesterday?

MR. O'DANIEL: Same objection.

THE WITNESS: That's what I heard yesterday.

MR. MOHS: Okay.

THE WITNESS: Yeah.

BY MR. MOHS:

Q. And, I mean, is HMD basically accepting Mr. Gisca's version of the events as he testified to yesterday?

A. Yes.

Q. Okay. We previously marked as Exhibit 16 Mr. Gisca's written statement to the police.

Have you seen that document before?

A. Yes.

Q. Is it HMD's position that Mr. Gisca was going

55 miles per hour before this incident occurred?
A. Say it again.
Q. Is it HMD's position that Mr. Gisca was going 55 miles per hour before this collision occurred?
A. Yes.
Q. And that's what you think is reflected on that document there, as he explained yesterday.
A. Yes.
Q. It doesn't look to you that he wrote down 65 miles per hour.
A. It looks 55.
Q. Okay.
A. That's what he confirmed that he was travelling 55.
Q. And you would agree that if he was going 65, that would be too fast for the conditions at the time leading up to the subject collision?
A. Yes.
Q. Okay. Does HMD think that Mr. Gisca did anything to cause or contribute to this collision?
A. No, we don't believe so.
Q. There's nothing that Mr. Gisca could have done differently within reason to avoid this collision?
A. No. We believe that he did everything right.

Q. Does HMD think that Mr. Gisca could have slowed down more after he saw the broke-down vehicle and before the vehicles swerved into his lane?

A. According to his statement, he slowed down to 25 miles per hour.

Q. And you have no reason to disagree with that.

A. No.

Q. Does HMD agree that from the time Mr. Gisca saw that vehicle broken down in the right lane that that was indicative of a hazard up ahead?

A. Yes.

Q. And if he also saw that there was two or three or four vehicles in the right lane approaching the broke-down vehicle that it would be expected for those vehicles to take evasive action?

MR. O'DANIEL: Object to form.

THE WITNESS: No, we don't believe so. If somebody cut right in front of you, it's unexpectable movement. You cannot predict that.

BY MR. MOHS:

Q. Okay. So what HMD's testimony and position here today is is that when one of its drivers sees a vehicle broken down up ahead and they also see vehicles approaching that broken-down vehicle, it is not expected or foreseeable that those vehicles

will take evasive action to avoid the broken-down vehicle.

MR. O'DANIEL: Object to form.

THE WITNESS: We believe that Mr. Gisca did everything that he could have done to prevent this accident. He slowed down, but unexpected event, they cut right in front of him, so he could not have avoid that.

BY MR. MOHS:

Q. I understand HMD's position is you're in agreement with Mr. Gisca that you don't think he could have done anything differently in this collision.

A. Yes.

Q. What I'm asking is a little bit different question. What I'm asking is isn't it an expected event -- when a commercial motor vehicle driver is driving down the road and they see a hazard up ahead that other vehicles might not yet see and those other vehicles are approaching that hazard, isn't it an expected event that those vehicles might take evasive action to avoid that hazard?

MR. O'DANIEL: Object to form.

THE WITNESS: You still have to take courses to change the lane. And if they cut right in front of

you, then there is no way we could have avoid that.
BY MR. MOHS:
Q. If instead you see a broken-down vehicle up ahead and you slow down enough to give more space between you and the other vehicles that are approaching the broken-down vehicle so that if they do take evasive action they have the room to move into your lane without you having to slam on your brakes, isn't that what you're supposed to do in the exercise of reasonable care in a situation like that as a commercial motor vehicle driver?
MR. O'DANIEL: Object to form.
THE WITNESS: That's what Gisca do. He slowed down to let those vehicles to change the lanes, but he was not expected them to make it that quick.
BY MR. MOHS:
Q. He slowed down, but we all agree that what actually happened is there was not enough space for them to move over without there being an emergency situation.
MR. O'DANIEL: Object to form.
THE WITNESS: According to his statement, he -- there was enough space.
BY MR. MOHS:
Q. There was enough space. But we know that

he -- once they did move over, he had to take evasive action by slamming on his brakes.

A. Because those vehicles cut right in front of him.

Q. If he had slowed down further sooner, there would have been more space for them to move over in front of him without him having to slam on his brakes.

MR. O'DANIEL: Object to form.

BY MR. MOHS:

Q. Do you agree with that statement?

A. Well, I believe he started slowing down once he saw the hazard on the side of the road.

Q. Do you think that Mr. Gisca was distracted at all while he was driving down the road?

A. No.

Q. You don't think that engaging in a phone call with his wife at the time of the collision at all took away from his attention on the road?

A. No, I don't believe so.

Q. Okay. And HMD thinks that that is safe and reasonable conduct for its drivers to be on the phone?

A. To using hands-free device, yes.

Q. So at HMD -- I think earlier we identified

you have over a hundred drivers that work for you.
A. Yes.
Q. Over a hundred drivers that work for you either as employees or as independent contractors.
A. Right.
Q. Is it okay if all of those drivers are regularly engaging in phone calls while driving all across the country?
A. On hands-free device, yes.
Q. Okay. Do you think that Mr. Gisca would have been able to see a disabled vehicle sooner and better anticipate what was going to happen if he was not on a phone call?
A. No, I don't think so.
Q. Does HMD agree that Mr. Glenn, my client, did nothing to cause or contribute to this collision?
A. Yes, we agree.
Q. Is it HMD's position that the vehicle or vehicles that moved in front of Mr. Gisca are a hundred percent responsible for causing this collision?
A. I would say not hundred percent. I would also blame the guy who was on the side of the road -- not the -- on the third lane.
Q. Okay. So HMD's position is that the people

who are responsible, in whatever combination, are the person controlling the disabled vehicle and the person or persons controlling the vehicles that swerved in front of Mr. Gisca.

A. Yes.

Q. HMD's position is that Mr. Gisca is not responsible at all for causing this collision.

A. Yes.

Q. Did HMD investigate this collision?

A. Yes.

Q. Who investigated it for HMD?

A. Me.

Q. All right. And what did you do to investigate the collision?

A. I collected all the information that was available to me, such as police report, driver's statement.

Q. And did you talk with Mr. Gisca?

A. Yes.

Q. And what was your determination?

A. That it was a non-preventable accident.

Q. Okay. And is that something that HMD does after every collision, you investigate and determine whether a collision is preventable or not?

A. Yes.

Q. And what standards do you use as a company in order to determine whether a collision is preventable?
A. The mixture of all the factors.
Q. I mean, are there -- is there written materials that you rely on to help?
A. No, I don't have that.
Q. Okay. Did you review Mr. Gisca's driver log after this collision?
A. I do not remember.
Q. Okay. And yesterday we marked as Exhibit 10 Mr. Gisca's log.
A. Um-hum.
MR. MOHS: Number 13.
BY MR. MOHS:
Q. And Mr. Gisca testified that there are inaccuracies on this log. Do you --
A. Yes, I heard that.
Q. Do you remember that?
That's not something that HMD determined at the time of the collision or in the aftermath, correct?
A. I can't remember, but I believe we would look at the log to see how much rest he had before the accident.

Q. Okay. But we do know that based on the Lytx data that was provided, which is Exhibits 11 through 14, that the data does not match up with what is shown on the log in terms of when he's driving and when he's off duty.

A. Yes.

Q. And so HMD as a company agrees that Mr. Gisca's log for the date of September 6th, 2016 is not accurate.

A. Yes. It doesn't match with the time of the accident.

Q. Okay. But it also doesn't match with his movements after the accident.

A. Okay. I agree.

Q. There's more than one inaccuracy on that log.

A. I agree.

Q. Okay. And that's Exhibit 10.

A. Um-hum.

Q. And if you found that out, that would be something that you would discipline Mr. Gisca for.

A. It depends on the violation.

Q. Well, I'm -- the violation we're talking about is the log violation.

A. Are we talking about the time that is not

matching with the accident?

Q. All of the inaccuracies in the log.

A. We would talk to the driver and ask him to explain.

Q. Okay. Mr. Gisca also received a citation as a result of this collision. Are you aware of that?

A. Yes.

Q. And he paid the fine?

A. Yes.

Q. And he submitted documentation, including documentation of his intent to plead guilty.

MR. O'DANIEL: Object to form.

BY MR. MOHS:

Q. Did you see that yesterday?

A. I saw it.

Q. And that would be a violation of HMD policy that HMD would discipline him for; isn't that correct?

Strike that. Let me ask it a different way.

HMD at the time of this collision had a policy in place governing discipline for moving violations, correct?

A. Right.

Q. And under that policy, HMD should have disciplined Mr. Gisca for the citation that he paid?

MR. O'DANIEL: Object to form.

THE WITNESS: Not on this one because we don't agree with the citation.

BY MR. MOHS:

Q. Okay. Even though he paid the fine?

MR. O'DANIEL: Object to form.

THE WITNESS: He -- yeah. We don't agree with this.

BY MR. MOHS:

Q. Okay. So that policy that we discussed earlier does not apply when HMD disagrees with the citation.

A. The driver also disagreed with the citation.

Q. I'm sorry?

A. The driver also disagreed with the citation.

Q. Okay. So when the driver or HMD disagrees with the citation, then HMD's policy doesn't apply?

A. The driver hired the attorney to fight the ticket, so we wait for the court decision. That's when the action is taken.

Q. Okay. Well, do you understand that he paid a fine and did not challenge it with the court? There wasn't --

MR. O'DANIEL: Object to form.
BY MR. MOHS:
Q. There wasn't a court decision?
A. I'm sorry. Say it again.
Q. Here. So we've previously marked as Plaintiff's 19 a copy of Mr. Gisca's affidavit that was submitted.
A. Okay.
Q. And as 20, the citation, and the disposition on the second page of 20.
And there was no court decision that was made. Instead, what happened was Mr. Gisca paid a fine and his attorney signed that disposition, which is Exhibit 20.
A. Okay.
Q. And Mr. Gisca signed that affidavit, which is Exhibit 19.
MR. O'DANIEL: And Exhibit 20 indicates he pled nolo.
BY MR. MOHS:
Q. And Exhibit 20 indicates he pled nolo. Exhibit 19 indicates he intended to plead guilty.
MR. O'DANIEL: Object to form.
THE WITNESS: And as he stated yesterday, he was not understanding what he is signing.

BY MR. MOHS:
Q. What I'm asking you is as a company there was no court determination that the citation was dismissed. And you as a company have a policy disciplining drivers if they receive citations.
A. The case is still under the process, so we cannot determine whose fault was that. I mean, we did determine, but it's still under investigation.
Q. The case is still under investigation. You guys are still trying to decide --
A. No.
Q. -- whether or not you're going to discipline him?
A. Not HMD, but it's still -- the case is still not closed.
Q. Okay. I just want to make sure I've given you a fair opportunity here. HMD has a policy that governs moving violations of its drivers. And Mr. Gisca received a moving violation citation as a result of this collision for which he paid a fine. And HMD's position is that you don't have to discipline him or follow your policy because you disagree with the citation.
MR. O'DANIEL: Object to form.
THE WITNESS: This citation did not affect his

driving record.
BY MR. MOHS:
Q. Okay. Why not?
MR. O'DANIEL: Object to form.
THE WITNESS: That was the court decision.
BY MR. MOHS:
Q. There was a Lytx DriveCam installed in the truck that Mr. Gisca was driving?
A. Yes.
Q. And we've pulled it up. Is that a photo of --
A. Yes.
Q. -- what it looked like?
A. Yes, I believe so.
Q. And did -- do you as a company have an understanding that there are manual trigger buttons on the camera that the driver can press to preserve any video data?
A. I was not involved in this project. I believe so, but I'm not sure.
Q. Did HMD as a company provide any training to its drivers on how the Lytx DriveCam works?
A. I believe so. It was different person who was assigned to this project.
Q. Were there any written materials that were

provided to drivers?
A. No.
Q. Do you know whether or not Mr. Gisca received any training on how the DriveCam works and whether or not he can manually trigger the system to save an event?
A. That's what the person who is responsible for that supposed to have done.
Q. Okay. Do you know whether or not they did that?
A. I cannot tell for them.
Q. Was there any other data on the truck or -- strike that.
Was there any other system on the truck that had the capability of storing data from the collision?
A. No. Just this one.
Q. Okay. Well, there is an ECM, an engine control module, in the truck.
A. Okay.
Q. And that could have been preserved if the truck was not moved. Do you understand that?
MR. O'DANIEL: Object to form.
THE WITNESS: Yes.

BY MR. MOHS:
Q. There -- Mr. Gisca also had a cell phone, correct?
A. Yes.
Q. Did HMD ask to get any of the data from the cell phone?
A. No.
Q. Is it HMD's understanding that there's no available data from any system related to this collision other than the Lytx data that we've previously identified as Exhibits 11 through 14 I think? Yeah, 11 through 14.
A. Yes, just this.
Q. Okay. And did you have any role in pulling that data?
A. Again, that was another person. His name was Ovie who was assigned to this project. So normally if we have an accident, we would request the data from him.
And I do remember asking him right after the accident. And he was not able to pull anything. And I'm pretty sure he even tried to contact the customer service for that, and they couldn't find anything.
Q. Okay. And did they or did you as a company

determine, you know, why there was no data from the Lytx system from this collision?

A. In order to get the video to start recording the event, it has to be some kind of, like, hard braking event, that's what trigger this.

Q. And so whatever -- do you know what the parameters are of that hard braking event?

A. In Lytx, no.

Q. You don't know if it's -- I think typically on an ECM it's seven or seven and a half miles per hour change in a less-than-one-second period.

A. I'm not sure about this.

Q. You don't have any idea?

MR. O'DANIEL: Object to form.

BY MR. MOHS:

Q. Okay. Whatever the system is, Mr. Gisca's braking maneuver on the date of the collision was not strong enough to trigger an event in the Lytx DriveCam system.

A. I would assume so.

MR. O'DANIEL: Object to form.

THE WITNESS: I'm not sure.

BY MR. MOHS:

Q. Well, that's the information you found out

as a company, correct?

A. Yes.

Q. Do you know the exact model of the Lytx DriveCam that was in Mr. Gisca's vehicle?

A. No, I don't.

Q. Is that something you could find out?

A. Yes.

Q. After this collision, HMD did not drug or alcohol test Mr. Gisca; is that correct?

A. Yes.

Q. And you understand that the Federal Motor Carrier Safety Regulations require a post collision drug and alcohol test after this collision?

A. No.

MR. O'DANIEL: Object to form.

MR. MOHS: No? Okay.

Let's pull up 54. I'll mark this as Plaintiff's Exhibit 34.

(Whereupon, Plaintiff's Deposition Exhibit No. 34 was marked for identification.)

BY MR. MOHS:

Q. This is a table that comes right out of the regulations. It's 382.303 (a) and (b).

Have you seen this before?

A. Yes.
Q. And I have added the red marks on there.
This collision did not involve a human fatality.
A. No.
Q. And what this collision did involve was disabling damage to any motor vehicle requiring that the vehicle be towed away.
A. No, it wasn't.
Q. Neither vehicle was towed away?
A. No.
Q. That's your position?
A. Yes.
Q. Okay. If Mr. Glenn testifies that his vehicle was towed away after the collision, would you have any reason to disagree with that?
A. Well, if he testify it was towed, I would have to believe it, but at the time of the accident we were not aware of the towing.
Q. Okay. And who was your source of that information?
A. From the driver.
Q. Okay. If the vehicle was towed away, you would agree that a drug and alcohol test was required in this situation.

A. Yes.
Q. And that's because your driver received a citation.
A. Yes.
Q. Okay. So in this collision that we're here to talk about, it involved a driver that HMD had hired approximately a month and a half beforehand, correct?
A. Yes.
Q. And at that time HMD was aware of 19 violations of Federal or State laws of which HMD determined were explainable by the driver, correct?
MR. O'DANIEL: Object to form.
THE WITNESS: He was qualified by the policy.
BY MR. MOHS:
Q. Okay. HMD determined that he was qualified in light of the 19 violations you were aware of and the fact that you also were unable to verify any prior employment.
MR. O'DANIEL: Object to form.
THE WITNESS: He was qualified under the policy.
BY MR. MOHS:
Q. Okay. After the collision, he was cited and paid the fine. And HMD did not discipline him at all, correct?

MR. O'DANIEL: Object to form.
THE WITNESS: Yes.
BY MR. MOHS:
Q. HMD failed to perform a drug or alcohol test.
A. No.
Q. Well, you did not perform a drug or alcohol test.
A. Because it was not required.
Q. Okay. I understand your position it was not required. I'm confirming that you did not, in fact, perform a drug or alcohol test.
A. We did not do that.
Q. Okay. Your driver had a inaccurate log from the date of the collision.
A. Yes.
Q. And it's your position that your driver and HMD exercised reasonable care related to the hiring of Mr. Gisca and related to -- strike that.
It's your position that HMD exercised reasonable care related to the hiring of Mr. Gisca.
A. Yes.
Q. And it's your position that your driver exercised reasonable care in the moments leading up to the subject collision.

A. Yes.
Q. Do you as a company look at your safety rating with the Federal Motor Carrier Safety Administration?
A. Yes.
Q. And how often do you look at that rating?
A. Monthly.
Q. And was that something you were doing at the time of this collision?
A. I believe so.
MR. MOHS: Let me mark as Plaintiff's Exhibit 35, this is 65.
(Whereupon, Plaintiff's Deposition Exhibit No. 35 was marked for identification.)
BY MR. MOHS:
Q. This is a copy of the company safety profile from the Federal Motor Carrier Safety Administration for HMD from the 23rd of September of 2016.
A. Yes.
Q. And at that time HMD had a score of 87 for unsafe driving and for driver fitness.
Do you see that?
A. Yes.

Q. And your understanding of what that means is that you are only safer than 13 percent of other motor vehicles similar -- of similar size -- motor carriers of similar size to your company.

A. Yes.

Q. And for hours of service compliance, you're in the 96th percentile, which means you're only safer than four percent of similar sized motor carriers, correct?

A. Yes.

Q. Okay. Do you think those are acceptable numbers?

A. Yes.

Q. Okay. At the time of this collision, HMD had insurance coverage through RLI; is that correct?

A. Yes.

(Whereupon, Plaintiff's Deposition Exhibit No. 36 was marked for identification.)

BY MR. MOHS:

Q. And I'm marking as Exhibit Number 36 a copy of the declarations page that was provided in this case as part of the insurance policy.

Is that your understanding?

A. Yes.

Q. That's the policy that applies to this collision?
A. Yes.
Q. And on that policy -- it's policy number LET0012 -- strike that.
It's policy number LET0010212.
A. Yes.
Q. And under coverages provided on Item 3 -- well, first of all, the policy period is from September 1st of 2016 until September 1st of 2017.
A. Um-hum. Yes.
Q. And the coverages provided are 900,000 of aggregate limit of indemnity in excess of self-insured retention.
A. Okay.
Q. Did I read that correctly?
A. Yes.
Q. And then below, under Item 4, it says your self-insured retention is 100,000.
A. Yes.
Q. Are you aware of any coverage or reservation of rights issue related to this collision?
A. No.
Q. Does HMD have any additional insurance coverage that covers this collision --

A. No.
Q. -- other than this insurance that we've talked about?
No other excess or umbrella policies?
A. No.
Q. We talked earlier about HMD's duties in terms of complying with the Federal Motor Carrier Safety Regulations.
A. Yes.
Q. One of the things you have to do as a motor carrier is file with the FMCSA in letting them know whether or not you have a certificate of insurance, a surety bond, or you're a self-insured entity, correct?
A. Yes.
Q. And you have to do this every year.
A. Yes.
Q. And --
MR. O'DANIEL: Object to form.
BY MR. MOHS:
Q. I guess you don't have to do it every year. You have to do it every time your insurance change --
A. Right.
Q. -- your status changes as a motor carrier?

A. You're talking about insurance updates, right?
Q. Yes.
A. Yeah, the agent would do that for us.
Q. Sometimes your insurance lasts longer than a year, and so you don't have to change it if it's a two-year policy, for instance.
A. Right.
(Whereupon, Plaintiff's Deposition Exhibit No. 37 was marked for identification.)
BY MR. MOHS:
Q. And I'm marking as Exhibit 37 a printout from the Federal Motor Carrier Safety Administration for HMD.
A. Okay.
Q. And this includes your insurance history and your filing history as a motor carrier.
A. Okay.
Q. Do you see that?
A. Yes.
Q. And if we go to Page 10 of 14, at the bottom of that page, the last entry is the applicable filing for HMD's insurance policy with RLI.
Do you see that?

A. Yes.

MR. MOHS: If you could zoom in on that last entry, please. Thank you.

BY MR. MOHS:

Q. And so that shows your coverage of a million dollars. And on the top left, it says you filed a Form 82.

Do you see that?

A. Yes.

Q. And a Form 82, MCS-82, do you know what that is?

A. No, I'm not sure.

MR. MOHS: I'll mark a copy as Exhibit 38, a blank form MCS-82.

(Whereupon, Plaintiff's Deposition Exhibit No. 38 was marked for identification.)

MR. O'DANIEL: This is the most recent form?

MR. MOHS: I believe so. Revised January 5th of 2017 is what it says on the top left there.

BY MR. MOHS:

Q. And this is a form you as a motor carrier submit to let the Federal Motor Carrier Safety Administration know who your surety company is, correct?

A. Right.
Q. And that's what you submitted when you identified RLI Insurance as your surety company in 20 -- effective on the date of this collision in 2016.
MR. O'DANIEL: I think it was submitted before then, but . . .
MR. MOHS: Yeah, I don't think it says when it was submitted.
MR. O'DANIEL: It says effective from 2015.
MR. MOHS: Effective date.
BY MR. MOHS:
Q. At some point before this collision, you as a motor carrier submitted a Form 82 like that one or similar to that one letting the Federal Motor Carrier Safety Administration know that RLI was your surety company for a particular time period, including the time of the wreck.
A. I don't do it myself, but I believe the insurance agent filed those forms for us.
Q. You as a company have never filed as a self-insured entity; is that correct?
A. I don't believe so.
Q. And that would be a different form that you have to fill out.

A. I'm not familiar with those forms.

MR. MOHS: Okay. Just to make sure, I'm going to mark as Exhibit 39 a Form BMC-40.

(Whereupon, Plaintiff's Deposition Exhibit No. 39 was marked for identification.)

BY MR. MOHS:

Q. Do you as a company have any knowledge of ever filing a form like this or any similar form letting the Federal Motor Carrier Safety Administration know that you were seeking to qualify as a self-insured entity?

A. I am not sure. I cannot answer this question.

Q. Okay. But based on the knowledge and information you have right now, that's not something you did.

A. Not me.

MR. MOHS: Okay. Let's take a quick break.

THE VIDEOGRAPHER: We'll go off the record -- hang on. We'll go off the record. The time is 11:05 a.m.

(Recess taken.)

THE VIDEOGRAPHER: Okay. We're back on the record at 11:16 a.m.

BY MR. MOHS:

Q. Ms. Corsello, I just had a conversation with your attorney. There's some materials that we're going to request as some of the stuff we've talked about today, like the hiring criteria from 2016.

Will you do your best to help your attorney find that old information, old documentation --

A. Yes.

Q. -- whatever is available?

Have you understood all of my questions today?

A. Yes, I did.

Q. Okay. Is there any answer you want to change or further explain?

A. No.

Q. And is there any information that we did not discuss about this collision or Mr. Gisca that you think we need to discuss as part of this case?

A. No, I don't think so.

MR. MOHS: Thank you very much. I know this wasn't an easy situation to be in. And I appreciate you being here.

THE WITNESS: Thank you.

MR. MOHS: Thank you.

MR. O'DANIEL: I have just one quick question.
MR. MOHS: Okay.
EXAMINATION
BY MR. O'DANIEL:
Q. Ms. Corsello, Mr. Mohs asked you earlier about your investigation of this accident. You said the police report and the driver's statement.
Was there also any -- were there any other statements you reviewed?
A. Also the other driver's statement who was driving that Mercedes.
MR. O'DANIEL: Okay. That's all I had.
THE WITNESS: Okay.
MR. MOHS: No other questions. Thank you.
THE COURT REPORTER: Signature?
MR. O'DANIEL: We'll reserve signature on her too.
MR. MOHS: The same thing.
MR. O'DANIEL: Yeah.
THE VIDEOGRAPHER: We are going off the record. This is the end of media unit number two. The time is 11:17 a.m. and this is the conclusion of the deposition.
(Deposition concluded at 11:17 a.m.)

STATE OF ILLINOIS )
) SS:
COUNTY OF GRUNDY )

I, JEANETTE A. SANDEI, an Officer of the Court, do hereby certify that heretofore, to-wit, on February 26, 2019, personally appeared before me, at 10031 Virginia Avenue, Chicago Ridge, Illinois, NADIA CORSELLO, in a cause now pending and undetermined in the United States District Court for the Northern District of Georgia, Atlanta Division, wherein Robert Glenn is the Plaintiff, and HMD Trucking, Inc., Cristian Gisca, and RLI Insurance Company are the Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to digital format by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was not waived by counsel for

the respective parties.

I further certify that the taking of this deposition was pursuant to notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my verified digital signature this 12th day of March, 2019.



Illinois Certified Shorthand Reporter

1

TO: CLAY S. O'DANIEL

Re: Signature of Deponent Nadia Corsello

Date Errata due back at our offices: 04/12/2019

Greetings:

The deponent has reserved the right to read and sign. Please have the deponent review the attached PDF transcript, noting any changes or corrections on the attached PDF Errata. The deponent may fill out the Errata electronically or print and fill out manually.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Veritext (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time above, the original transcript may be filed with the court without the signature of the deponent.

Please send completed Errata to:

Veritext Production Facility

20 Mansell Court

Suite 300

Roswell, GA 30076

(770) 343-9696

2

ERRATA for ASSIGNMENT #

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

___ There are no changes noted.

___ The following changes are noted:

Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them. To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

Page _____ Line ______ Change ___________________________

_______________________________________________________

Reason for change ________________________________________

Page _____ Line ______ Change ___________________________

_______________________________________________________

Reason for change ________________________________________

Page _____ Line ______ Change ___________________________

_______________________________________________________

Reason for change ________________________________________

Page _____ Line ______ Change ___________________________

_______________________________________________________

Reason for change ________________________________________

Page _____ Line ______ Change ___________________________

_______________________________________________________

Reason for change ________________________________________

3

Page _____ Line ______ Change _________________________
__________________________________________________________
Reason for change ______________________________________
Page _____ Line ______ Change _________________________
__________________________________________________________
Reason for change ______________________________________
Page _____ Line ______ Change _________________________
__________________________________________________________
Reason for change ______________________________________
Page _____ Line ______ Change _________________________
__________________________________________________________
Reason for change ______________________________________
Page _____ Line ______ Change _________________________
__________________________________________________________
Reason for change ______________________________________
Page _____ Line ______ Change _________________________
__________________________________________________________
Reason for change ______________________________________

______________________________________
DEPONENT'S SIGNATURE

Sworn to and subscribed before me this ___ day of
_________________, _______.

__________________________________
NOTARY PUBLIC
My Commission Expires:_____________

**&**

**&** 3:19 14:10,24 16:8

**0**

**04/12/2019** 100:3
**04410** 1:7 5:17
**06** 23:9
**07** 23:9
**084-003685** 1:25

**1**

**1** 100:1
**10** 3:9 4:8 15:20 16:5 18:1 27:21 33:8 39:20 74:12 75:18 92:22
**100,000** 90:19
**10031** 1:18 5:19 98:7
**10:03** 43:5
**11** 4:9 75:2 82:11 82:12
**11:05** 95:22
**11:16** 95:25
**11:17** 97:22,25
**12** 4:10 44:11
**12th** 99:10
**13** 4:11 74:14 89:2
**138** 24:15
**14** 4:12 17:5,10 22:17 75:3 82:11 82:12 92:22
**15** 22:21
**150** 24:12
**1500** 2:4
**15241** 99:13
**16** 4:13 66:21
**19** 3:10 4:14 22:23 32:12 33:5 34:22 39:8 41:1 47:4,11 78:6,17,22 86:10 86:17
**19th** 32:22
**1:18** 1:7 5:17
**1st** 90:10,10

**2**

**2** 101:1
**20** 4:15 29:21 31:6 78:9,10,14,18,21 94:4 100:20
**2004** 23:2
**2005** 23:2
**2008** 21:18
**2010** 17:24 21:18 22:10
**2011** 17:25 22:10
**2013** 22:2
**2015** 32:12,22 94:10
**2016** 8:18 15:16 18:7 19:2,5 28:14 33:24 34:25 53:12 54:17 55:18 75:8 88:20 90:10 94:5 96:6
**2017** 90:10 93:20
**2018** 9:23 24:11
**2019** 1:20 5:2 98:6 99:11
**21** 30:4
**210** 2:17
**23rd** 88:19
**24** 3:11
**25** 3:9 10:21,23 68:5
**26** 1:19 3:10 19:19 19:22 28:10 30:4 98:6
**26th** 5:2
**27** 3:11 24:5,8
**28** 3:12 36:24 37:3
**29** 3:14 42:9,11 43:8

**3**

**3** 37:21 90:8 102:1
**30** 3:15 10:7 43:2 43:15 49:19 101:6
**300** 100:21
**30076** 100:22
**30326** 2:5
**30342** 2:11
**30350** 2:17
**31** 3:16 4:4,5 44:3 44:5
**310-6127** 2:11
**32** 3:17 4:6 56:13 56:17,25
**33** 3:18 57:21,23 58:2
**34** 3:19 22:25 84:18,20
**343-9696** 100:23
**35** 3:20 88:11,14
**3550** 2:4
**36** 3:12,21 89:18 89:21
**37** 3:22 92:10,13
**38** 3:24 93:13,16
**382.303** 3:19 84:24
**39** 3:25 95:3,5
**391.25** 3:16 44:9

**4**

**4** 11:6,7 90:18
**40** 3:25 95:3
**404** 2:5,18
**40414** 13:4
**419-6300** 2:18
**42** 3:14
**43** 3:15
**44** 3:16
**48** 4:7

**5**

**5** 4:4 31:17
**51** 12:22 24:3
**52** 44:3
**520** 12:22,22
**54** 84:17
**5447** 2:10
**55** 67:1,4,11,14
**56** 3:17
**57** 3:18
**591-1800** 2:5
**5th** 93:19

**6**

**6** 4:5 10:7 31:21
**65** 67:10,16 88:12
**66** 4:13
**678** 2:11
**6th** 8:17 75:8

**7**

**7** 3:4 4:6 20:13 30:5 32:2,8,18 35:7,13 47:22,23 55:16 101:6
**70** 24:22
**74** 4:8
**75** 4:9,10,11,12
**770** 100:23
**78** 4:14,15

**8**

**8** 4:7 48:7,13
**8010** 2:16
**82** 3:24 93:7,10,10 93:14 94:14
**84** 3:19
**87** 88:22
**88** 3:20
**89** 3:21

**9**
**9-11-30** 101:7
**900,000** 90:12
**92** 3:22
**93** 3:24
**95** 3:25
**96th** 89:7
**97** 3:5
**9:02** 1:20 5:2
**9:50** 42:23

**a**
**a.m.** 1:20 5:2 42:23 43:5 95:22 95:25 97:22,25
**able** 11:11,17 26:8 27:12 35:8 43:8 48:9 59:10 72:11 82:21
**acceptable** 65:2,5 65:8 89:11
**accepted** 39:9
**accepting** 66:17
**accident** 8:16 12:14 44:22 69:6 73:21 74:25 75:11 75:13 76:1 82:18 82:21 85:18 97:6
**accidents** 19:11 40:8 47:17
**accurate** 62:18 75:9
**accurately** 42:19
**act** 10:13 13:16 25:20
**action** 6:1 68:15 69:1,22 70:7 71:2 77:22
**actions** 50:11
**added** 51:23 85:2
**additional** 51:23 52:3 90:24 101:9
**address** 12:21 13:5
**adjust** 64:16
**administration** 88:4,19 92:14 93:24 94:16 95:11
**affect** 79:25
**affidavit** 78:6,16
**affiliations** 6:4
**aforesaid** 98:17,23
**aftermath** 74:21
**agency** 50:4
**agent** 14:10 92:4 94:20
**aggregate** 90:13
**ago** 15:6,23 16:2 17:5,11 22:12,17
**agree** 5:9 11:11 26:15 32:8 36:16 50:17 60:20 61:1 63:10,17 67:15 68:8 70:17 71:11 72:15,17 75:14,17 77:5,9 85:24
**agreeable** 6:22
**agreement** 6:15 8:6,14 69:11
**agrees** 50:9 75:7
**ahead** 10:20 42:8 64:1,5,7 68:10,23 69:19 70:4
**aided** 98:20
**alcohol** 3:18 57:18 84:9,13 85:24 87:4,8,12
**allow** 46:17,25 47:15,18 59:12,18 59:24 60:15
**allowable** 6:17
**allowed** 59:16
**america** 22:17
**amount** 27:19 49:17
**annual** 31:17 45:4 45:5
**annually** 15:7,8 45:9
**answer** 6:21 7:24 7:25 8:5,10 15:22 45:8 47:20 50:21 61:11 95:13 96:14
**answers** 7:16
**anticipate** 72:12
**anybody** 34:2 38:19
**appear** 43:10
**appearances** 2:1 6:4
**appeared** 98:6
**applicable** 44:17 92:23
**applicant** 29:16
**application** 18:20 21:7 36:18 52:16 54:5,17
**applies** 90:1
**apply** 7:16 30:8 77:13,19
**appreciate** 96:22
**approaching** 68:13,24 69:20 70:6
**approximately** 17:24 21:18 86:7
**area** 40:20,21,23
**arrested** 16:23
**arts** 17:6
**asked** 36:18,19 47:13 66:2 97:5
**asking** 38:14 47:2 69:15,16 79:2 82:20
**assessing** 45:25
**assign** 33:18 49:23
**assigned** 80:24 82:17
**assignment** 101:1
**assist** 101:8
**assume** 41:3 48:2 83:21
**atlanta** 1:3 2:5,11 2:17 5:17 98:10
**attach** 101:9
**attached** 100:6,7
**attempted** 39:22
**attempting** 37:8
**attempts** 37:22
**attend** 30:12
**attended** 7:13
**attending** 16:13
**attention** 60:23 61:4 71:19
**attorney** 12:6 43:13 77:20 78:13 96:3,7 100:12
**attorneys** 9:24 12:2 99:4
**audio** 5:8,8
**auditing** 18:19
**august** 19:5 28:14 34:25
**authority** 25:10 33:2 38:18 46:18 50:7
**authorized** 24:24
**automatically** 66:1
**available** 73:16 82:9 96:10

avenue 1:19 5:19 98:7
avoid 65:20,23 67:23 69:1,8,22 70:1
aware 32:9,14,16 32:19,24 39:8 47:12,24 60:16 61:22 76:6 85:19 86:10,18 90:21

**b**

b 3:7,16,19 4:1 10:7 13:2 44:9 54:11 84:24
babies 23:15,16
baby 23:15,18
back 16:9 22:22 23:1 24:11 43:4 54:17 95:24 100:3
backed 9:15
based 26:24 29:4 75:1 95:15
basically 9:6 21:9 57:9 66:17
basis 45:4
becoming 18:10
behalf 6:7,8 10:13 10:13 11:12 15:11
believe 15:18 22:7 33:25 34:19 43:12 43:22 48:6,20,23 49:17 55:7 59:24 61:5 67:21,25 68:17 69:4 71:12 71:20 74:23 80:14 80:20,23 85:18 88:10 93:19 94:19 94:23
believes 27:6 35:6
belt 33:9
best 7:22,23 8:4 96:7
better 72:12
beverages 25:5
bind 10:15 11:11 11:12
bit 21:17 43:24 57:6 69:15
blame 72:23
blank 93:14
bluetooth 59:19 60:5,7 61:9
bmc 3:25 95:3
bolingbrook 12:20 12:22,25 13:1,2
bond 91:13
bottom 30:5 37:22 92:23
brakes 66:4 70:9 71:2,8
braking 83:5,7,18
break 8:10,12 28:19 29:10 43:14 95:19
breaks 8:9
brian 2:3,6 6:6
bring 16:9
brings 23:9
broke 65:17 68:2 68:14
broken 68:9,23,24 69:1 70:3,6
brought 42:5
building 25:4
bulletins 53:24
business 17:8
butler 14:10,24 16:8
buttons 80:16

**c**

c 7:8
call 60:1 61:2 71:18 72:13
called 1:13 7:2
calls 12:5 61:9 72:7
camera 80:17
capability 81:15
capacity 9:2
car 63:7,11,15
care 62:10 70:10 87:18,21,24
career 13:19
cargo 57:11
carrier 20:22,23 20:25 21:1,4,14,21 23:11,25 25:10,18 25:21 26:20 33:2 36:19 37:13 38:17 40:16 44:9,16,17 44:21 45:3 46:18 50:7 51:13 58:14 62:15 84:12 88:3 88:18 91:7,11,25 92:14,18 93:22,23 94:14,16 95:10
carriers 20:23 44:10 60:10 61:18 61:20,23 89:4,9
case 5:17 9:9,17 28:25 79:6,9,14 89:23 96:19
cases 9:4,22
category 30:10
cause 38:24 62:4 67:20 72:16 98:8 98:16
causing 72:20 73:7
cdl 53:22 62:22
cell 3:17 5:6 56:10 57:4 59:9,11,19 60:11,15 61:24 82:2,6
cellular 5:5
certain 25:11 27:19 47:17 63:13
certainly 31:9
certificate 91:12
certification 14:14
certifications 63:19
certified 1:17 14:15 99:14
certify 98:5,14,24 99:2,6 101:2
challenge 77:24
chance 42:18
change 62:5 69:25 70:14 83:11 91:23 92:6 96:15 101:11 101:13,14,16,17 101:19,20,22,23 101:25 102:1,3,4,6 102:7,9,10,12,13 102:15,16,18
changes 91:25 100:7 101:4,5,7
charged 16:24
charges 20:13
chart 32:1
check 54:22
checked 54:24
chicago 1:19 5:20 98:7
choked 9:7
citation 36:4 76:5 77:2,5,14,15,17,19 78:9 79:3,19,23,25 86:3

**citations** 15:20 16:4 34:14 79:5
**cited** 86:23
**civil** 1:14 6:18 101:6
**claim** 51:6
**claiming** 50:25
**claims** 19:12
**clarify** 47:3
**classroom** 14:20
**clay** 2:16 6:8 100:1
**clear** 7:20
**client** 72:15
**close** 33:10 49:11 49:12 55:8,18
**closed** 79:15
**closely** 49:5 55:21
**closer** 49:16
**codaniel** 2:18
**colby** 2:24 5:21
**collected** 42:19 73:15
**collecting** 12:6
**college** 17:6,15 21:22
**collision** 8:15,17 15:17 18:7 19:2 19:16 20:4 35:3 50:4,7 55:13,23,24 56:22 58:4,18 59:10 65:15,21,24 67:4,17,20,24 69:13 71:18 72:16 72:21 73:7,9,14,23 73:24 74:2,9,21 76:6,22 79:20 81:16 82:10 83:2 83:18 84:8,12,13 85:3,6,15 86:5,23 87:15,25 88:9 89:14 90:2,22,25 94:4,13 96:18
**collisions** 16:21
**combination** 73:1
**come** 14:24
**comes** 84:23
**commercial** 13:21 13:24 26:3,8,21 27:2,7,13 35:9 58:24 60:1,21 62:10 63:20,23 64:23 65:2,5,8 69:17 70:11
**commission** 102:25
**communicate** 54:18
**communications** 54:25
**companies** 40:1 60:12,14 62:2
**company** 1:10 3:10,20 5:15 10:13,15 11:12,13 14:8,9,23,24 18:21 19:19 24:8 26:6 26:17 33:15 34:9 34:13,15 36:12 38:24 39:3,4,8 41:25 47:14 51:5 54:19 56:5 57:15 58:23,25 59:3,15 60:18 62:5 74:1 75:7 79:2,4 80:15 80:21 82:25 84:1 88:2,17 89:4 93:24 94:3,17,21 95:8 98:13
**company's** 36:14
**complete** 52:1 53:3
**completed** 100:18
**compliance** 20:15 30:6 45:24 89:6
**comply** 25:14,23 62:12,21,24 63:3
**complying** 25:17 91:7
**computer** 98:20
**concern** 33:17 38:24 62:4
**concluded** 97:24
**conclusion** 97:22
**conditions** 64:17 67:16
**conduct** 53:10 71:22
**confirm** 43:8 51:12 59:18
**confirmation** 38:10
**confirmed** 50:2 67:13
**confirming** 87:11
**connections** 13:8
**conscious** 9:8
**consequences** 20:15 30:6
**consider** 26:18 40:4 44:16,21 45:14,23
**considers** 45:17
**consist** 42:20
**construction** 51:19
**contact** 37:8,23 82:22
**contest** 33:21
**continue** 5:8 46:17 47:1,15,18
**continued** 4:1 41:24
**contractor** 26:13 29:17 57:11
**contractors** 24:18 24:20 51:8 72:4
**contribute** 67:20 72:16
**control** 81:19
**controlling** 73:2,3
**conversation** 34:17 96:2
**conversations** 5:5 12:1
**cooper** 2:9,10,12 6:6
**cooperspencela...** 2:12
**copies** 58:6 100:12
**copy** 11:2 24:8 43:10,14 44:8 58:14 78:6 88:17 89:22 93:13
**corporate** 9:2 13:16
**corporation** 23:23
**correct** 15:1 17:20 23:23 25:5 28:4 30:15,18,20 31:19 32:14 35:1 36:6 36:21 38:1,11 39:11 40:13,17,18 40:24 41:22 46:12 49:4,20 63:21 64:8 74:22 76:19 76:24 82:3 84:1,9 86:8,12,25 89:9,15 91:14 93:25 94:22 98:22
**corrections** 100:7 101:9
**correctly** 44:19,25 90:16

**corsello** 1:13 3:3 5:12 6:14 7:1,8,9 12:18 43:7 46:7 96:2 97:5 98:8 100:2
**cottingham** 14:10 14:24 16:8
**coughing** 9:7
**council** 61:13
**counsel** 5:13 6:3 6:15 98:25 99:6
**counselled** 55:3
**country** 25:11 72:8
**county** 98:3
**course** 14:11,21 15:4 42:14 46:4 47:10 50:3 51:18 51:21,24 52:9,11 52:17
**courses** 52:21,24 69:24
**court** 1:1 5:16,23 12:16 77:21,24 78:3,11 79:3 80:5 97:15 98:4,9 100:15,20
**courts** 1:15
**coverage** 89:15 90:21,25 93:5
**coverages** 90:8,12
**covering** 14:12 15:5
**covers** 90:25
**creating** 19:15 20:6
**crime** 16:24
**cristian** 1:9 5:14 38:4 98:12
**criteria** 3:15 28:13 28:21 29:3 43:17 56:8 96:5
**cross** 6:17
**csa** 58:9,10
**csr** 1:24
**csx** 61:19
**current** 18:2 29:2 29:11 53:21 56:8
**currently** 12:18 17:18 43:18 53:20 54:16,18
**curve** 66:5
**customer** 82:23
**cut** 65:19 68:18 69:7,25 71:3
**cv** 1:7 5:17

**d**

**d** 3:1 7:8
**damage** 85:7
**damages** 9:16
**data** 75:2,3 80:18 81:12,15 82:5,9,10 82:15,19 83:1
**date** 55:15 75:8 83:18 87:15 94:4 94:11 100:3
**day** 14:11,21 15:4 36:8 47:4,5 52:8,9 52:11,12,13,14,19 99:10 102:21
**days** 52:14,19
**decide** 26:24 40:6 40:15 42:1 79:10
**decided** 32:25 38:9,16
**decision** 46:21 77:21 78:3,11 80:5
**declarations** 3:21 89:22
**defendants** 1:11 2:19 6:9 98:13
**defensive** 51:20 63:24
**dep** 3:9
**department** 24:1
**depends** 31:13 40:25 42:4 60:8 75:22
**deponent** 100:2,6 100:6,7,9,15
**deponent's** 102:20
**deposed** 31:16
**deposition** 1:13 5:7,12,18 6:13 7:13 8:20 10:5,7 10:23 11:2,22,25 12:4 19:22 24:5 36:24 42:11 43:2 44:5 46:8 56:13 57:23 84:20 88:14 89:18 92:10 93:16 95:5 97:23,24 98:25 99:3,4 101:8
**depositions** 1:16
**description** 3:8
**designated** 10:12 13:16
**desire** 101:7
**detail** 37:22
**determination** 73:20 79:3
**determine** 44:13 61:7 73:23 74:2 79:7,8 83:1
**determined** 74:20 86:12,16
**determines** 50:9 50:17
**develop** 20:17
**device** 59:13,19 60:13 61:9 65:9 71:24 72:9
**different** 37:22 38:15 49:14 56:18 56:21 57:7,9 60:18 63:6 69:15 76:20 80:23 94:24
**differently** 67:23 69:12
**digital** 98:20 99:10
**director** 14:3,7,15 17:20 18:4,6,10 19:8
**disabled** 72:11 73:2
**disabling** 85:7
**disagree** 68:6 79:23 85:16
**disagreed** 77:15 77:17
**disagrees** 77:13,18
**discipline** 36:5 40:23 41:22 55:10 56:1 75:21 76:18 76:23 79:12,22 86:24
**disciplined** 55:2 77:2
**disciplining** 79:5
**disclosed** 48:19
**discovery** 6:16
**discuss** 34:4 39:2 41:11 96:18,19
**discussed** 39:25 58:19,22 77:12
**discussion** 34:3 63:5
**dismissed** 79:4
**dispatch** 52:17
**disposition** 78:9 78:13

**disqualified** 30:23 31:4,9
**disseminate** 53:23
**distracted** 65:6 71:14
**distracting** 59:23 60:2 61:10
**distraction** 60:6
**district** 1:1,2,15 5:16,16 98:9,10
**division** 1:3 5:17 98:11
**document** 11:4 19:19,25 20:7 28:3 48:12,24 56:16 66:23 67:7
**documentation** 37:8 76:11,12 96:8
**documents** 12:6,8 12:10,16 37:6 42:19 43:14
**doing** 88:8
**dollars** 93:6
**dq** 3:14 12:12 18:22 21:5 39:24
**drive** 12:22 27:1,6 29:16 47:1,15,19 59:11 64:24
**drivecam** 80:7,22 81:4 83:20 84:4
**driver** 9:6,14 21:10 26:12 27:21 29:19,23 30:12,17 31:3,6,22 33:13,25 34:19 35:10 36:9 39:2 41:1,8,13,17 41:20 42:2,16,20 43:11 44:2,2,12,13 44:16,23 45:11 46:1,5,25 51:1 52:1,16,18 53:3,21 54:13 60:21,22 63:20,24 65:3,6,9 65:16 69:17 70:11 74:8 76:3 77:15 77:17,18,20 80:17 85:22 86:2,6,12 87:14,17,23 88:23
**driver's** 13:22 26:18 36:15 40:5 44:22 58:10,12 73:16 97:7,10
**drivers** 18:20 19:12 24:15,17,19 26:2,7 30:8 40:13 40:17,23 41:10 51:7,14 53:24 54:19 58:7,23 59:12,16,19,24 60:15 61:24 62:7 62:9,12,18,21,24 63:2,14,24 64:24 68:22 71:22 72:1 72:3,6 79:5,18 80:22 81:1
**driving** 12:13 20:19 26:14,18 29:18 30:11 31:12 31:18 32:3,4 35:6 37:10 38:13 44:14 45:6,14,22,25 46:17 48:15 51:19 51:20 52:2 60:16 60:23 61:3,4,24 63:6,7,10,11,15 64:2,17 65:6,10,12 69:18 71:15 72:7 75:5 80:1,8 88:23 97:11
**drove** 9:8
**drug** 3:18 52:15 57:18 84:8,13 85:24 87:4,7,12
**dual** 36:13
**dubuque** 15:2,8
**due** 100:3
**duly** 7:2 98:15
**duties** 18:18 19:9 25:11 63:13,22 91:6
**duty** 26:11,17 51:13 64:23 75:5

**e**

**e** 3:1,7 4:1 7:8 54:11 101:6,7
**earlier** 22:8,16 28:3 30:6 45:21 49:3 71:25 77:13 91:6 97:5
**easiest** 17:13
**easy** 96:22
**ecm** 81:18 83:10
**education** 17:1
**effect** 19:16
**effective** 94:4,10 94:11
**either** 10:11 17:14 29:17 61:6 65:25 72:4
**eld** 51:24
**electronically** 100:8
**elr** 1:7 5:17
**emergency** 51:24 64:13 70:19
**employed** 17:18
**employee** 26:12 29:17
**employees** 24:17 72:4
**employers** 37:7,9 37:15,19 38:21 39:11
**employment** 17:15 18:23 20:10 21:8 36:20 38:10,19 39:21 40:1 42:1 86:19
**employs** 44:12
**engaging** 59:25 61:2,9 71:17 72:7
**engine** 81:18
**entered** 101:8
**entity** 91:14 94:22 95:12
**entry** 92:23 93:3
**equipment** 33:14 33:16,23 34:10,18 36:4,9 40:19
**errata** 100:3,7,8,9 100:11,13,14,18 101:1
**especially** 27:10
**evasive** 68:15 69:1 69:22 70:7 71:1
**event** 64:12 69:6 69:17,21 81:6 83:4,5,7,19
**events** 66:18
**everybody** 15:1
**evidence** 6:19 26:19 44:16,22
**exact** 19:6 49:17 84:3
**examination** 1:14 3:2 6:17 7:4 97:3
**examined** 7:3
**exceed** 65:3
**excerpt** 37:3
**excess** 90:13 91:4

**exercise** 62:9 70:10
**exercised** 87:18,20 87:24
**exhibit** 3:9,10,11 3:12,14,15,16,17 3:18,19,20,21,22 3:24,25 4:4,5,6,7,8 4:9,10,11,12,13,14 4:15 10:20,23 19:22 24:5 28:4 28:10 30:4 31:17 32:2,8,18 35:7,13 35:14 36:24 37:2 37:21 42:9,11 43:2,8,15 44:3,5 47:22,23 48:7,12 49:19 55:16 56:5 56:7,13,25 57:21 57:23 58:2 66:21 74:12 75:18 78:14 78:17,18,21,22 84:18,20 88:11,14 89:18,21 92:10,13 93:13,16 95:3,5
**exhibits** 31:17 75:2 82:11
**expect** 58:23 62:18 62:21,24 63:2
**expected** 68:14,25 69:16,21 70:15
**expects** 62:9,12
**experience** 20:22
**expires** 102:25
**explain** 33:4 39:15 76:4 96:15
**explainable** 86:12
**explained** 33:14 34:9 39:19 67:7
**explanation** 34:14 39:4,10 49:8
**explanations** 46:12,16,24 47:12

**f**

**f** 2:9,10
**facility** 100:19
**fact** 34:21 86:18 87:12
**factor** 35:23
**factors** 74:4
**failed** 87:4
**fainted** 9:6
**fair** 36:13 66:10 79:17
**familiar** 61:12,17 95:1
**far** 17:2 39:21 64:5
**fast** 67:16
**fatality** 85:4
**fault** 34:15,16 39:10,11 79:7
**february** 1:19 5:2 98:6
**federal** 6:18 25:14 25:17 26:19 36:19 37:13 40:16 44:8 44:17 58:14 62:13 62:15 84:11 86:11 88:3,18 91:7 92:14 93:23 94:15 95:10 101:6
**fedex** 61:19
**fight** 77:20
**file** 3:14 12:12 18:22 21:5 31:22 37:3 39:24,24 42:16,20 43:11 46:21,24 91:11 100:12
**filed** 5:15 7:12 93:7 94:20,21 100:15
**files** 42:14
**filing** 3:23 19:13 92:18,24 95:9
**fill** 18:20 52:16 94:25 100:7,8
**filling** 21:6
**financially** 6:1
**find** 43:24 50:24 82:23 84:6 96:8
**fine** 30:13,18 76:9 77:7,24 78:13 79:20 86:24
**finish** 7:24,25
**firm** 5:21
**first** 6:22 7:2 9:1,5 9:9 23:10 28:9 30:11 31:18 43:7 45:12 48:3 52:14 59:18 90:9 98:15
**fitness** 88:23
**five** 18:25
**flip** 11:6 37:21
**fmcsa** 3:22 91:11
**fmcsr** 3:16,19
**follow** 40:13,17 59:7 63:14,16 64:15 79:22
**following** 33:10 42:3 49:5,6,11,12 55:7,18,20 101:5
**follows** 7:3
**for's** 34:16
**foregoing** 98:21 98:25
**foreseeable** 68:25
**form** 3:24,25 6:20 15:21 27:14 30:1 31:11 39:12 45:5 46:2,19 47:2 50:20 51:2 60:17 61:25 66:8 68:16 69:3,23 70:12,21 71:9 76:13 77:3,8 78:1,23 79:24 80:4 81:23 83:15 83:22 84:15 86:13 86:20 87:1 91:19 93:7,10,14,18,22 94:14,24 95:3,9,10 101:7,9
**format** 57:9 98:20
**forms** 94:20 95:1
**forward** 100:12
**found** 75:20 83:25
**four** 18:25 23:7 68:13 89:8
**free** 59:12 60:12 71:24 72:9
**freight** 25:4
**frg** 2:6
**fried** 2:3
**friends** 13:7
**front** 32:19 49:20 65:20 68:18 69:7 69:25 71:3,7 72:19 73:4
**full** 7:6 43:10 52:19
**furnish** 101:9
**further** 71:5 96:15 98:14,24 99:2,6

**g**

**ga** 100:22
**garbage** 25:4
**gather** 11:16
**general** 25:3
**georgia** 1:2 2:5,11 2:17 5:16 8:18 13:8 98:10
**getting** 21:10 47:3

**gisca** 1:9 5:14 7:12 8:18 19:4 28:14 28:20 31:16,24 32:25 33:1 34:3,8 34:13 35:18 36:17 37:7 38:4,9,17 39:7 41:6 43:21 46:14 47:9 48:19 49:25 50:3,10,18 51:17 52:7 53:6 53:13 54:25 55:2 56:22 58:3 63:6 65:16 66:25 67:3 67:19,22 68:1,8 69:4,11 70:13 71:14 72:10,19 73:4,6,18 74:16 75:21 76:5 77:2 78:12,16 79:19 80:8 81:3 82:2 84:9 87:19,21 96:18 98:12
**gisca's** 32:3 35:6 37:3 42:14 43:11 45:22,25 46:8 48:14 66:18,22 74:8,12 75:8 78:6 83:17 84:4
**give** 9:21 12:21 16:8 42:17 46:17 60:22 70:4
**given** 8:20,23 33:5 55:8 79:16 98:17 98:22 101:8
**giving** 61:3
**glenbrook** 12:24
**glenn** 1:5 5:13 6:7 7:11 72:15 85:14 98:11
**go** 5:9 7:14 10:20 15:9,11 16:7 17:14,15 21:6 30:2 36:10 39:19 40:8 42:8,17,21,22 47:16 52:23 54:21 92:22 95:20,21
**goes** 48:25 54:1
**going** 5:1 15:16 18:20 21:22 22:5 22:13 29:16 36:5 40:7 42:17 57:14 66:25 67:3,15 72:12 79:12 95:2 96:4 97:20
**goldberg** 2:3
**good** 5:1 28:12 32:17 39:4
**goodwin** 12:22
**governing** 26:21 44:23 76:23
**government** 61:7
**governors** 17:7
**governs** 79:18
**graduate** 21:23 22:1
**graduated** 17:3,5
**greetings** 100:5
**ground** 7:14
**grundy** 98:3
**guess** 28:7 40:3 46:23 47:3 50:24 91:21
**guide** 58:10
**guidelines** 35:12
**guilty** 76:12 78:22
**guy** 72:23
**guys** 25:3 48:19 79:10

**h**

**h** 3:7 4:1
**half** 13:6 29:22 30:5 34:23 52:20 83:10 86:7
**hand** 10:18
**handbook** 58:12
**handed** 48:7
**handheld** 65:9
**hands** 59:12 60:12 71:24 72:9
**hang** 95:21
**happen** 72:12
**happened** 9:10,19 65:15 70:18 78:12
**hard** 9:7 83:5,7
**hazard** 68:10 69:18,20,22 71:13
**hazards** 64:8,11 64:12
**hazmat** 51:20
**head** 7:17 16:18 38:25
**heard** 46:24 52:13 61:19 66:13 74:18
**heavier** 64:20
**held** 5:18
**help** 23:18 58:22 74:6 96:7
**helped** 20:17
**helping** 18:20 21:6
**hereinbefore** 99:5
**heretofore** 98:5
**hereunto** 99:9
**hire** 24:24 26:11 27:4 29:25 33:1 38:9,17 40:7 41:2 45:10,12
**hired** 19:4 27:11 28:14,20 30:8 31:18 32:5,10 33:6,13 34:22,23 34:25 35:20 36:1 36:3,17 39:6,7 41:5,7 43:21 46:15 47:9 49:24 55:17,19 77:20 86:7
**hiring** 3:15 21:10 26:23 27:16 28:13 28:21 29:3 31:23 34:5 35:24 39:9 43:17 44:2 45:3 56:8 87:19,21 96:5
**history** 3:12,22,23 17:16 18:23 26:25 27:10 29:18 35:7 36:20 37:4,10 38:11,12 39:2,21 40:6 45:22,25 48:15 54:22,24 92:17,18
**hit** 66:4
**hmd** 1:8 3:10,11 3:15,20,22 5:14,18 6:13 7:12 9:2 10:7 14:7 15:11,14 16:15 17:18,22 18:14,17,24 19:15 19:19 20:3 21:15 22:10 23:22 24:12 25:9 26:6 27:5,6 28:21 29:15 30:8 31:2,23 32:5,8,13 32:16,19,25 33:7 33:17,21,23 34:2 35:6,11,22 36:5 37:8,12,25 38:16 40:3,15 42:13 43:18 45:17,20,23 46:15,17 47:1,9,15 48:13 50:4,9,10,17 50:18 51:5,13 53:8,10,23 55:4,10 55:19 56:1,10

58:6,21 59:5,7,18 59:20,22,25 60:9 60:20 61:6 62:7 63:10 66:17 67:19 68:1,8 71:21,25 72:15 73:9,11,22 74:20 75:7 76:17 76:18,22 77:1,13 77:18 79:14,17 80:21 82:5 84:8 86:6,10,11,16,24 87:4,18,20 88:19 88:22 89:14 90:24 92:15 98:12
**hmd's** 13:16 46:18 50:6 56:4 59:9 63:3 65:14 66:25 67:3 68:21 69:10 72:18,25 73:6 77:19 79:21 82:8 91:6 92:24
**hold** 9:5 23:14
**holder** 53:22
**hour** 67:1,4,10 68:5 83:11
**hours** 20:18 58:7 89:6
**huhs** 7:17
**hum** 35:17 74:13 75:19 90:11
**human** 85:3
**hundred** 60:22 61:3 72:1,3,20,22

**i**

**idea** 24:21 26:23 64:10 83:14
**identification** 10:24 19:23 24:6 36:25 42:12 43:3 44:6 56:14 57:24 84:21 88:15 89:19 92:11 93:17 95:6
**identified** 35:13 37:7,15 38:21 56:3 58:19 71:25 82:11 94:3
**illinois** 1:18,19 5:20 12:20,23 21:3 23:23 98:1,7 99:14
**implement** 15:14 58:21
**implemented** 16:14
**important** 45:18 59:5 64:23
**inaccuracies** 74:17 76:2
**inaccuracy** 75:15
**inaccurate** 87:14
**incident** 8:16 67:1
**included** 11:7 52:6
**includes** 55:17 92:17
**including** 25:17 51:7 62:15 65:12 76:11 94:18
**increase** 41:21
**indemnity** 90:13
**independent** 24:18 24:20 26:13 29:17 51:7 72:4
**indicates** 78:18,21 78:22
**indicative** 27:12 35:7 42:2 68:10
**individually** 10:14
**industry** 25:24 59:7 60:9 61:7,8 62:25
**infinity** 37:17 38:6
**information** 11:16 37:9 73:15 83:25 85:21 95:16 96:8 96:17
**infraction** 31:4
**initial** 14:6
**injuries** 9:17
**inquiry** 45:6
**inspection** 53:18
**inspections** 58:12
**installed** 80:7
**instance** 19:18 64:20 92:7
**institute** 53:17
**insurance** 1:10 3:22 5:15 14:9,24 19:11 89:15,23 90:24 91:2,13,22 92:1,5,17,24 94:3 94:20 98:13
**insured** 90:14,19 91:13 94:22 95:12
**intended** 66:3 78:22
**intent** 76:12
**intentionally** 65:23
**interested** 6:1 99:8
**interfere** 5:7
**interference** 5:5
**international** 17:8
**interstate** 25:1
**introduction** 52:17
**investigate** 73:9 73:14,23
**investigated** 73:11
**investigation** 48:14 79:8,9 97:6
**involve** 85:3,6
**involved** 9:25 13:12 16:20 20:12 20:20 21:5 35:3 56:22 58:3 80:19 86:6
**involving** 8:18
**iowa** 15:2
**issue** 90:22
**issues** 33:20 41:9
**item** 90:8,18

**j**

**j.j.** 58:7
**january** 55:18 93:19
**jeanette** 1:17,24 5:23 6:10 98:4
**job** 18:18 19:9 23:10
**june** 32:12,22
**jury** 50:9,17

**k**

**keep** 41:8 62:18 64:1
**keller** 58:7
**kind** 83:4
**knew** 33:5 34:13 34:22
**know** 7:13 8:3,10 9:10 12:1 21:16 25:23 28:2,23,24 29:24 43:20 48:17 49:23 52:10 54:9 62:1,12,21,24 63:2 70:25 75:1 81:3,9 83:1,6,9 84:3 91:12 93:10,24 94:16 95:11 96:21
**knowledge** 95:8 95:15

**known** 49:24

**l**

**l** 7:8,8 13:2
**lane** 65:17,18 68:3 68:9,13 69:25 70:8 72:24
**lanes** 70:14
**languages** 17:4
**lansing** 21:3
**larger** 61:18
**lasts** 92:5
**laundry** 27:9
**law** 2:9 25:15 62:13
**law.com** 2:6
**laws** 26:20 40:17 44:23 86:11
**lawsuit** 7:11
**lawsuits** 13:13,18
**lawyers** 10:10
**leading** 32:4 67:17 87:24
**learn** 15:13
**leaves** 52:18
**left** 17:15 65:21,23 65:25 66:1,4,5 93:6,20
**legal** 5:22 25:11 51:13
**legally** 50:10,18
**lenox** 2:4
**let0010212** 90:6
**let0012** 90:5
**letting** 91:11 94:15 95:10
**liability** 50:19
**liable** 50:19 51:1,6
**liberal** 17:6
**license** 1:25 13:22
**light** 86:17
**limit** 65:3 90:13
**line** 101:11,14,17 101:20,23 102:1,4 102:7,10,13,16
**linguist** 17:4
**list** 11:7 27:9 32:13 33:9 46:11 57:15
**litigation** 42:14
**little** 21:17 38:15 43:24 57:6 69:15
**live** 12:19,20
**lived** 13:5
**locate** 29:14
**located** 5:19 21:2
**location** 9:14
**log** 74:9,12,17,24 75:4,8,16,24 76:2 87:14
**logbook** 40:9 51:22 52:5 53:3
**logbooks** 18:19 53:5
**logistic** 37:20
**logistics** 37:16
**logs** 62:19
**long** 13:5 14:19 16:2 17:22 18:3 21:16
**longer** 92:5
**look** 29:23 31:5 33:8 45:11,18 46:3 49:16,19 67:9 74:24 88:2,6
**looked** 60:9 80:13
**looking** 26:24 29:15,18 40:5 45:22 64:4,7,10
**lookout** 64:1
**looks** 56:18 57:6 67:11
**lost** 9:6,7
**lot** 10:10 34:10 60:12,14
**lytx** 75:2 80:7,22 82:10 83:2,8,19 84:3

**m**

**m** 14:13
**mail** 100:10
**maintenance** 33:12,20 39:16 40:4 41:9 45:24
**major** 17:4
**majority** 20:9 24:20
**making** 36:9 101:8 101:8
**management** 51:20
**manager** 41:10
**maneuver** 83:18
**maneuvers** 51:24
**manner** 25:21 26:3
**mansell** 100:20
**manual** 53:2 58:8 62:22 80:16
**manually** 81:5 100:8
**march** 99:10
**mark** 10:20 19:18 42:8 57:14,20 84:17 88:11 93:13 95:3
**marked** 4:3 10:24 19:23 24:6 28:3 31:16 36:25 42:12 43:3,15 44:6 56:4 56:7,14,16 57:24 66:21 74:11 78:5 84:21 88:15 89:19 92:11 93:17 95:6
**marking** 24:8 37:2 44:3 89:21 92:13
**marks** 85:2
**match** 75:3,10,12
**matching** 76:1
**materials** 16:9,11 25:4 29:7 52:23 58:7 74:6 80:25 96:3
**matter** 5:13 34:21
**mcdonald** 2:15
**mcs** 3:24 93:10,14
**mean** 30:25 40:12 40:15 52:4 66:17 74:5 79:7
**means** 10:8,11,12 24:12 89:1,7
**meant** 8:6
**media** 5:11 43:5 97:21
**meet** 26:13
**meetings** 12:6 53:10
**meets** 44:13
**mentioned** 20:21 99:5
**mercedes** 97:11
**met** 7:9
**microphones** 5:3,7
**middle** 65:17
**miles** 67:1,4,10 68:5 83:11
**military** 13:10
**million** 93:6
**minimum** 26:14 44:13
**minor** 9:16
**mix** 24:19
**mixture** 74:4

**mmj** 37:16 38:3
**model** 84:3
**module** 81:19
**mohs** 2:3 3:4 6:6,6 6:13 7:5 10:18 11:1 15:25 16:3 19:18,24 24:3,7 27:17 28:8 30:3 31:14 37:1 39:14 42:5,8,13 43:6 44:1,7 45:7 46:6 46:22 47:7 50:15 50:16,23 51:4,11 56:15 57:20 58:1 60:19 62:3 66:9 66:14,16 68:20 69:9 70:2,16,24 71:10 74:14,15 76:14 77:6,11 78:2,20 79:1 80:2 80:6 82:1 83:16 83:24 84:16,22 86:15,22 87:3 88:11,16 89:20 91:20 92:12 93:2 93:4,13,19,21 94:8 94:11,12 95:2,7,19 96:1,21,25 97:2,5 97:14,18
**moments** 87:24
**monitoring** 19:12
**month** 86:7
**monthly** 88:7
**months** 15:6 23:15 35:4 44:11
**morning** 5:1
**motor** 13:21,25 16:21 20:22,23,23 20:25 23:25 25:10 25:17,21 26:3,9,19 26:21 27:2,7,13 33:1 35:9 36:19 37:13 38:17 40:16 44:8,10,11,15,17 44:21,24 45:3 46:18 50:6 51:13 58:14,24 60:1,10 60:21 61:18,19,22 62:10,15 63:20,23 64:23 65:3,6,9 69:17 70:11 84:11 85:7 88:3,18 89:3 89:3,8 91:7,11,25 92:14,18 93:22,23 94:14,16 95:10
**move** 70:7,19 71:1 71:6
**moved** 17:5 66:1,5 72:19 81:22
**movement** 68:19
**movements** 75:13
**moving** 20:19 30:11 31:12 40:9 49:4,9 76:23 79:18,19
**multiple** 14:12 15:5 51:18
**mvr** 48:16

**n**

**n** 3:1 7:8 14:13
**n.e.** 2:4,10
**nadia** 1:13 3:3 5:12 6:14 7:1,8 10:15 98:8 100:2
**name** 5:21 7:6 20:25 82:16
**names** 10:1
**national** 61:12
**natmi** 14:13,17,18
**necessarily** 60:3 63:15
**necessary** 101:9
**need** 7:16,19,22 8:10 11:16 21:9 25:20,23 47:3 63:18,24 64:1,4,16 64:21,24 96:19
**needs** 60:22
**negligence** 51:8
**negligent** 50:10,18 51:8
**neither** 85:10
**never** 38:22,22 60:6 65:2,5,8 66:3 94:21
**new** 16:14 33:14 33:23 34:18 40:19 48:4,21 57:4,6
**nine** 17:23 22:12
**nods** 7:17
**nolo** 78:19,21
**non** 20:15 30:6 73:21
**normal** 40:2
**normally** 15:4 52:9,13 53:25 82:18
**northern** 1:2 5:16 98:10
**notarized** 100:9
**notary** 102:24
**note** 5:3
**noted** 101:4,5
**notice** 3:9 6:15 10:19 11:2,8 99:3
**noticed** 10:6
**noting** 100:7
**number** 3:8 4:2 5:17 10:21 19:6 24:3 30:4 31:21 32:2,13,18,20 37:3 44:3 47:25 48:13 74:14 89:21 90:4 90:6 97:21
**numbers** 89:12

**o**

**o** 7:8,8 13:2,2
**o'daniel** 2:15,16 3:5 6:8,8,23 15:21 27:14 28:6,12 30:1 31:8,11 35:15 39:12 41:4 42:7 45:5 46:2,19 47:2 50:13,20 51:2,9 60:17 61:25 66:8,12 68:16 69:3,23 70:12,21 71:9 76:13 77:3,8 78:1 78:18,23 79:24 80:4 81:23 83:15 83:22 84:15 86:13 86:20 87:1 91:19 93:18 94:6,10 97:1,4,12,16,19 100:1
**oath** 10:3
**object** 15:21 27:14 30:1 31:8,11 39:12 45:5 46:2 46:19 47:2 50:20 51:2 60:17 61:25 66:8 68:16 69:3 69:23 70:12,21 71:9 76:13 77:3,8 78:1,23 79:24 80:4 81:23 83:15 83:22 84:15 86:13 86:20 87:1 91:19
**objection** 51:9 66:12
**objections** 6:20

**obtain** 31:23 48:9 48:13
**occasions** 13:17
**occurred** 8:17 18:7 32:21 67:1,4
**ocga** 101:7
**october** 24:11
**odmclaw.com** 2:18
**offense** 30:11,17 30:22
**officer** 18:11,17 98:4
**officers** 15:12 18:19,24 19:11 52:18
**offices** 15:2 100:3 100:10
**oh** 53:19
**okay** 7:20,21 8:1,2 8:8,13,14,18 9:1,4 9:12,18,24 10:2,10 10:18 11:20 12:7 12:18 13:3,7,10,21 13:24 14:5,14,17 14:19,23 15:7,11 15:13,16,19,25 16:11,17,20,23 17:17,24 18:2,9,12 19:1,8,18 20:11,17 20:21 21:13,18,23 22:3,16,24 23:1,9 23:13,20 24:21,23 27:20,23 28:2,19 29:9,15 30:14,19 31:15 32:13,18,24 33:4 35:23 36:8 39:15 42:5 43:23 44:1 46:7 47:21 47:23 48:3,10,18 48:21 49:3 50:24 51:12 52:7,10,21 53:6,13,17,19 54:6 54:12,14,21 55:2 55:10 56:1,6,19 57:8 58:17,21 61:6,17 62:4 66:14,21 67:12,19 68:21 71:21 72:6 72:10,25 73:22 74:8,11 75:1,12,14 75:18 76:5 77:7 77:12,18,23 78:8 78:15 79:16 80:3 81:9,18,20 82:14 82:25 83:17 84:16 85:14,20,23 86:5 86:16,23 87:10,14 89:11,14 90:15 92:16,19 95:2,15 95:19,24 96:14 97:2,12,13
**old** 22:23 33:16 34:10 96:8,8
**older** 33:24
**once** 14:11,25 15:3 44:11 71:1,13 100:9
**ones** 12:16 32:16
**operate** 25:7,10 26:2,8 27:1,13 33:1 35:8 38:17
**operating** 3:10 19:20 50:3,6 58:24 59:20 60:1 62:10
**operation** 26:21 44:23
**operations** 25:1
**opportunity** 79:17
**order** 11:16 17:14 25:9 27:22 33:7 46:21 52:1 58:22 59:2 60:20 63:16 63:22 64:16 74:2 83:3
**ordering** 100:13
**ordinary** 62:9
**organize** 14:10
**organizing** 15:3
**orientation** 21:7 53:14
**original** 100:12,15
**outcome** 6:2 99:8
**ovie** 82:17

**p**

**page** 3:8,21 4:2 7:15 11:6,7 20:13 22:9 30:5,5 35:13 37:21 78:10 89:22 92:22,23 101:11 101:14,17,20,23 102:1,4,7,10,13,16
**pages** 101:9
**paid** 76:9 77:2,7 77:24 78:12 79:20 86:24
**paper** 25:5
**parameters** 83:7
**part** 28:25 31:22 31:23 36:17 48:14 89:23 96:19
**particular** 94:17
**parties** 5:9 99:1,7 100:13
**party** 5:24
**pdf** 100:6,7
**pending** 8:11 98:8
**people** 23:18 72:25
**percent** 24:22 60:22 61:4 72:20 72:22 89:2,8
**percentage** 24:21
**percentile** 89:7
**perform** 87:4,7,12
**performance** 3:12 19:12 37:4
**performing** 38:12
**period** 27:11 28:6 29:22 32:4 33:6 34:23 41:7 47:10 52:8 83:12 90:9 94:18
**permits** 19:13
**person** 26:25 27:6 35:8 73:2,3 80:23 81:7 82:16
**personal** 13:8 61:2
**personally** 13:13 16:20 19:14 98:6
**persons** 73:3
**pertaining** 1:16
**phone** 3:17 12:5 56:10 57:4 59:9 59:11,19,25 60:11 61:2,9,24 71:17,23 72:7,13 82:2,6
**phones** 5:6 60:15
**photo** 80:10
**pick** 5:4 7:17
**pictures** 12:13
**place** 5:6,9 19:15 20:3,7,10 27:15 28:13 29:3 33:17 43:18,21 56:21 57:2,5 58:2,18 61:23 76:23
**plaintiff** 1:6 2:7,13 5:13 6:7 98:11
**plaintiff's** 10:22 19:21 24:4 36:23 37:2 42:9,10 43:1 44:4 56:12 57:22

78:6 84:18,19 88:11,13 89:17 92:9 93:15 95:4
**plead** 76:12 78:22
**please** 5:3,5 6:11 7:6 8:3 93:3 100:6 100:10,18 101:9,9
**pled** 78:18,21
**plus** 52:3
**pocketbook** 58:15
**point** 27:18 28:12 33:10 39:19 41:21 41:25 48:6,22 49:1,5,9,14 94:13
**points** 27:19,22 29:4 33:8,11,18 39:20 40:8 48:4 49:7,17,23
**police** 12:12 66:22 73:16 97:7
**policies** 16:15 19:15 20:3 30:7 35:19 56:4 58:17 58:22 60:11,18 61:23 63:3 91:4
**policy** 3:10,17,18 19:19 20:9 27:15 27:18,24,25 28:9 28:16 29:3,11,12 30:2 31:10 35:13 41:25 46:5 49:2,6 49:21 56:5,10,21 57:4,12,18 58:2 59:9 62:5 76:18 76:23 77:1,12,19 79:4,17,22 86:14 86:21 89:23 90:1 90:4,4,6,9 92:7,24
**position** 18:9 66:25 67:3 68:21 69:10 72:18,25

73:6 79:21 85:12 87:10,17,20,23
**positions** 18:12
**possible** 59:3
**post** 41:13 84:12
**potential** 29:16 64:7,11
**power** 24:12
**prairie** 17:5 21:24 22:1,13
**pre** 18:23 53:18
**predict** 68:19
**preface** 11:25
**preparation** 11:21 12:8,11
**prepare** 11:24 12:4
**presence** 98:19
**present** 2:24 6:3 64:17 99:4
**preserve** 80:17
**preserved** 81:21
**press** 80:17
**pretty** 39:3,25 82:22
**prevent** 41:13 69:5
**preventable** 73:21 73:24 74:3
**previous** 14:7
**previously** 4:3 66:21 78:5 82:11
**print** 100:8
**printed** 24:11
**printout** 3:22 92:13
**prior** 20:21 37:7,9 37:15,19 38:10,18 39:9,11 86:19
**private** 5:4

**probably** 21:17 28:17 29:13 52:19
**problem** 40:20
**problems** 33:12
**procedure** 1:15 6:18 40:2 101:7
**procedures** 3:10 16:15 19:20 56:4
**process** 21:7 27:16 27:16 34:5 52:6 53:7 79:6
**production** 100:19
**products** 25:5
**professional** 53:17
**professionally** 13:18
**profile** 3:20 88:18
**prohibit** 61:23
**project** 80:19,24 82:17
**provide** 14:25 36:20 51:16 58:6 80:21
**provided** 20:2 28:24 42:13 43:13 46:11 48:3 52:8 75:2 81:1 89:22 90:8,12
**providing** 51:21
**psp** 31:21 38:13,14 48:1,16
**pti** 41:14 53:16
**public** 26:4 27:5 102:24
**publish** 53:23,25
**pull** 24:3 82:21 84:17
**pulled** 80:10
**pulling** 82:15
**punish** 40:23

**punished** 55:3
**punishment** 20:18 41:17,22
**purposes** 6:16,17
**pursuant** 1:14 6:14 10:7 36:18 99:3 101:6
**put** 22:20,22 23:1 26:7 27:4 42:15 53:5

**q**

**qualification** 31:22 42:16,20 43:11 44:2
**qualified** 21:11 26:2 27:1 33:3,5,7 35:10,19 39:20 46:5 86:14,17,21
**qualify** 95:12
**quarterly** 19:13
**question** 6:20 7:24 8:1,7,11 15:22 28:7 38:15 45:8 47:6,20 50:13,22 61:11 69:16 95:14 97:1
**questions** 8:4,5 96:11 97:14
**quick** 42:21 53:16 70:15 95:19 97:1
**quite** 15:9
**quiz** 41:15 51:25
**quizzes** 52:22

**r**

**r** 7:8 23:14,15,15 23:16,17 54:11
**r&l** 61:18
**rating** 88:3,6
**reaches** 31:3

**react** 64:12
**read** 44:19,25 90:16 100:6 101:2
**real** 42:21
**really** 9:7,16
**reason** 34:10 39:6 67:23 68:6 85:16 101:13,16,19,22 101:25 102:3,6,9 102:12,15,18
**reasonable** 25:20 26:1,3 63:23 64:25 70:10 71:22 87:18,21,24
**reasonably** 26:8 36:10 60:21 63:16 64:16
**reasons** 101:8
**recall** 34:7,17 53:11 54:16
**receive** 30:13,17 35:22 36:4 53:7 53:13 79:5
**received** 13:24 14:2,5,14 15:19 32:12 34:14 37:20 38:3,6 46:14 47:11 55:7,12 76:5 79:19 81:4 86:2
**recess** 42:24 95:23
**recognize** 56:20
**record** 5:2,10 6:5 7:7 26:18 31:18 32:3,4 38:4,13 42:17,21,22 43:4 44:12,22 45:4,6,11 45:15 80:1 95:20 95:21,25 97:20
**recorded** 5:12
**recording** 5:8 83:4
**records** 3:13 12:13 18:22 37:4
**recruiter** 53:22
**red** 85:2
**reduced** 98:20
**refer** 8:15
**referred** 4:3
**referring** 8:16 20:14
**reflected** 35:7 67:6
**refuse** 25:4
**regard** 60:10
**regarding** 11:17
**register** 23:18
**registered** 23:25 25:3
**regular** 53:10
**regularly** 72:7
**regulates** 27:16
**regulation** 58:15
**regulations** 18:21 25:18 26:20 36:19 37:13 40:16 44:9 44:18 57:16 62:16 84:12,24 91:8
**related** 5:24 45:24 60:11 82:9 87:18 87:19,21 90:22 99:7
**relatives** 13:7
**relevant** 28:7
**rely** 74:6
**remember** 9:11,14 9:18,20,24 10:1 12:15 16:1,4 20:24 34:12 38:25 39:25 49:17 55:1 63:8 66:2 74:10 74:19,23 82:20
**repeat** 8:4 41:20 50:13
**rephrase** 8:5 47:8
**report** 12:13 31:21 73:16 97:7
**reported** 1:24 98:18
**reporter** 1:18 5:23 97:15 99:14
**represent** 7:11
**representative** 9:2 13:16
**representing** 2:7 2:13,19
**request** 3:13 37:4 82:18 96:4
**require** 84:12
**required** 30:12 37:12 45:2 85:25 87:9,11
**requirements** 26:14 44:14
**requiring** 85:7
**reservation** 90:21
**reserve** 97:16
**reserved** 6:21 100:6
**respective** 99:1
**respondeat** 50:11
**responded** 38:22
**response** 37:20,25 38:3,7 39:23
**responsibilities** 25:12
**responsibility** 36:13,14,15
**responsible** 36:9 36:12 50:11 72:20 73:1,7 81:7
**responsiveness** 6:21
**rest** 33:11 74:24
**result** 16:13 76:6 79:20
**retention** 90:14,19
**retrained** 55:3
**retraining** 41:14
**returned** 100:11 100:14
**reverse** 17:14
**review** 12:7 31:17 42:18 43:8 44:11 45:6 46:4,20 74:8 100:6
**reviewed** 12:10 97:9
**reviewing** 45:4
**revised** 93:19
**ridge** 1:19 5:20 98:7
**right** 21:15 22:18 23:22 24:13 39:5 45:12 47:22 48:24 49:22 50:1,2 52:4 55:6 63:25 64:14 64:22 65:4,7,11,13 65:18,18,19 67:25 68:9,13,18 69:7,25 71:3 72:5 73:13 76:25 82:20 84:23 91:24 92:2,8 94:1 95:16 100:6
**rights** 90:22
**rli** 1:10 3:21 5:14 89:15 92:24 94:3 94:16 98:12
**road** 2:4,10,16 9:8 27:5 52:5,15 53:15 59:20 61:3 64:2 69:18 71:13 71:15,19 72:24

**roadside** 58:12
**roadway** 26:7 36:10 64:18 66:6
**roadways** 26:4
**robert** 1:5 6:7 98:11
**rogers** 2:3
**role** 19:14 20:6 82:14
**room** 6:3 70:7
**ross** 2:24 5:21
**roswell** 2:10,16 100:22
**rude** 7:19
**rule** 10:7 64:15 101:6
**rules** 1:14 6:18 7:14,16 39:22 40:12 42:3 51:22 63:14 101:6
**run** 48:16
**running** 18:22
**russia** 17:3

**s**

**s** 2:16 3:7 4:1 7:8 100:1
**safe** 25:21 26:3,14 27:6 29:19,25 36:10 42:2 44:14 46:1 59:3 60:21 62:7 63:16,23 64:16,25 71:21
**safely** 26:8 27:1,13 35:8
**safer** 89:2,8
**safety** 3:12,20 14:3,7,11,13,15,25 15:5,12 17:20 18:4,6,10,11,17,19 18:24 19:8,10,10 19:12 25:18 26:20 30:12 36:19 37:4 37:10,13 38:11,12 40:16 44:9,18 52:18 53:10,24 58:15 59:5 61:12 62:15 84:12 88:2 88:3,17,18 91:8 92:14 93:23 94:16 95:10
**sandei** 1:17,24 5:23 98:4
**save** 81:6
**saw** 65:17 68:2,9 68:12 71:13 76:16
**saying** 11:25 46:23
**says** 24:23,24 30:10 31:11 38:4 44:10 45:5 90:18 93:6,20 94:8,10
**schneider** 61:18
**school** 17:2 22:5 23:6,10
**scope** 50:3
**score** 88:22
**seal** 100:11
**seat** 33:9
**second** 9:13 30:17 78:10 83:11
**section** 20:15
**security** 57:12
**see** 29:18 32:6,11 41:17 48:1 55:14 68:23 69:18,19 70:3 72:11 74:24 76:15 88:24 92:20 92:25 93:8
**seeking** 95:11
**seen** 11:4,9 19:25 66:23 84:25
**sees** 68:22
**self** 90:14,19 91:13 94:22 95:12
**send** 100:12,18
**sensitive** 5:4
**separate** 13:17
**september** 8:17 75:8 88:19 90:10 90:10
**served** 13:10
**service** 20:18 33:18,19 58:8 82:23 89:6
**sessions** 16:14
**set** 43:14 99:9
**seven** 18:25 53:5 83:10,10
**sheets** 53:5
**shop** 41:10
**short** 27:10
**shorthand** 1:17 99:14
**show** 48:8,17,25
**shower** 23:19
**showing** 32:2,3
**shown** 75:4
**shows** 24:12 55:16 93:5
**side** 65:18 71:13 72:23
**sign** 100:6
**signature** 97:15,16 98:24 99:10,13 100:2,15 102:20
**signed** 78:13,16 100:9,11,14
**signing** 78:25
**similar** 89:3,3,4,8 94:15 95:9
**simple** 53:4
**sit** 41:10 49:22
**situation** 29:23 39:1 41:19 60:8 70:10,20 85:25 96:22
**six** 18:5,25 33:11 35:15,16 49:5,6,9
**size** 89:3,4
**sized** 89:8
**skype** 54:9
**slam** 70:8 71:7
**slamming** 71:2
**slow** 64:21 70:4
**slowed** 68:2,4 69:6 70:13,17 71:5
**slowing** 65:19 71:12
**snapshot** 24:9
**solutions** 5:22
**somebody** 26:24 34:6 35:24 36:3 45:3 68:18
**sooner** 71:5 72:11
**sorry** 50:14 55:1 61:15 77:16 78:4
**sound** 22:18 24:13
**source** 85:20
**sources** 61:6
**space** 51:19 64:12 70:5,18,23,25 71:6
**specialized** 63:18 63:19
**specified** 49:2
**speed** 51:19 64:25 65:3
**speeding** 15:24
**spence** 2:9,10 6:6
**ss** 98:2
**stage** 21:10
**standards** 25:24 59:7 60:9 62:25 74:1

**start** 17:14 27:22 35:10 45:10 52:2 83:3
**started** 9:7 17:10 20:10 22:10 65:18 71:12
**starting** 11:6
**state** 1:18 6:4 7:6 9:18 17:6,7 19:13 21:24 22:1,13 25:15 26:20 40:17 48:11 62:13 86:11 98:1
**stated** 78:24
**statement** 36:13 66:22 68:4 70:22 71:11 73:17 97:7 97:10 101:8
**statements** 97:9
**states** 1:1,15 5:15 24:1 25:7 98:9
**status** 91:25
**stayed** 17:9
**stenographically** 98:18
**steps** 26:1 59:2
**stop** 9:15
**store** 23:20
**storing** 81:15
**strike** 19:3 59:16 76:20 81:13 87:19 90:5
**strong** 83:19
**studies** 17:10
**stuff** 96:4
**subject** 58:3 67:17 87:25
**submit** 93:23
**submitted** 76:11 78:7 94:2,6,9,14
**subscribed** 102:21
**subsection** 44:9
**subsections** 44:15
**substance** 101:7
**suit** 99:7
**suite** 2:4,17 100:21
**summary** 66:10
**superior** 50:11
**supervising** 19:10
**supposed** 39:22 70:9 81:8
**sure** 7:15,20 21:10 22:2,9 26:2,13 29:1,8 36:9 39:3 39:25 42:18 45:20 49:18 50:1,15 56:3 57:15 61:14 61:16 62:1,7 64:4 79:16 80:20 82:22 83:13,23 93:12 95:2,13
**surety** 91:13 93:24 94:3,17
**suspension** 30:18
**swear** 6:11
**swerve** 66:3
**swerved** 65:21,23 68:3 73:4
**swerving** 65:25
**sworn** 6:12 7:3 8:20,23 98:15 102:21
**system** 20:17 39:20 40:8 48:4 48:22 49:1 54:21 81:5,14 82:9 83:2 83:17,20

**t**

**t** 2:3 3:7 4:1 14:13
**table** 84:23
**take** 5:9 8:9,12 15:13 25:11 26:1 29:13 43:24 49:16 59:2 68:15 69:1 69:22,24 70:7 71:1 95:19
**taken** 1:16 5:12 6:14,16 42:24 77:22 95:23
**takes** 52:14,15
**talk** 7:23 39:1 55:13 59:19 73:18 76:3 86:6
**talked** 35:21 91:3 91:6 96:5
**talking** 28:7,10,16 30:6 39:16,18 44:1 52:4 75:23 75:25 92:1
**talks** 20:13
**task** 60:23 61:4
**taxes** 19:13
**team** 19:10
**tell** 9:4 17:1 19:6 54:15 55:6 81:11
**telling** 27:5 40:3
**tells** 41:12
**terminate** 42:1
**terminated** 30:25
**termination** 27:16 27:24
**terms** 13:18 59:10 60:11 75:4 91:7
**test** 14:20,22 41:15 51:25 52:5,5,15,15 53:1,4,15 84:9,13 85:24 87:5,8,12
**testified** 7:3 13:17 49:3 66:18 74:16
**testifies** 85:14
**testify** 10:13 11:12 11:17 85:17 98:15
**testifying** 10:3
**testimony** 8:21,24 9:21 45:21 48:21 68:21 98:17,22 99:9 101:2,7
**testing** 3:18 57:18
**tests** 52:25
**texting** 54:5
**thank** 6:10 93:3 96:21,24,25 97:14
**thereof** 99:8
**thing** 42:6 57:10 97:18
**things** 21:9 91:10
**think** 9:5 15:23 16:17 22:8,16,19 23:19 26:25 29:3 35:2 42:15 50:2 52:12,21 53:9 55:20,22,23 58:20 59:22,25 66:5 67:6,19 68:1 69:11 71:14,17,25 72:10,14 82:12 83:9 89:11 94:6,8 96:19,20
**thinking** 59:14
**thinks** 61:8 71:21
**third** 8:25 10:3 30:22 31:3 52:18 72:24
**thought** 49:3,8
**three** 14:11,21 15:4,6 18:25 22:4 23:6,7,8 31:5,7 37:15,19,22 38:21 39:23 52:9,11,14 65:19 68:13

**ticket** 15:24 32:11 48:8 55:8,12 77:21
**time** 1:20 8:9,11 8:25 10:3 15:17 16:2,15 18:6 19:1 19:4,16 20:3 22:6 22:14 26:11 27:11 28:6,13,20 29:14 31:3 32:4,5,9 35:20 38:16 39:7 41:4 42:23 43:21 43:24 50:4,7 52:15 53:8 55:3 56:22 58:3,18 59:10 64:11 67:17 68:8 71:18 74:21 75:10,25 76:22 85:18 86:10 88:9 88:22 89:14 91:22 94:17,18 95:21 97:21 100:14
**timeframe** 31:2
**times** 8:23 9:1 39:23 55:6
**titled** 19:19 20:15 37:4
**today** 7:17 10:2,14 11:3,9,13,18,22,25 12:4,8,11 29:7,10 42:6,7 58:19 68:22 96:5,12
**top** 16:17 38:25 93:6,20
**topic** 51:25
**topics** 11:7,9,13,17 14:12 15:5 51:18
**towed** 85:8,10,15 85:17,23
**towing** 85:19
**toys** 23:14,17
**traffic** 15:19 64:20
**train** 51:14
**training** 13:25 14:2,5,6,11,19,25 14:25 15:3 16:7 16:14 30:13 51:16 51:18,22,23 52:7 52:17 53:7,14,16 63:19 80:21 81:4
**trainings** 14:9,13 47:17 52:4
**trans** 37:16,20
**transcript** 7:18,20 98:22 100:7,12,15 101:2
**transcription** 98:21
**transportation** 24:1 37:16
**travelling** 65:16 67:14
**tried** 65:20 82:22
**trigger** 80:16 81:5 83:5,19
**trip** 53:18
**trips** 53:4
**truck** 9:15,15,16 27:5 46:18 47:1 53:14,17 63:6,10 63:14 80:8 81:12 81:14,19,22
**trucking** 1:8 5:14 5:19 6:14 7:12 10:7 14:8 23:22 33:21 38:16 98:12
**trucks** 24:13 33:1 59:20
**true** 98:21
**truth** 98:15,16,16
**truthful** 62:19
**try** 7:23 15:14
**trying** 7:19 26:24 40:6 50:24 51:5 79:10
**turn** 5:6 32:11,21 47:25 48:5,8 49:14,23
**twenty** 35:15,16
**two** 9:1,4,22 13:17 13:20 14:8,21 18:25 21:17 22:4 23:6,8 32:13,20 33:6 35:4 38:22 39:9 41:7 43:5 44:15 47:10,25 52:19,19 65:19 68:12 92:7 97:21
**typically** 83:10

**u**

**u** 32:11,21 47:25 48:5,8 49:14,23
**u.s.** 17:9
**uh** 7:17
**um** 35:17 74:13 75:19 90:11
**umbrella** 91:4
**unable** 11:21 86:18
**unacceptable** 60:25
**undersigned** 101:2
**understand** 8:3 10:6,8,10,16 13:15 45:21 47:6 58:23 69:10 77:23 81:22 84:11 87:10
**understanding** 34:8 35:18 37:6 65:14,22 78:25 80:16 82:8 89:1 89:24
**understood** 8:7 25:9 96:11
**underwent** 52:11
**undetermined** 98:9
**unexpectable** 68:18
**unexpected** 69:6
**unfinished** 17:7
**unit** 5:11 43:5 97:21
**united** 1:1,15 5:15 24:1 25:7 37:16 37:20,25 98:9
**units** 24:12
**university** 17:3,7
**unlimited** 20:25 21:4,13,21 23:11
**unsafe** 20:19 30:11 31:11 88:23
**updates** 92:1
**usdot** 3:11 24:9
**use** 6:22 59:11,12 60:11,15 65:9 74:1 101:9
**uses** 31:2

**v**

**v** 54:10,11
**validity** 33:21
**value** 49:15
**vehicle** 13:22,25 16:21 27:2,7,13 35:9 40:4 44:12 45:24,24 60:1,21 63:20,23 64:24 65:3,6,9,17 66:1,4 68:2,9,14,23,24 69:2,17 70:3,6,11 72:11,18 73:2 84:4 85:7,8,10,15

85:23
**vehicles** 26:4,9,21 44:24 58:24 62:10 65:19 68:3,13,15 68:24,25 69:19,20 69:21 70:5,14 71:3 72:19 73:3 89:3
**verbal** 7:16 55:8
**verification** 21:8 38:18
**verified** 99:10
**verify** 86:19
**veritext** 5:22,24 100:10,19
**version** 66:18
**versus** 5:14
**viber** 54:1,3,7,9
**vicarious** 50:12,19
**vicariously** 50:25 51:6
**video** 1:13 5:8,11 51:21,25 52:25 80:18 83:3
**videographer** 2:24 5:1,22 6:10 42:22 43:4 95:20,24 97:20
**videos** 41:14 52:22 65:12
**violate** 41:24
**violated** 26:19 44:17,23
**violation** 27:19 31:13 32:21 33:18 33:19 34:1,20 35:21 36:4 40:25 41:11,14,16 46:4 46:10 47:4,21,24 47:25 48:5,17,18 48:22 49:4,5,9,9 49:14,24 55:18,21 75:22,23,24 76:17 79:19
**violations** 20:18 20:19 27:10 29:21 29:24 30:11 31:6 31:12 32:2,3,9,20 32:25 33:5,9,11,15 33:22 34:3,4,11,22 39:8,17,18 40:5,9 40:9,10,19,22,24 41:1,5,6 42:4 45:17,18,23 46:11 46:12,14 47:4,11 47:11 55:16 76:24 79:18 86:11,17
**violator** 41:20
**virginia** 1:18 5:19 98:7
**vs** 1:7

**w**

**wait** 77:21
**waived** 98:25
**want** 7:14 8:9 12:1 15:8 17:15 20:12 22:8 42:18 43:7 45:20 56:3 57:14 59:2 79:16 96:14
**wanted** 11:20 51:12
**wants** 26:7 59:7 62:7
**warning** 55:9
**washington** 32:21 48:11
**way** 17:13 70:1 76:21 99:7,8
**we've** 10:6 32:1 42:19 44:1 56:3,4 56:7 58:22 78:5 80:10 82:10 91:2 96:4
**website** 3:11 24:9
**week** 30:18 53:4
**went** 12:12 23:6 35:12 46:10 52:11 53:6
**whereof** 99:9
**whichever** 17:13
**whispering** 5:4
**wife** 71:18
**wit** 98:5
**witness** 3:2 6:11 6:12 7:2 15:23 16:1 27:15 30:2 31:13 39:13 46:3 46:20 50:21 51:3 51:10 60:18 62:1 66:13,15 68:17 69:4,24 70:13,22 77:4,9 78:24 79:25 80:5 81:24 83:23 86:14,21 87:2 96:24 97:13 98:14,18,19,23
**work** 13:19 21:13 72:1,3
**worked** 14:7 21:16 21:20 23:14 34:9 34:16 38:23
**working** 18:21,22 19:11,13 22:5 23:11 27:22 33:15 34:1,20 35:11,22
**works** 80:22 81:4
**wreck** 94:18
**written** 3:15 16:14 27:25 28:9,10,21 28:23 29:6 43:17 52:23 56:10 66:22 74:5 80:25
**wrong** 49:4
**wrote** 67:9

**x**

**x** 3:1,7 4:1

**y**

**yeah** 16:12 23:3 29:11 48:2 66:15 77:9 82:12 92:4 94:8 97:19
**year** 13:6 14:11,25 15:4,9 16:1 22:2 29:22 33:6 34:23 41:7 47:10 51:23 91:16,22 92:6,7
**years** 14:8 15:20 15:23 16:5 17:5 17:10,23 18:5 21:17 22:4,12,17 22:23 23:6,7,8 31:5,7 39:9
**yesterday** 7:9,13 31:15 46:8,11,16 46:24 47:13 52:12 63:5 66:2,11,13,19 67:7 74:11 76:15 78:24

**z**

**zip** 13:3
**zoom** 93:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.