EXHIBIT A

VERITEXT LEGAL SOLUTIONS

Deposition of:

# Cristian Gisca

*February 25, 2019*

In the Matter of:

# Glenn, Robert v. HMD Trucking

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT GLENN, )
Plaintiff, )
vs. ) No. 1:18-cv-04410-ELR
HMD TRUCKING, INC., )
CRISTIAN GISCA, and )
RLI INSURANCE COMPANY, )
Defendants. )

The video deposition of CRISTIAN GISCA, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jeanette A. Sandei, Certified Shorthand Reporter in the State of Illinois, at 10031 Virginia Avenue, Chicago Ridge, Illinois, on February 25, 2019, at the time of 2:05 p.m.

Reported By: Jeanette A. Sandei, CSR
License No.: 084-003685

APPEARANCES:

FRIED ROGERS GOLDBERG
BY: MR. BRIAN T. MOHS
3550 Lenox Road, N.E.
Suite 1500
Atlanta, Georgia 30326
(404) 591-1800
brian@frg-law.com
Representing the Plaintiff

COOPER F. SPENCE LAW
BY: MR. COOPER F. SPENCE
5447 Roswell Road, N.E.
Atlanta, Georgia 30342
(678) 310-6127
cooper@cooperspencelaw.com
Representing the Plaintiff

O'DANIEL McDONALD
BY: MR. CLAY S. O'DANIEL
8010 Roswell Road
Suite 210
Atlanta, Georgia 30350
(404) 419-6300
codaniel@odmclaw.com
Representing the Defendants

* * * * *

ALSO PRESENT:
Ross Colby, videographer
Nadia Corsello, HMD Trucking

I N D E X


| WITNESS | EXAMINATION |
|---|---|
| CRISTIAN GISCA | |
| By Mr. Mohs | 7 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Interrogatories | 12 |
| Exhibit 2 | Lease agreement | 32 |
| Exhibit 3 | Handbook receipt acknowledgment | 37 |
| Exhibit 4 | Driver's license | 41 |
| Exhibit 5 | Driving record annual review | 48 |
| Exhibit 6 | PSP report | 49 |
| Exhibit 7 | Chart | 50 |
| Exhibit 8 | Washington traffic ticket | 51 |
| Exhibit 9 | Ohio disposition | 51 |
| Exhibit 10 | Log | 89 |
| Exhibit 11 | Lytx data | 96 |
| Exhibit 12 | Lytx data | 96 |
| Exhibit 13 | Lytx data | 96 |
| Exhibit 14 | Lytx data | 96 |
| Exhibit 15 | Bill of lading | 100 |
| Exhibit 16 | Written statement | 125 |

E X H I B I T S (Continued)


| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 17 | Police report | 131 |
| Exhibit 18 | Gisca written statement to HMD | 133 |
| Exhibit 19 | Affidavit | 134 |
| Exhibit 20 | Citation | 137 |
| Exhibit 21 | Photos | 143 |
| Exhibit 22 | Facebook profile | 146 |
| Exhibit 23 | Instagram profile | 146 |
| Exhibit 24 | Video still shot from Instagram page | 147 |

THE VIDEOGRAPHER: Good afternoon. We are going on the record at 2:05 p.m. on February 25th, 2019.

Please note that the microphones are sensitive and may pick up whispering, private conversations, and cellular interference. Please turn off all cell phones or place them away from microphones, as they can interfere with deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record. This is media unit one of the video recorded deposition of Cristian Gisca taken by counsel for the plaintiff in the matter of Glenn versus HMD Trucking, Inc., Cristian Gisca, and RLI Insurance Company, filed in the United States District Court for the Northern District of Georgia, Atlanta Division, Case Number 1:18-cv-04410-ELR.

This deposition is being held at HMD Trucking located at 10031 Virginia Avenue in Chicago Ridge, Illinois.

My name is Ross Colby from the firm Veritext Legal Solutions, and I am the videographer. The court reporter is Jeanette Sandei from the firm Veritext. I'm not related to any party in this action,

nor am I financially interested in the outcome.

Counsel and all present in the room will now state their appearances and affiliations for the record.

MR. MOHS: Brian Mohs and Cooper Spence on behalf of the plaintiff, Robert Glenn.

MR. O'DANIEL: Clay O'Daniel on behalf of the defendants.

MS. CORSELLO: Nadia Corsello, the safety director of HMD Trucking.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear the witness.

(Witness sworn.)

MR. MOHS: This will be the deposition of Cristian Gisca taken pursuant to notice and agreement of counsel.

It is being taken for purposes of discovery, cross-examination, and all other purposes allowed under the Federal Rules of Civil Procedure and Federal Rules of Evidence.

All objections except form of the question and responsiveness of the answer will be reserved until first use, if that's agreeable.

MR. O'DANIEL: It is agreeable.

MR. MOHS: And what do you want to do about

signature?
MR. O'DANIEL: We'll reserve signature.
MR. MOHS: Okay. Any notary is fine.
MR. O'DANIEL: Okay.
CRISTIAN GISCA,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. MOHS:
Q. Sir, would you please state your full name for the record.
A. My full name is Cristian and the last name is Gisca.
Q. All right. Gisca. And Mr. Gisca, my name is Brian Mohs. And I am an attorney, along with my co-counsel here, Cooper Spence, and we represent Mr. Robert Glenn, who was involved in a collision with you on September 6th of 2016 in Georgia.
A. Okay.
Q. When we -- today when you or I are discussing the incident or the accident or the collision, can we have an agreement that we're referring to that collision that occurred on September 6th, 2016?
A. Okay.

Q. I know that you've probably met with your attorney and he's given you some ground rules on what to do today. I just want to make sure we're on the same page.
So, first of all, we need verbal answers today.
A. Okay.
Q. When you and I are in the same room, I know what a nod of the head means, but we have a court reporter taking everything down.
A. Okay. No problem.
Q. Next thing is you're going to anticipate where my questions are going.
A. Okay.
Q. Let me finish my full question before you answer it so she can get the full question down.
A. Okay.
Q. In a normal conversation, we can kind of anticipate and cut each other off. And I'm going to try to do my best to not cut you off when you're answering a question.
A. Okay.
Q. If you don't understand any of my questions, please let me know.
A. Okay.

Q. And I'll do my best to rephrase it.
Can we have an agreement that if you do answer my questions today, that meant you understood them?
A. Okay. I understand.
Q. And then, finally, if you want to take a break at any time, just let us know. The only rule we have is that you answer whatever question is pending at that time --
A. Okay.
Q. -- and then we can take a break. Okay?
A. No problem.
Q. Before we start, are you on any medication or is there any other reason that will prohibit you from telling the truth today?
A. No.
Q. Okay. Have you ever given a deposition or sworn testimony before?
A. No. First time.
Q. Okay. And just so you know, I'm here today to find out what happened in the collision, find out a little bit about you. I'm not here to trick you.
A. Um-hum.
Q. I want to make sure you have a fair

opportunity to give your answers today. So, you know, I just wanted to give you that as a little bit of a background.

First of all, at the time of this collision, you were in the course and scope of your agency with HMD Trucking; is that correct?

A. That is correct.

Q. You were an independent contractor? Is that what you understood?

A. Yes. I was -- I rent the truck from them.

Q. Okay. So you were a separate entity operating exclusively under their motor carrier authority.

A. Yeah, that's right.

Q. Okay. And do you understand that they have -- HMD has insurance through RLI Insurance that covers both you and HMD for this collision?

A. I understand, yeah.

Q. Okay. And have you been notified of whether or not any -- my client has attempted to resolve this --

A. What --

Q. -- claim within the policy limits?

A. What do you mean like?

Q. Were you -- and one thing I want to make

sure I'm clear about. I don't want to know about any conversations you had with any attorneys.
A. Oh, okay.
Q. I'm not entitled to know that, and I don't want to know that.
A. Um-hum.
Q. Have you been notified by anybody else that in this case, before the lawsuit was filed, my client attempted to resolve this case within the policy limits?
A. No.
Q. Okay. And the same rule applies for the whole deposition. I don't want to know any of your conversations that any -- between you and any attorneys.
A. Um-hum.
Q. Did you prepare for the deposition today?
A. No.
Q. Okay. Did you review any documents at all?
A. I review the documents.
Q. Okay. What documents did you review?
A. You send -- somebody send me the whole paperwork.
Q. Okay.
A. Like somebody make a lawsuit against the

HMD company.
Q. Okay. So you reviewed the lawsuit, the complaint?
A. Yes.
Q. Okay. Other than the complaint, did you review anything else?
Like did you -- do you remember answering written questions that are called interrogatories in this case?
A. What kind of questions like?
MR. MOHS: Pull up number two.
(Whereupon, Plaintiff's Deposition Exhibit No. 1 was marked for identification.)
BY MR. MOHS:
Q. I'll hand you what I've marked as Plaintiff's Exhibit Number 1.
These are what are called interrogatories or written questions that were directed --
A. Okay.
Q. -- to you.
Have you reviewed this document before?
A. Yes.
Q. Okay. And these are your answers on this exhibit, correct?

A. Yes, that's right.
Q. Okay. Other than the lawsuit and the interrogatories, have you reviewed anything else in preparation for today, like photographs or the police report?
A. I send the photographs like . . .
Q. Okay.
A. My police report, yes, I saw it.
Q. Okay. Any other documents you can remember?
A. Documents?
Q. Yeah, like paper --
A. I saw my background, like my tickets and every stuff like that.
Q. Your driver background?
A. Yeah, my driver records.
Q. Okay. All right. Anything else you can remember that you reviewed? Any other documents?
A. My -- how you say -- my application on this company.
Q. Okay.
A. Application.
Q. Perhaps maybe what you reviewed is your driver qualification file --
A. Yes.
Q. -- which has your application and your

history, all that sort of stuff?
A. Yes. I saw everything.
Q. Okay. Any other documents that you can remember reviewing?
A. Documents. Hold on a second. Just let me think about this. The documents that show -- you show me.
Q. And I know you probably -- look, I understand you probably can't remember every document you reviewed.
A. Yeah, just --
Q. I just want to -- if you have a memory of any other documents, I just wanted to know about it. It sounds like --
A. My application. My -- the picture that I send to the police report, both sides.
Q. Okay.
A. And the ticket, I think, so . . .
Q. Okay.
A. That's it, I think.
Q. Okay. Mr. Gisca, what is your -- what was your cell phone number at the time of this collision?
A. (425) 244-1449.
Q. And what was your provider?
A. Sprint.

Q. Okay. And is that still your cell phone number and provider?
A. Yes.
Q. Okay. Did you have any other cell phones --
A. No.
Q. -- at the time?
A. Just . . .
Q. Okay. What type of phone did you have at the time of the collision?
A. A Samsung.
Q. Do you know the model?
A. Galaxy S6, I think.
Q. Okay.
A. And I have a bluetooth.
Q. Okay.
A. It's Blue Parrot. That's company name, blue Parrot. I don't know it's like -- like you put on there.
Q. That's the bluetooth?
A. Yeah.
Q. Did you have a headset that you used?
A. Yeah, headset.
Q. Okay. So I understand that you at some point -- you were born in Moldova?
A. Yeah, that's right.

Q. Am I pronouncing that right?
A. Yeah.
Q. And at some point you moved to America.
A. Yes.
Q. Why don't you tell me about that, you know, process and what brought you to America.
A. Okay. I came with G-1 Visa. It's a work and travels. It's work and travel.
Q. Okay.
A. And after that, I go to the college.
Q. Okay. What college?
A. It's Sonic. It's in Wheeling, but I think now it's closed. And I go to the college. And they said they have evening lessons. And after that, they said they don't have evening, just in the middle of day. And I didn't -- I cancelled the college.
Q. Okay. And what college did you say it was? Sonique?
A. Sonic, S-o-n-i-c.
Q. Okay. And that's here in Illinois.
A. Yes.
Q. Okay. I'm not from here, so --
A. Okay. Yeah.
Q. -- I don't know the area.

A. And, oh, I'm sorry. It's not Sonic. That's Solex, S-o-l-e-x.
Q. S-o-l-e-x.
A. Yeah.
Q. Okay.
A. It's in Wheeling. I'm sorry.
Q. So that was the plan to go there.
A. Yeah. The plan was to go there and to make my -- finish my study from Moldova. And my parents was like -- I prepare the documents, and they was my sponsors. And after that, my father go sick, and they didn't have enough money to give me to study here, and I go to work.
Q. Okay.
A. And after that, I meet my wife and . . .
Q. How old were you when you moved to the U.S.?
A. Nineteen years old.
Q. Okay. And so when would that have been?
A. 2014.
Q. Okay. And so you initially came to the Chicago area, and then at some point did you move to --
A. From first time I came USA?
Q. Um-hum.
A. Yeah, I was in D.C. -- Washington, D.C. It's

Alexandria, if I can remember.
Q. Okay.
A. And I used to work for the lifeguard on the pool.
Q. Okay.
A. It was my first job, like, they provide, but was bad experience.
Q. And then at some point did you move to Illinois from D.C.?
A. I moved to Washington after that.
Q. Okay. And what did you do in Washington?
A. I make my CDL.
Q. Is that where you went to truck driving school?
A. Yeah, truck driving school.
Q. Do you remember the --
A. But until I moved to Washington, I stay one year in Illinois, and I work for the construction companies.
Q. Okay. Do you remember the name of the truck driving school that you went to in Washington?
A. Yes. Pacific Trucking School.
Q. Pacific?
A. Pacific, yeah.
Q. Do you remember what city that's in in

Washington?
A. Just, yeah, it was close to Seattle.
Q. Okay.
A. But I'm not sure it's Seattle. It's Bellevue or -
Q. Okay.
A. -- something.
Q. Okay. And tell me about the trucking school. How long was the program to get your CDL?
A. One month.
Q. Okay.
A. And if you go to every day, it going to take one month. If you go, like, three times on the week, it take two, three months. It's depends on your skills and how you're driving.
Q. Okay.
A. The people are studying there six months, eight months, because they can't do the practice and they cannot park and every stuff like that, until they know everything, you know.
Q. Okay. So does it include both classroom training and in-cab training?
A. That's right.
Q. Okay. And it took you a month?
A. It took, like, month and a half.

Q. Okay. And during that time, how often were you going? Five days a week?
A. Every day.
Q. Every day.
A. Every day, just they don't work on Sundays.
Q. Okay. So six days a week.
A. Yeah. Six days a week, yeah.
Q. Okay. And when you were at that truck driving school, did you -- were you provided with a CDL manual?
A. Yeah. CDL manual and practice and every stuff. We have two class. It was the theoretically, like how to do logbooks and how to -- all the regulations, and after that you go to the practice.
Q. Okay. And when you went to the practical part of the class, would there be a driver with you or --
A. Yeah, of course.
Q. -- a supervisor with you?
A. Yeah, supervisor.
Q. Okay. And sometimes would you watch them do stuff and they'd show you --
A. Yeah. They explain how to -- I -- they have two option, to study on the stick-shift or to automatic transmission. And I studied for the

stick-shift.
Q. Okay.
A. And for the stick-shifts, it take a little bit, but you drive the cars in my country with stick-shift, and it was very easy for me to know how to move the stuff like that.
Q. Okay. And so when you were doing the practical training, it was both you observing another driver --
A. Yeah, and couple --
Q. -- and him observing you.
A. Yeah.
Q. Okay.
A. And couple guys with me, yeah.
Q. And how did it -- how did you graduate? At some point do you take a test or do they just say --
A. Yeah, take exam. It's a very hard exam. You need to go to DMV, take three practical exam. It's, like, air brakes -- I don't remember. It's, like, tough. It was a lot of questions and you need to answer these, general knowledge, air brakes, and -- and one more.
Q. Okay.
A. And you go to DMV. You need to provide --

to do this skill test. And if you did this, you get the license, but it's not a license. It's like . . .

Q. A permit?

A. Permit, yeah. I'm sorry. Yeah. It's permit. And after that, you can go to start practice school.

Q. Okay.

A. And after that, you go to the exam. And exams take, like, one day. You go to the exam and you make a PTI, everything on the truck around. And you go to the --

Q. And PTI stands for pre-trip inspection?

A. Pre-trip inspection, that's right.

And you go on the road. You make couple miles -- you drive couple miles. You look on the mirrors and every stuff like that. You go back. And after that, you starting to parking, like, 90 degrees, parallel parking, then go straight back.

Q. Okay. And did you pass all that on the --

A. Yes.

Q. -- first attempt?

A. Yes.

Q. Okay. And then after you got your CDL, did you work at all in Washington?

A. No.
Q. Okay. Is that when you came to Illinois?
A. My friend sponsor, give me the money to make the school because it is too expensive and I didn't have money.
Q. Okay. So what was the first company that you worked for as a commercial motor vehicle driver?
A. Okay. The thing is the general name, it's MMJ.
Q. Okay.
A. But they put new drivers on Delta. It's, like, Delta.
Q. Delta?
A. Yeah. Delta Express or Delta. Just Delta.
Q. Delta Express?
A. It's in Alsip, Illinois.
Q. Aslip?
A. Alsip.
Q. Alslip?
A. Yeah.
Q. A-s-l-i-p?
A. A-l-s-i-p.
Q. Okay. Alsip.
And MMJ was the first place that you worked.
A. Yeah, that's right.

Q. I think in your interrogatory responses, you said you worked there from May of 2015 until October of 2015?

A. Not May. It was, like, September to October, like one month and a half.

Q. Let's see. I might have misread that.

MR. O'DANIEL: I may have messed it up too.

BY MR. MOHS:

Q. I think it's on Page 6 of 15 at the top.

A. Okay. This one says SDM Transport. It's not my first . . .

Q. If we look there, it says on the third sentence MMJ --

A. Oh, MMJ, yeah.

Q. -- May to October of 2015?

A. Not May, but it was September.

Q. Of 2015?

A. Yes. September 2015 to October 2015.

Q. So it was just a month?

A. Month, yeah.

Q. Okay.

A. Just one month.

Q. When did you get your CDL?

A. I get -- I got my CDL on 28 of July. 28 July. And I go to training. I training one month.

Q. 28th of July 2015?
A. 2015 July.
Q. Okay. And so you went -- you said you went to training for one month with who?
A. With company driver. I don't know. It's a guy.
Q. At MMJ?
A. Yes, MMJ.
Q. Okay. So that was -- was that in August? August to September?
A. Yeah, August.
Q. And then in September, you started driving for them?
A. Yes.
Q. And then in October, you left.
A. Yes, that's right.
Q. And why did you leave?
A. The thing is, they have flatbed trailers. And I was working for miles. They pay for miles. And they pay high rate, but they give me a small -- a small road, like small . . .
Q. Route.
A. No, not small route, but less miles than supposed to give me, you know.
Q. Okay.

A. They give me --
Q. You didn't have the opportunity --
A. Yeah, I didn't have opportunity to make money.
Q. Okay.
A. I just make, like, $800 per week.
Q. And so you decided --
A. Can go to the construction.
Q. You decided to leave.
A. Yeah, I decided to leave.
Q. After you left MMJ, where did you go to next?
A. I go to -- from the -- I know the guy who have the trucks, but the DeWalt trucks, but they give me -- like you -- you used to work, like, Chicago to California, you know, and it's 2,000 miles. And you make miles and you make money, but he pay little bit less, so . . .
Q. Okay.
A. But it was better.
Q. Do you remember the name of that company?
A. Yeah. The first name, it was Infinity.
Q. Okay.
A. They have trucks in that company. And after that, they open their own company.

Q. Okay. And how long were you working for Infinity?
A. Around 10 months.
Q. So would that have been starting in October of 2015?
A. Yeah, that's right.
Q. Until --
A. Until --
Q. -- August of --
A. Until May, I think.
Q. Okay.
A. Until May or June. I don't remember when I start driving for HMD because I moved from them to HMD.
Q. Okay. What about -- well, first of all, back to MMJ, were you travelling -- driving interstate for them?
A. Yes.
Q. Okay. All over the place or was it a dedicated route?
A. No. Just east coast.
Q. Okay.
A. That's why it was very hard to work.
Q. And then, next, Infinity from October 2015 until maybe May of 2016.

A. Yeah, whole country.
Q. And interstate, the whole country.
A. Whole country.
Q. And then from there, did you go to HMD?
A. Yes.
Q. What about I think on this answer, you also identified S -- SMD is where you currently work.
A. Yeah, SDM. It's not SMD.
Q. Okay.
A. I changed the company in January, just one month ago.
Q. All right. And --
A. This was my . . .
Q. What about United Logistics?
A. Yeah, United Trans Logistics. Yeah, this one I said, like, they have trucks in the Infinity. And after that, they open their duty number.
Q. And that's what --
A. And they move their truck to this company.
Q. So were both -- were you driving for both Infinity and United Trans Logistics prior to joining HMD?
A. Yes.
Q. Okay. And why did you leave Infinity and United Trans Logistics?

A. Interesting question. Because they have old trucks.
Q. Okay.
A. And every inspection, I got out-of-service tickets and violations.
Q. Okay.
A. And I go to the shops and they fix. I go on the road, and the second day something is going broke.
Q. Okay. Did you discover these violations during your pre-trip inspections?
A. Sometimes, yes.
Q. Okay. And would you still go out on the road when you --
A. No. I call them and go to the shop.
Q. Okay. So you left and started working as an independent contractor for HMD in August of 2016? Does that sound right?
A. Right.
Q. Okay. And you're no longer with HMD.
A. No.
Q. As of when?
A. As May 2016, I think. Yeah, May or June.
Q. You mean of 2017?
A. 2017, I think.

Q. Okay.
A. Yeah, 2017. I'm sorry.
Q. And did you leave or were you terminated?
A. I leave.
Q. Okay.
A. Because I bought my truck.
Q. Because you what? You bought your truck?
A. Yeah, bought my truck.
Q. And once you bought your truck, you decided to lease on with somebody else?
A. Yes. I go to another company.
Q. Okay. And why did you go to another company?
A. Because the car hauling business is the best business in the trucking business.
Q. Okay. And so that's what you do now is car hauling?
A. Yes.
Q. For SDM Transport?
A. Yes, but I change the DM to another company.
Q. Okay.
A. It's the same car hauling.
Q. SDM you joined in maybe May or June of 2017?
A. Yeah, that's right. May or June.
Q. And you just changed last month you said?

A. Yeah.
Q. To what's the company you work for?
A. Green Light Carrier.
Q. Green Light Career?
A. Yes, that's right.
Q. Courier or career?
A. Carrier.
Q. C-o-u --
A. C-a-r-r-e-i-r. Carrier. I can write it, so . . .
Q. Here, why don't we have you write on this.
MR. O'DANIEL: Carrier or career?
THE WITNESS: I don't know.
MR. O'DANIEL: Okay. You write it.
MR. SPENCE: Is he saying courier?
MR. MOHS: I think courier.
MR. O'DANIEL: Oh, that might be the one.
THE WITNESS: It's like two R, i-e-r. Carrier. Carrier.
BY MR. MOHS:
Q. Oh, carrier.
A. Yeah, carrier.
Q. Okay. Green Light Carrier.
A. Yes, that's right.
Q. And you've been with them for a little over

a month.
A. Yeah. Just month, yeah.
Q. All right. Have we identified every motor carrier you've worked for since you got your CDL?
A. Excuse me?
Q. Have we -- I just want to make sure we've identified every motor carrier.
A. Yeah, yeah, just these companies.
Q. Okay. And with HMD --
MR. MOHS: Hand me 12.
BY MR. MOHS:
Q. HMD, you were working for them as an agent pursuant to a lease agreement; is that correct?
A. Yes, lease agreement, that's correct.
MR. MOHS: We'll mark as Exhibit 2 a copy of the lease agreement.
(Whereupon, Plaintiff's Deposition Exhibit No. 2 was marked for identification.)
BY MR. MOHS:
Q. I just want to make sure that that's the lease agreement you --
A. Yes, it's mine.
Q. -- you were operating under with HMD.
A. That's right.

Q. Okay. And who was your primary supervisor at HMD?
A. His name?
Q. Yes.
A. It's Ovie.
Q. How do you spell that?
A. O-v-i-e.
Q. And last name?
A. I don't know it.
Q. You don't know it? Okay.
Do you know what Ovie's position was?
A. I think it was manager.
Q. Okay. Did you have any other supervisors?
A. I have just dispatch.
Q. Just dispatch?
A. Dispatch, yeah.
Q. Okay.
A. Yeah, I don't know anybody else.
Q. When you were hired at HMD, did you receive any training or orientation?
A. Yes.
Q. Tell me about that.
A. We -- I got the paper and that I need to fill up the questions about how to --
Q. Your application?

A. Application -- no, not application, but it was like . . .

Q. Some quizzes?

A. Yes.

Q. Okay.

A. Some working stuff, you know, like how to drive, how to maintain distance or something like that, you know. And after that, you go to -- we go to the practice in parking lot and the road test.

Q. How many days were you doing the quizzes?

A. One day. It's, like, take, like, six hours or five hours, something like that.

Q. Okay. For all -- for everything.

A. Yeah, for everything.

Q. Okay. And including the quizzes, including the practical.

A. Yeah, that's right.

Q. And were you driving a truck and somebody was observing you?

A. Yes.

Q. Do you know who that was?

A. Ovie.

Q. Ovie? Okay.

And then after that day, did you receive any other training from HMD Trucking?

A. I'm not sure if it was this company, but we go to the safety class school.
Q. Okay.
A. And I'm not sure it's for this company right now.
Q. Do you know how often you'd go to a safety class?
A. I did three times.
Q. Okay.
A. And they give me the, like, paper, like certificate. And I have them. Yeah, certificate.
Q. How often were the safety classes, if -- I guess, first of all -- strike that.
Is it -- you don't have a memory of whether or not you did any safety classes with HMD or if it was another company; is that fair?
A. Well, every time when you hire a new company, you need to make a safety class. And after that, I didn't make anything.
Q. Okay. As you sit here right now, do you have a memory of whether or not after your initial training at HMD you received any other additional training?
A. No. I don't remember.
Q. Okay. You don't remember if there were

safety meetings?
A. No. No safety meetings, I think.
Q. So you do remember, and you don't -- that there were not safety meetings.
A. No. I didn't remember, like, if it was safety meetings.
Q. Okay. Do you remember receiving copies of HMD company policies?
A. Yes. I receive, but I don't remember what it's saying right now.
Q. Okay. Do you remember -- off the top of your head, do you remember -- well, strike that.
Well, I don't want to mark all these, but, I mean, do you remember receiving a company policy and a cell phone policy and a cargo --
A. Yes.
Q. -- security policy?
A. Yes.
Q. The company regulations, the drug and alcohol policy?
A. Yes.
Q. Do you also remember receiving several J.J. Keller --
A. J.J. Keller.
Q. -- books or materials, like on hours of

service or --
A. I don't remember.
Q. -- the FMCSRs?
A. J.J. Keller?
Q. Like those green books?
A. No, I don't remember.
Q. Like, for instance, this is --
A. That's my sign.
MR. MOHS: Here, why don't you look at that. This is what we've -- why don't we go ahead and mark this as Exhibit 3.
(Whereupon, Plaintiff's Deposition Exhibit No. 3 was marked for identification.)
BY MR. MOHS:
Q. This is an acknowledgment.
A. Okay.
Q. It's says driver receipt, I acknowledge receipt of hours of service, a driver's guide handbook?
A. Yeah.
Q. Do you remember receiving that handbook?
A. I don't remember.
Q. Okay. Do you remember were you ever disciplined or punished at HMD for any violations

of any kind?
A. Just when I speak on the phone.
Q. Okay. And when was that?
A. After one ticket. I got the ticket. And they said like -- I know the policy they have, but if you have a ticket or violations, they charge you.
Q. Um-hum.
A. But I took their attorney, and they cancelled my ticket. And they didn't -- just say be safe and I hope it's never be again, you know.
Q. Do you remember when you received -- well, first of all, let me make sure I understand. You were cited by police for using a handheld --
A. No. Never.
Q. All right. What were you cited for?
A. For following too close.
Q. Okay. And where did this happen?
A. In Georgia, the same. It was after six months.
Q. After six months of what?
A. Of accident.
Q. Of the -- so six months after the accident we're here --
A. Yes.
Q. -- to talk about.

A. Yes.
Q. Okay. And you were pulled -- I guess you were cited for following too closely?
A. Yes.
Q. Were you in a collision?
A. No.
Q. Okay.
A. It's nothing.
Q. Where did this ticket -- where were you when you received this ticket?
A. In Georgia, like on I-75.
Q. Okay. Do you remember where, what city or police?
A. It was mile mark 20, Valdostar, Val . . .
Q. Valdosta?
A. Yeah, that's it.
Q. Okay.
A. The city.
Q. And did the police officer also give you a citation for using a phone?
A. No.
Q. All right. What was the deal? I thought you told me you were for --
MR. O'DANIEL: No.

BY MR. MOHS:
Q. No? Did I mishear you?
A. Yeah.
Q. Okay.
A. I never.
Q. The ticket wasn't for using the phone. It was for following too closely.
A. Following too close, yeah, that's right.
Q. Okay. And after you got that ticket, your company hired an attorney?
A. No. I hired an attorney.
Q. You hired an attorney. Okay.
A. It's my record.
Q. And after you hired the attorney, the ticket was --
A. Dismissed.
Q. -- dismissed and you were given a verbal warning by your company, HMD.
A. Yeah, that's right.
Q. Okay. Other than that warning from HMD, have you ever received any other discipline from HMD at any time?
A. No.
Q. Okay. Did you receive any discipline from HMD following this collision?

A. No.
MR. MOHS: Okay. Will you pull up number three, please. I'll mark this as Exhibit 4. You can look on the screen or at the . . .
THE WITNESS: Okay.
(Whereupon, Plaintiff's Deposition Exhibit No. 4 was marked for identification.)
BY MR. MOHS:
Q. Is that a copy of your current commercial driver's license?
A. That's right.
Q. Do you still keep -- maintain it out of Washington?
A. Yes.
Q. Do you live in Washington?
A. No.
Q. Okay. And that says date of issue 5/24/16.
A. That's right.
Q. That was the first time that you -- that's not the original --
A. Right.
Q. -- issue date, correct?
A. Yeah, that's right.
Q. I am correct in saying that.

A. Yeah, you're correct.
Q. All right.
A. I can explain if you want.
Q. Sure.
A. When I did the practice school, I was living with my friends. And they didn't put my name on the -- on the U.S. email -- U.S. mailbox. And that's why the -- I got the temporary. It was on the paper. And the plastic is not coming for one year.
Q. Okay.
A. And I used to fly to the Washington to remake my temporary driver's license, temporary, temporary, until I got the plastic one. I have a little bit trouble. The guys, they didn't give me the plastic.
Q. Okay. Have you ever attempted to transfer it to Illinois?
A. No.
Q. Okay. Why not?
A. Because I need to make another school and go and take the time. And on the first, I didn't have work authorization like I have right now work authorization, but I --
Q. To work in the U.S.

A. Yes. Right.
Q. Okay.
A. But when I did the -- I make the driver's license, it was. And I cannot change. Just in the U.S. -- just in Washington, you can make the driver license without the work authorization.
Q. Okay.
A. I've got a social and other stuff like that.
Q. Do you have a work authorization now?
A. Yes. Right.
Q. So what's stopping you from transferring it now?
A. Time, money.
Q. Okay. Have you ever been involved in a crash other than the crash we're here to talk about?
A. Before or after?
Q. Both, but we can cut it down.
A. Okay. Before, I have a accident, not a crash. It was, like, accident, minor accident.
Q. Okay.
A. Just the police stop me and say I hit the guy behind me.
Q. Okay.
A. And I didn't have any scratches on the truck and I have nothing, you know, but they give

me the ticket and police report.
Q. Was that in a commercial motor vehicle?
A. Yes. It's at MMJ.
Q. At MMJ?
A. Yeah.
Q. And where did the collision take place?
A. In Chicago Ridge.
Q. What police entity investigated? Do you know?
A. What do you mean, like, entity?
Q. Was it the Chicago Ridge Police Department?
A. I think so, yes.
Q. Okay. And did they issue you a citation?
A. Yeah, they give me the citation. And I hire attorney. And they cancel it, dismiss it.
Q. Okay. What was the citation for?
A. For driving not -- just for collision, something like that. I don't remember exactly.
Q. Okay.
A. But they give me the citation and the police report.
Q. Okay. And when did this happen?
A. In 2015.
Q. Okay. And explain to me what happened in the collision itself.

A. I drive with my lane. And how he explain me, it was two lanes. He was stop with -- he stop there, the guy in front of him. And the one car, it was on the middle lane, like, you know, it's not travel lane, just --

Q. Like a turn lane?

A. Turning lane, yeah. And there was -- I just moved from this lane to pass the police officer. And I was in this lane. And after that, this guy -- I don't know -- I don't see him. And he was in front of me after the accident. And he said, I tried to stop you and to explain you, but you didn't see me.

Q. Okay.

A. Nobody try nothing. Just police officer stop. And he said, you hit this guy.

Q. Okay.

A. And that's it.

Q. So that car was claiming that you struck him --

A. Yes.

Q. -- as you passed by him.

A. Yeah, but I don't have any scratches or nothing.

Q. Okay.

A. And I ask the police officer to show me, okay, if I hit this guy, I suppose to have scratch or paint, something on my truck.
Q. Okay.
A. And he said, I don't care. You hit this guy. I give you the ticket. I don't have time to explain.
Q. Okay. Other than that collision, any other collisions that you were involved in?
A. With the car.
Q. Okay. And when was that?
A. It was month after the accident.
Q. And you were driving your personal car?
A. My personal car.
Q. And where did this collision happen?
A. In I-294.
Q. In Illinois?
A. Yeah.
Q. And tell me what happened in that collision.
A. It was hydroplaning.
Q. Okay.
A. And I just hit the wall. It was . . .
Q. It was just a single-vehicle collision?
A. Yeah, my -- just my vehicle.
Q. Okay. Were you just going too fast for the

conditions?
A. No. It was -- well, I drove, like, 50 mile an hour. And I felt how my back is going like this. And I slow down, slow down, until I go in a curve. And in curve, I start to drifting or whatever you say.
Q. Okay.
A. And I hit the wall.
Q. Okay. Other than those two collisions and, of course, the collision we're here to talk about, any --
A. I got the one more collision in 2018.
Q. Okay. Tell me about that one.
A. The -- on the SDM Transport, they have old trucks. And the brake, it didn't work so well. And the traffic stop in front of me. And when I push on brakes, it's take too much space to stop, and I was full loaded. And I hit two or three cars, but no injuries, no nothing. And they didn't give me the citation.
Q. And where did that take place?
A. It was mile mark one in Louisiana and Alabama, between these. I don't know. It was, like, on the state lane.
Q. Uh-huh.

A. It's over there.
Q. Do you remember the name of the road?
A. It's I-10.
Q. I-10?
A. Yeah, Interstate 10.
Q. Other than those three collisions and the collision we're here to talk about, have you been involved in any other collisions?
A. No.
Q. Okay.
A. This is all my bad days.
Q. All right. Let's go through -- we asked you on your interrogatories and we also have your driver qualification file that was provided by HMD. I want to go through all traffic citations you've received from the time you received your CDL until the time you got hired by HMD.
A. Okay.
MR. MOHS: Okay. Can we pull up number four. We'll mark this as Exhibit 5.
(Whereupon, Plaintiff's Deposition Exhibit No. 5 was marked for identification.)
THE WITNESS: Thank you.

BY MR. MOHS:
Q. This is a copy of a document that was provided to us by HMD. And it looks like their annual review of your driving record when they hired you in August of 2016.
A. Um-hum.
Q. Did you fill this out?
A. Yes.
Q. And on that you listed all violations that you had received -- let's see -- I guess it says on the past 12 months.
A. Um-hum.
MR. MOHS: All right. And then I think they also provided -- yeah, let me mark as Exhibit 6 -- this is number five -- a PSP report.
THE WITNESS: Okay.
(Whereupon, Plaintiff's Deposition Exhibit No. 6 was marked for identification.)
BY MR. MOHS:
Q. Did you provide this to them or did they get this on their own?
A. I didn't provide this.
Q. Okay. Have you seen this document before?
A. Yes.

Q. Okay. Did you use this document to help you fill out the violation sheet?

A. Yes.

MR. MOHS: Okay. All right. So what I have done is -- number nine -- I've made a chart that I'm going to mark as Plaintiff's Exhibit Number 7. And I want to make sure that this is accurate.

(Whereupon, Plaintiff's Deposition Exhibit No. 7 was marked for identification.)

MR. O'DANIEL: Just to clarify for the record, this is not something we produced. This is something --

MR. MOHS: This is correct.

MR. O'DANIEL: Okay.

MR. MOHS: Exhibit Number 7 is not -- has not been produced by HMD.

MR. O'DANIEL: Got it.

MR. MOHS: This is a chart that we have made using Exhibits Number 5 and Number 6.

THE WITNESS: Um-hum.

BY MR. MOHS:

Q. And so however you want to do this, if you want to take a break to look at it, I mean we can go through it together.

A. Okay.
Q. I've included every citation that was listed on your PSP and on your annual review. And I want to make sure that you agree with me that I've accurately reflected all the charges and the dates.
A. I agree.
Q. Okay. And you made sure that -- by the way, just so you understand this chart, when I put OOS, that means --
A. Um-hum. Out of service. I know.
Q. -- an out-of-service violation.
A. Um-hum.
Q. And so I want to confirm with you that you made sure HMD knew about all of these violations at the time they hired you.
A. Yes.
Q. Okay. And just so we're clear too -- seven and eight -- two of these violations -- actually, I just remembered this, so let me mark these as eight and nine.
(Whereupon, Plaintiff's Deposition Exhibit Nos. 8 & 9 were marked for identification.)

BY MR. MOHS:
Q. So I've also marked as Exhibit 8 a traffic ticket from Washington State.
A. Um-hum.
Q. And as Exhibit 9, a disposition from Ohio.
A. Ohio. Okay.
Q. And those two are also included on the chart.
A. Yeah.
Q. So just for the record, Exhibit Number 7, the chart prepared by me --
A. Um-hum.
Q. -- lists all the violations that are listed on Exhibit 5, Exhibit 6, Exhibit 8, and Exhibit 9.
A. Um-hum.
Q. Do you agree with that statement?
A. Yes, I agree.
Q. Okay. And you made sure that HMD was aware of all of those violations --
A. Yes.
Q. -- at the time you were hired.
A. Yeah.
Q. And did you plead guilty or pay the fines for all of those charges?

A. But this is just inspection. All of this is inspection. Just this one is citation. And I didn't pay anything from here. And in Ohio, fuel permit --
Q. All right. Let's go --
A. Okay.
Q. Let's take it one at a time.
A. Okay.
Q. So let's pull up -- we have Number 7 pulled up. This is the chart.
A. Okay. First one?
Q. First one in Arizona, failing to use a seat belt while operating a commercial motor vehicle.
A. Yeah. The thing is, the guy was on the bridge. And I use the black T-shirt. And I was with the -- my seatbelt on.
Q. Okay.
A. And he stopped me. And after that, I explain that I got my seat belt. He said, you have to go to court to prove yourself.
Q. Okay.
A. But I never drive the car or the -- this commercial motor vehicle without seat belt. That's my rule from beginning.

Q. Okay. Did you go to court or --
A. No. I --
Q. -- did you pay the fine?
A. I hire the attorney. And in Arizona, the -- failing to use seat belt operating commercial motor vehicle, it's criminal. And I hire attorney. And they move, like, to the simple citation, and I pay the fine, $300.
Q. Okay. So you did pay a citation.
A. Yes. This one, first one, yes.
Q. Okay. All right. What was the next one you wanted to tell me about?
A. U-turn restricted. It was when I start in Washington for -- I don't know why it's December 1 here because June 19 is -- oh, yeah, it's something wrong here because when I got this ticket, U-turn is restricted in June 19th. I didn't have CDL here.
Q. Okay.
A. And on 1st December, it's impossible to have the CDL.
Q. Okay. So that was --
A. Maybe it was 1st the following 2016. I'm not sure.
Q. All right. I think the date on your -- so you're talking about the first violation?

A. Yeah, this one.
Q. The Arizona.
A. Was the -- the Washington was first.
Q. If you look -- where I got that date, if you look at Exhibit Number 5 -- or six -- Number 6. Your hand's on it right now.
A. This one.
Q. Yes.
A. Okay.
Q. If you look at the bottom of that PSP report.
A. Okay.
Q. The first thing listed says date, December 1st, 2015.
A. Okay. Maybe. Maybe this one on the June 2015 it was wrong, but . . .
Q. Let's do one at a time.
A. Just one second. Yeah. Okay. Yeah. I'm -- my bad. This one in Washington is supposed to be first, yeah, because it's June 19. And after that, it's coming the --
Q. Yes. Okay.
A. That's my --
Q. I gotcha.
A. Yeah.

Q. I misordered --
A. Order, yeah.
Q. -- number one and two.
A. I'm sorry, yeah.
Q. Okay.
A. The other thing is correct.
Q. It's my fault, not yours.
MR. O'DANIEL: You'll be in trouble for that.
MR. MOHS: Yeah. I might lose my license.
THE WITNESS: It's just that I -- you know, I go step by step and I know the tickets.
MR. MOHS: Yeah. Okay.
THE WITNESS: And I know this one, it was first. And after that, I got the seat belt.
BY MR. MOHS:
Q. Okay. And the U-turns restricted one was in Washington.
A. Yes.
Q. Were you going to tell me something about that one?
A. Yeah, very simple. On every traffic light, you know, you can make U-turn. No sign. No nothing.
Q. Okay.
A. And I go to court and explain to the guy

what happen. And they said that you got the six-month supervision and you suppose to pay the fine they say.
Q. Okay.
A. And I think they dismiss the case.
Q. But you did pay the fine.
A. I pay the fine.
Q. Yeah. All right. Was there any other violations on here you wanted to tell me about?
A. These violation until here, it's about my reason that I leave the Infinity company, United Trans Logistics. They have a bad equipment. And every day I have trouble with bad equipment, bad equipment.
And they didn't give me the -- you know, the flatbed loads have tarps and bungees, you know, to secure the load. And I don't have these bungees. And I use the rope to cover the load. And every time I got the trouble because I don't have these bungees. It was -- the reason I leave that company was, like, all of this --
Q. Okay.
A. -- stuff. And this look, like, how many out-of-service I got.
Q. You did understand that when you drove for

Infinity that you were subject to the Federal Motor Carrier Safety Regulations, correct?

A. Yes, I know.

Q. And you, as a driver, had a duty every day to make sure that the vehicle you were operating was in a safe and reasonable condition.

A. Yes.

Q. And when you chose to go out on the road every day, that was your way of telling --

A. Yes.

Q. -- the public that you've performed an inspection and you feel that the vehicle is safe?

A. Right.

Q. And these violations that you're talking about, many of them include equipment violations.

A. That's right.

Q. And your belief is that it was the equipment that you were being provided by Infinity --

A. Yes.

Q. -- was aging, was older.

A. Yes.

Q. Okay. But you still made the choice when you went out on the road to drive these vehicles.

A. Okay. When I make pre-trip inspection every time, it was everything was okay. You drive

100 miles, you don't know what can happen. The clamp, the brake are adjustment that not good or the hub is going to be broke, you know, after the 100 miles.

And, you know, you can drive the truck 100 miles and you go on the nail and on -- with tire on the nail and you didn't see it. You driving, and you didn't see your tire is going to be flat.

And that's why I got -- I go and here I have the flat tire. And I know I go to the weigh station because I know you have to go to weigh station. And they stop me. And they show that the tire was -- that had the nail. But when I start driving, everything was okay. You know, it's happen on the road.

Q. Is it your testimony that none of these violations were things that you knew about ahead of time?

A. Yeah, I don't know about this violation. I mean, like, yeah, for this, you know, like no proper load securement, I said I didn't have the bungees. I put -- but I -- so I thought it's illegal to put the -- and the tarp is going like this, you know, and that's why they stopping me.

Q. Do you agree that these charges -- these citations are valid, were legitimate at the time you received them?

MR. O'DANIEL: Which ones are we talking about? All of them?

BY MR. MOHS:

Q. Yeah, all of these ones that we've been talking about, I guess your -- we talked about the first two and then you kind of generally said every other one has been related to the time you were at Infinity --

A. Yeah, that's right.

Q. -- that were related mainly to equipment.

A. Yeah.

Q. And your testimony -- correct me if I'm wrong -- is that you felt the equipment was old and aging and that lead to these violations.

A. Yes.

Q. And what I'm asking you is I understand that's the reason for the violations, but do you agree that these citations were legitimate?

MR. O'DANIEL: I object to the form of the question. You can still answer.

THE WITNESS: Um-hum. If it's my fault or it's equipment fault? I -- if you can like --

BY MR. MOHS:
Q. I guess like, for instance, let me just take the first one there.
A. Okay.
Q. January 20th of 2016.
A. Okay.
Q. You received -- you underwent an inspection.
A. Okay.
Q. Correct?
A. Yeah.
Q. In Oregon.
A. Okay. That's right.
Q. And the officer who performed the inspection found three violations that day.
A. Okay.
Q. Windshield wipers inoperative or defective, inoperative turn signal --
A. Okay.
Q. -- and following too close.
A. Okay.
Q. Do you challenge the validity of any of those findings of that officer?
A. Yes. I explain everything.
Q. Okay. Explain it to me.
A. Okay. Windshield wiper inoperative or

defective. It was working, but the part of the windshield, it have a plastic. And that plastic is going, like, a little bit loose and that's why he put it's not working.

And turn signal, it was working, but it was -- if the truck is old and his headlamp have this yellow thing, you know, the headlamp is covered with yellow thing, and you didn't see the blinking when you turn right or left. You didn't see the blinking, but it was working. And it was weak working, you know.

And the following too close, again the guy jump in front of me after there. He go in the interstate and he jump in front of me and the -- saying like he saw that I drove too close.

But interesting thing, I didn't following too close. I change the lane. And the police officer was behind me. And he said, why you change the lane? Because this guy could have jump in front of me. And he say, okay, but you suppose to slow down.

But I am commercial motor vehicle with 80,000 pounds and go on the downhill. And I drove legally 55 miles an hour. And he -- this guy jump in front of me 45. I don't have enough space to

stop, you know, and that's the reason I move the lane. And he -- I don't care. You need to go to court or something where you going to pay the citation.

Q. And you paid the citation.

A. I pay the citation.

Q. Okay.

A. Because I don't have time to go to Oregon.

Q. Okay. And so just for the record, you told me the wipers were working, but they did have a broken piece on them.

A. Yes.

Q. Okay. And do you understand under the regs that that means it's inoperative or defective?

A. No.

Q. Okay.

A. I don't agree with this.

Q. Okay. And you also said that the turn signal was working, but you couldn't see it.

A. The guy couldn't see it, but the -- it's working. You know, I have one, two, three, four, five turn signal. And if it's not working, the signal is blinking like that, tick, tick, tick, tick, tick. But it's working properly, it's like tick, tick, and everything was okay.

Q. Do you understand that part of having a working turn signal is that members of the motoring public need to be able to see it?
A. Yes, I understand.
Q. Okay.
A. But you can see it.
Q. Just not as good as the other ones.
A. Yes.
Q. Okay.
A. It's not this good like a new one, that's why.
Q. All right. So then your next set of violations was on February 5th of 2016.
A. Um-hum.
Q. Brakes out of adjustment, failure to secure the vehicle equipment, and air brake system violation.
A. Okay.
Q. Are any of those legitimate charges or are those all --
A. I can explain just this one, failing to secure the vehicle equipment.
Q. Okay.
A. Some -- in some states when you drive a flatbed trailers, you have the 4-by-4 wood, you

know, you put under the load. And when you don't need this wood, you put -- you have the space between the flatbed and between the -- how do you say -- like you have a space where you can put that wood. And I secure them with bungees and everything is nice.

But in some states, the regulation are -- don't permit to put wood over there. In some states, it's permit. It's legal. And this guy said it's not legal to put over there the woods. It can fall.

Q. And it's your responsibility --
A. Yeah.
Q. -- as a driver to know which states you can do that in and which --
A. No.
Q. It's not your --
A. I don't -- yeah. I don't know 50 states all of the rules and, I mean, their laws, you know.
Q. Did you pay the fine for those citations?
A. They didn't give me the fine. Nothing.
Q. Okay.
A. Just the inspection.
Q. The next is on --
A. California.

Q. -- April 13th in California.
A. Okay.
Q. Several. We've got --
A. Hub.
Q. -- a wheel hub, we've got a registration license plate violation, and another brake out of adjustment violation.
Were all those -- were any of those legitimate citations?
A. Yes. And the thing is, with registration license plate, it's the company -- it's the company responsibility, you know, to give me the legal license plates and the registration, but it was expired.
Q. I mean, did it have the date on there?
A. No.
Q. And what about the wheel hub issue and the brake issue, were those legitimate?
A. Like I said, you can drive 100 miles and it can blow out or broke, just a small thing.
Q. But when you were inspected, those were legitimate --
A. Yes.
Q. -- citations?
A. No. When I inspect in the morning,

everything was okay.

Q. No. When you got inspected by the Motor Carrier Authority --

A. Okay.

Q. -- in California.

A. Yeah.

Q. At the time they gave you the inspection report and said that these are violations, you agree that those were violations that were --

A. Yes, I agree.

Q. -- present on your truck.

A. Yeah.

Q. Okay.

A. Because -- yeah.

Q. And then in Ohio on April 15th of 2016, do you remember what happened there?

A. Yeah. It was a weigh station. And you got the -- well, after new year, you got one month to make this fuel use permit violation. It's, like, IFTA.

Q. Um-hum.

A. And they didn't have the IFTA on the truck.

Q. And then you have several violations three days later, April 18th of 2016.

A. Um-hum.

Q. And on the PSP, it just says in the U.S.
A. Yeah. It's -- I think it's Iowa.
Q. Okay.
A. Like, I remember.
Q. Were those violations that were listed on the inspection report, the PSP, legitimate?
A. Yeah, you see, the interesting thing, in Ohio was everything okay, just the fuel permit. And after that, three days after in Iowa, they found, like, these violation. And this was the same thing, you know, they make in Ohio the inspection, and after three days they found this.
Insurance violation, it was -- by their opinion in Ohio, you must to have insurance, like, less -- not less than five -- five hundred -- $500,000. But in other states, it's $250 -- $250,000. And they have for $250,000, but not for $500,000, and that's why they give me the violation.
Flat tire, like I said, I just wake up in the morning, make everything -- the pre-trip inspection and everything was okay. When I drove through the scale, I saw the tire was -- they saw when they stop me and explain the tire are bad. And we call the road service, and they change the

tire and every stuff like that. We cannot -- I cannot drive if I am out of service.

Q. Right. And these were one, two, three, four out-of-service violations --

A. Yeah.

Q. -- for that particular stop.

A. Yeah.

Q. Okay.

A. And the --

Q. And at the time of that inspection, you agree that those violations were present on the vehicle.

A. Yes.

Q. Okay.

A. I agree.

Q. All right. And then --

A. And I fix that.

Q. And the next one we have is June 25th of 2016.

A. Yep.

Q. Load securement issue again and then violation of local -- two violations of local laws.

A. Yes.

Q. Were those legitimate --

A. Yes.

Q. -- violations?
A. I can explain this one too.
Q. Sure.
A. I go to the Connecticut. And they have the load that it's supposed to go to the driving trailers, but my company give me to my trailer. And when I ask the guys on the facility if I suppose to put the tarp to cover that load, they said no. And the broker said no too.
But the -- but about this load and on the -- when the police officer stop me, they said you have to -- you must to have, like, tarp on your securement. It was the brick, you know, like red bricks.
Q. Um-hum.
A. And they are covered, like, with -- they are safe, you know. In some states, they -- you must to have tarp and some states not.
Q. Okay.
A. It's depend on the state.
Q. And besides the tarp, were there any other violations?
A. This is all three violations for that thing.
Q. Okay. Do you agree that you, as a commercial motor vehicle driver, are responsible to

follow the laws of the state you're driving through?
A. I agree, but I don't know all laws in every state, you know.
Q. And just so we make sure we're clear, so we've gone through these violations, and you've had a chance to explain them all.
A. Yeah.
Q. Did you -- did anybody at HMD ask you to explain any of these violations when you were --
A. No.
Q. Let me finish the question.
A. Okay. I'm sorry.
Q. Did anybody at HMD ask you to explain any of these violations when you were hired at HMD?
A. No.
Q. Okay. And you made sure they were aware of all of these violations that are on Exhibit 7.
A. Yes.
Q. Okay.
A. Every time you hire, they check, like, your driver license report, you know, like . . .
Q. The annual review report?
A. Yeah. Annual, yeah. This one, PSP.
Q. Exhibit 7, before we move on, can you confirm for me that accurately reflects your driving

history before September 6th of 2016?
A. Can you repeat, please?
Q. Exhibit Number 7.
A. This one? Um-hum.
Q. Can you confirm for me that that document accurately reflects your driving history from before September 6th of 2016?
A. Right.
Q. All right. Mr. Gisca, do you agree that -- or Gisca. I'm sorry.
A. Um-hum.
Q. Do you agree that driving a truck commercial motor vehicle is not like driving a normal passenger car?
A. Of course I agree.
Q. And what are some of the differences?
A. Because you are -- it's very big truck and it's very small car, that's one. The truck, it's stopping, like, one football field. The car can stop very fast. And you need to more space to turn around, wide curves, and every stuff like that. You can have, like, thousand of explanation this way.
Q. And because driving a truck and a commercial motor vehicle is different than driving a car, you need to follow different duties than you

do when you're driving a car.
A. That's right.
Q. And there are different rules that apply to a truck driver --
A. That's right.
Q. -- than apply to regular car drivers.
A. That's right.
Q. And that's why you need specialized training.
A. Yes.
Q. That's why you go to the truck driving school.
Is that yes?
A. Yes.
Q. Sorry.
And you agree that as a truck driver, you have to drive your truck in a reasonable and safe manner.
A. Yes.
Q. And you have to follow the Federal Motor Carrier Safety Regulations.
A. That's right.
Q. You have to know and comply with the CDL manual.
A. Right.

Q. You have to know and comply with industry standards?

A. Right.

Q. And when you're operating for a motor carrier, you need to know and comply with their policies and procedures.

A. That's right.

Q. Okay. So do you agree that it's never acceptable for a commercial motor vehicle driver to needlessly endanger the public?

A. Can you repeat, please? What did this mean, like . . .

Q. So what I'm asking you is as part of your duty as a commercial motor vehicle driver, we talked about you --

A. Yeah.

Q. -- have certain duties and responsibilities. I want to find out, do you agree that one of those duties is that you're never within reason supposed to needlessly endanger other members of the public on the roadway?

A. What this mean needlessly? Like, I don't understand this.

Q. Like without reason. Without a legitimate reason.

A. Because I don't understand the question.
Q. Okay.
A. Like if I drive --
Q. Let me try to phrase it differently.
A. Okay. Yeah.
Q. Let me try to phrase it differently.
Do you agree that you should do everything within reason to avoid endangering other people on the highway?
A. Yes.
Q. Okay. And do you agree that in order to be a reasonably safe commercial motor vehicle driver, you need to give 100 percent of your attention to the task of driving when you're driving?
A. Yes, of course.
Q. And anything less would be unsafe.
A. Of course.
Q. Do you agree that as a commercial motor vehicle driver, you need to be a defensive driver?
A. Yes.
Q. And what does it mean to you to be a defensive driver?
A. It's means to be prepared. Like if something is going to happen, you need to expect

it. You need to know that guy stop or what. You need to maintain distance and every stuff like that.
Q. Is it fair to say being -- in order to be a reasonably safe commercial motor vehicle driver and being a defensive driver, you need to be on the lookout for potential hazards?
A. Yes.
Q. Yes.
And you need to have a plan to avoid those potential hazards --
A. Yeah.
Q. -- in the event they become an emergency.
A. Yes, that's right.
Q. And one of the things you're trained to do as a commercial motor vehicle driver is to expect the unexpected.
A. Yes, that's right.
Q. And to keep a lookout ahead for potential hazards.
A. Yes. Right.
Q. And the CDL manual tells you most people, including commercial motor vehicle drivers, don't keep a lookout ahead far enough.
A. Um-hum.
Q. And instead they tell you, you need to look

far enough ahead to see the potential hazard before it becomes an emergency so that you have more time to see and avoid these hazards. Is that a fair statement?

A. Yeah, that's right.

Q. And so do you agree that commercial motor vehicle drivers are -- in order to be reasonably safe, are trained to look 12 to 15 seconds ahead on the roadway?

A. Yes. Right.

Q. And that is what the CDL manual says is a far enough distance to give you enough time to see potential hazards, come up with a plan, and avoid them.

A. Yeah, that's right.

Q. Okay. Another thing -- and, in particular, commercial motor vehicle drivers are trained to be on the lookout for particular types of hazards too. Is that a fair statement?

A. Yes.

Q. And including disabled vehicles --

A. Um-hum.

Q. -- and accidents up ahead. Those are two types of potential hazards that you're particularly trained on to keep a lookout for as you're --

A. Yeah.
Q. -- driving down the roadway; is that fair?
A. Yeah, that's right.
Q. Another thing that you have to do in order to be a reasonably safe driver is to adjust your driving for the conditions present on the roadway.
A. That's right.
Q. And so that means if you're in heavy traffic, you need to slow down in order to be reasonably safe.
A. Yeah, that's right.
Q. Even if the speed limit's 60, you need to be going slower.
A. Yeah.
Q. Because when you --
A. 10 miles slow that speed limit it's supposed to be.
Q. Sorry?
A. It's 10 miles if you see the -- on the -- we don't -- well, the trucking, it's not driving the speed limit posted. You need to driving less -- 5 or 10 miles less.
Q. Okay. And is that just in normal conditions?
A. It's normal conditions, yeah.
Q. Okay. And if traffic's heavy and --

A. If traffic's heavy, yeah.
Q. -- there are more vehicles around you --
A. You have to keep distance -- very big distance between another car.
Q. And you do that by slowing down --
A. Yes, of course.
Q. -- even further.
Because, like we talked about earlier, the truck -- it takes a truck a lot longer to stop than a normal car.
A. That's right.
Q. And so you're trying to give yourself enough distance to be able to stop if you need to.
A. That's right.
Q. Okay. And you're also trained to do your best within reason to know what's going on all around your vehicle as well, not just in front of your vehicle.
A. Um-hum.
Q. In case you do need to make an emergency maneuver --
A. Okay.
Q. -- you're trained as a commercial motor vehicle driver to check your mirrors to see what's going on --

A. Yes, of course.
Q. -- on the sides as well, right?
A. Yes.
Q. Okay.
A. But we have a side where's it's name the blind spot.
Q. Yes.
A. And sometimes you can't see what's happen over there.
Q. Okay.
A. Or, like, if the car driving behind the truck, it's the same. Like if you don't see the trucking mirror, you cannot drive behind the truck. He cannot see you.
Q. Okay. But as a truck driver, you know that you have large blind spots on your vehicle, correct?
A. Yeah, that's right.
Q. And it's your job to do everything you can within reason to try to find out whether or not there are vehicles or other potential hazards in those blind spots --
A. Yep.
Q. -- before they enter the blind spot.
A. Yeah.

Q. Is that fair?
A. Yeah, fair.
Q. One situation that occurs often when you're driving a commercial motor vehicle is you're sitting up higher --
A. Yeah.
Q. -- than most people, correct?
A. Um-hum. You see everything.
Q. And we talked about earlier you're supposed to look 12 to 15 seconds ahead, as far ahead as you can see.
A. Um-hum.
Q. And -- is that a yes?
A. Yes.
Q. Sorry.
A. Okay.
Q. And one situation that occurs often is you may see a potential hazard up ahead that not everybody else --
A. Um-hum.
Q. -- has seen yet.
And you know that once the other vehicles see that potential hazard, they're going to react and take evasive action.
A. Yeah.

Q. Is that a situation you've encountered as a commercial motor vehicle driver many times?
A. Yes.
Q. Like, for instance, if there's construction up ahead and two lanes become one, once the other vehicles realize that that's going to happen, they might start coming into your lane.
A. Yeah, that's right.
Q. And so one of the things you're trained to do as a defensive truck driver --
A. You move the lane.
Q. -- is either move into another lane or slow down when you see the hazard in anticipation --
A. You have to slow down. And if you see that you cannot avoid these things, you need to move lanes.
Q. But one of the things you're trained to do is if you see a potential hazard up ahead where you anticipate that once other vehicles see it --
A. You slow down, that's right.
Q. Let me finish the question.
A. Okay.
Q. Sorry. You're doing a good job, but just let me finish the whole question --
A. Okay.

Q. -- before you answer it.
So one of the things you're trained to do as a commercial motor vehicle driver is when you see a potential hazard up head that may lead to other vehicles coming into your lane is to slow down --
A. Slow down.
Q. -- to give them the time and the space to come into your lane without creating an emergency situation.
A. That's right.
Q. Okay. And there are a number of potential hazards that you can see up ahead that might lead to this situation. Is that a fair statement?
A. Can you repeat, please?
Q. Sure. There's a number of potential hazards --
A. Okay.
Q. -- up ahead that could lead to a situation where other vehicles are reacting to that hazard and coming into your lane.
A. Yes.
Q. That's something that happens often when you're a commercial motor vehicle driver.
A. That's right.

Q. And what you're trained to do is what we've been talking about here is to keep a lookout for hazards. It's called hazard perception --
A. Um-hum.
Q. -- and reaction.
A. Okay.
Q. Does that -- is that something you were trained on as a commercial motor vehicle driver?
A. Yes, that's right.
Q. Okay. And the concept is let's keep a lookout as far enough ahead as we can for potential hazards and let's react right away by slowing down in order to be a reasonably safe truck driver so that we can create a safety cushion between us and the other cars on the roadway.
A. That's right.
Q. Is that a fair statement?
A. Yeah.
Q. Okay. Another important duty you have as a commercial motor vehicle driver is to travel at a safe and reasonable speed. Do you agree with that?
A. Yes, of course.
Q. And is it ever acceptable to exceed the speed limit in a commercial motor vehicle?
A. No.

Q. And do you agree that the faster you're going in a commercial motor vehicle, the longer it's going to take you to stop?
A. I agree.
Q. Both in time and in distance.
A. I agree.
Q. And do you agree it's never acceptable to be distracted while driving a commercial motor vehicle?
A. I agree for 110 percent.
Q. And it's never acceptable to use a handheld device while driving --
A. That's right.
Q. -- a commercial motor vehicle.
A. I accept.
Q. Do you agree that it's never okay to hold a handheld device and take videos while driving?
A. Yes. Right.
Q. Have you ever recorded videos while driving?
A. Not me. My co-driver.
Q. Okay. Your co-driver of you?
A. It's, like, the guy who sometimes we train. Like, you know, when you driving the car -- the truck, you take somebody with you, and they drive the truck.

Q. Okay. Did you have a co-driver with you at HMD regularly?
A. No.
Q. Okay. Did you ever have a co-driver at HMD?
A. No.
Q. Okay. Do you have co-drivers now?
A. No.
Q. Okay. Have you ever had a co-driver?
A. Yes.
Q. All right. When?
A. Just sometimes when, you know, the guy make CDL and you need to help him, you know, to give some advice as to how to drive. It's take maybe two, three weeks. It's, like, practice.
Q. Okay. And when did this occur?
A. What do you mean?
Q. Like when would this have occurred where you were training somebody else?
A. When you go to the road and someone -- if you are starting to -- starting driving.
Q. Okay.
A. And maybe -- you know, maybe you have friends who sometimes the friend -- the truck -- or my friend broken on the road. And they can call me, man, if you driving through this state, can you

take me to go home, you know, sometimes like that.
Q. Okay.
A. You know, you can drive it.
Q. Okay.
A. But he have to main drug test.
Q. If you did have a co-driver, that would have to be documented in your --
A. Yes.
Q. -- log.
A. Yes. Right.
MR. MOHS: Okay. Let's go ahead and take a quick break.
MR. O'DANIEL: Okay.
THE VIDEOGRAPHER: We'll go off the record. The time is 3:20 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We're back on the record at 3:27 p.m. This is media unit two.
BY MR. MOHS:
Q. Mr. Gisca.
A. Yeah.
Q. One thing we both need to be -- I was made aware by the court reporter. We're both kind of talking over each other. So try your best to let me finish my question --

A. Um-hum.
Q. -- and then you can answer. I think we're both kind of talking over each other.
A. Okay.
Q. It's not just you. It's me as well. I'll acknowledge that.
So I want to make sure we go through what we just spoke about. What we talked about is another duty you have as a truck driver is to drive a safe and reasonable speed.
A. Yes. Right.
Q. Is that yes?
A. Yes.
Q. And you also agree that it's never acceptable to exceed the speed limit.
A. It never is.
Q. In any vehicle.
A. It's any vehicle.
Q. Okay. You agree it's never acceptable to be distracted while driving.
A. That's right.
Q. In any vehicle.
A. Any vehicle.
Q. All right. Let's change gears and let's talk about this collision that we're here --

A. Okay.
Q. -- that's the subject of this lawsuit.
In the 24 hours before the collision, did you drink any alcoholic beverages?
A. No.
Q. Did you smoke or ingest marijuana or any other illegal drug?
A. No.
Q. Did you take any prescription or other over-the-counter or illegal drugs?
A. No.
Q. Okay. Do you know how much sleep you got the night before the collision?
A. Ten hours.
Q. All right. Do you remember when you went to bed?
A. In Jacksonville, I think.
Q. Okay. Do you remember what time you went to bed in Jacksonville?
A. Oh, no.
MR. MOHS: And I think we have -- number 13 is the log, if you pull that up.
(Whereupon, Plaintiff's Deposition Exhibit No. 10 was marked for identification.)

MR. MOHS: I'll mark as Exhibit 10 a copy of your log. We have it on the screen there too.
THE WITNESS: Um-hum.
MR. O'DANIEL: Thirteen you said? Ten?
MR. MOHS: Ten. I'm sorry.
MR. O'DANIEL: That was my fault.
MR. MOHS: That's the only problem with this. You pre-mark them, but it never matches up.
MR. O'DANIEL: I understand.
MR. MOHS: The alternative is you have a bunch --
MR. O'DANIEL: I'm with you.
MR. MOHS: -- like you'll have five different exhibits and you're missing stuff.
BY MR. MOHS:
Q. All right. So this -- first of all, Mr. Gisca, is this your log from September 16th of 2016?
A. Yes.
Q. Okay. And are there any inaccuracies on this log?
A. No.
Q. Okay. It shows that you came on duty at 11:00 a.m. that day.
A. That's right.

Q. And these are all Eastern time?
A. Yes, suppose to be Eastern time.
Q. Okay. And it says you were in Jacksonville, Florida.
A. Right.
Q. And you think you slept for at least -- I'm sorry. Strike that.
A. Minimum 10 hours I suppose to sleep. Like, here, I maybe -- I remember.
Q. And did you sleep in the sleeper birth of the vehicle?
A. Yes.
Q. Okay. Do you remember what time you woke up that morning?
A. No.
Q. Okay. Did you do anything before you started to drive?
A. Yeah. I drop the trailer and I pick the empty one.
Q. And where was that?
A. In Jacksonville.
Q. Okay. Were you already at the location?
A. Yeah. This is Conway. It was Conway. Right now, I think they change the company name to XPO.

Q. Okay. Conway, C-o-n-w-a --
A. Yes.
Q. -- y?
And it looks like your first trip that day was from Jacksonville to Tifton, Georgia?
A. Yeah.
Q. And you drove from noon until 3:15?
A. Yes.
Q. Then you went off duty for it looks like a half an hour?
A. Yes, half an hour you have to.
Q. And it looks like you came back on duty at 3:45?
A. And fuel.
Q. It looks like you fueled at that point?
A. Yeah.
Q. And that was in Tifton, Georgia.
A. Right.
Q. Okay. And then you were on your way to Union City, Georgia? That was your next stop?
A. Yes.
Q. And the accident took place on that trip from Tifton to Union City.
A. Yes, that's right.
Q. And you marked the accident -- you started

driving at 4:00.
A. Um-hum.
Q. Until you got in the accident at 7:00?
A. The accident happen at 6 o'clock.
Q. Okay.
A. And I make a mistake here.
Q. Okay. So the log shows the accident happening at 7:00.
A. Yeah.
Q. But the accident really happened at 6:00.
A. At 6:00, yeah.
Q. Okay. Then the log shows you on duty from 7:00 until 9:15?
A. Yeah.
Q. But not driving.
A. Not driving.
Q. And then it shows you driving from 9:15 until 10:15.
A. Yeah.
Q. To Union City from the collision site.
A. Yeah.
Q. Is that right?
A. Right.
Q. And then it shows you on duty, not driving, from 10:15 to 11:00.

Page 94

A. Yeah, it was.
Q. PM, is that right?
A. It's right, but, like, I remember it was one hour I make a mistake here.
Q. Well, I guess what I'm asking you is what other mistakes do you see on here?
A. The mistake's that the accident happen at 6 o'clock.
Q. Okay. Are there any other mistakes on here?
A. No. Just I think, like, I see you supposed to drive, like, three hours and three hours and supposed to be one hour because that -- in the plant at the timeframe, it's one hour different there, and that's why I make mistakes.
You know, sometimes you go to the east coast, go Central time, go to Pacific time. And when you do the -- right now, it's more easier when you make, like, e-logbooks. They record by theirself. But when you do with your pen, was little bit hard to know what time. You know, you look at your phone and you see, okay, it's 7 o'clock, but it's 6 o'clock.
Q. But you do understand as a commercial motor vehicle driver, it's your responsibility --
A. Yeah.

Q. -- to fill out an accurate log.
A. Yes. It's my mistake.
Q. And what you've acknowledged here is the accident time on this log is incorrect.
A. Yes, is correct -- incorrect.
Q. You should have marked it as 6:00 instead of 7:00.
A. Yes.
Q. So were you driving from -- did you start driving at 4:00 p.m. that day and it should have stopped at 6:00?
A. I think I start driving at 3:00 p.m., but I'm not remember.
Q. So you think everything is off on this log --
A. Yes.
Q. -- by an hour?
A. Is suppose to be one hour, yes.
Q. And so do you think you came on duty at 10:00 a.m. instead of 11:00 a.m.?
A. Yes.
Q. And so if we move everything back an hour, you think it will become accurate.
A. Yes.
Q. Okay.

A. Everything is like this.
MR. MOHS: Why don't we mark -- I have four exhibits I'm going to mark here.
(Whereupon, Plaintiff's Deposition Exhibit Nos. 11-14 were marked for identification.)
MR. MOHS: 11 -- I put that upside-down -- 12, 13, and 14.
BY MR. MOHS:
Q. All right. Mr. Gisca, we've marked four documents here as Plaintiff's Exhibits 11, 12, 13, and 14.
A. Um-hum.
Q. These are Lytx data printouts that were provided by HMD.
Have you seen these before?
A. Yes.
Q. All right. So, for instance, if we look at -- the first one there, I think, is 11. It's number 31. That shows a trip end time -- this is an end of a trip where you've stopped the vehicle.
A. Um-hum.
Q. And it says 6:23 p.m. And you can see that little red symbol in the top left.
A. Um-hum.

Q. It correlates with you being in Stockbridge, which is the area where this collision occurred.
A. That's right.
Q. All right. And then it shows a trip start time of 7:31 p.m. on the next exhibit, Exhibit 12, which is 32. That shows -- I'm sorry -- 7:31 p.m. a trip start time in that same location.
Do you see that?
A. Um-hum.
Q. So that means the vehicle started driving again.
A. Okay.
Q. Correct?
A. Right.
Q. Then if we look at Exhibit 12, which is number 33 --
MR. O'DANIEL: Thirteen?
THE WITNESS: Thirteen? Yeah.
MR. MOHS: I'm sorry. Thirteen.
THE WITNESS: Okay.
BY MR. MOHS:
Q. This is a trip end at 8:50 p.m.?
A. Yes.
Q. And that's in Fairburn, Georgia?
A. Yep.

Page 98

Q. It's over on the left side of that map there?
A. Yeah.
Q. And the next exhibit, is that 14 or did I . . .
A. Um-hum.
Q. Fourteen is a trip start time of 9:17 p.m.
A. That's right.
Q. And that's when you left Fairburn to go finish your trip.
A. Um-hum.
Q. Is that correct?
A. Yeah.
Q. So when we look at the log --
A. Okay.
Q. -- does that match?
Let's see. So your trip start time from the accident scene, you left the accident scene at 7:31 p.m.
A. Okay.
Q. You marked as 9:15.
A. Okay.
Q. So even if we take it back an hour, it's still 45 minutes off.
A. Maybe it's I take -- it took, like, two

Page 99

hours to stay over there. I moved the truck from the first lane -- or from the third lane to the shoulder.
Q. Okay.
A. Maybe it's recorded. I don't know.
Q. I guess I'm just trying to figure out. In the log, it shows you left the scene at 9:15, drove for an hour for 10:15, and then it shows you not driving the rest of the day.
Do you see that?
A. Yeah.
Q. It shows you stop in Union City.
A. Yeah, that's right.
Q. But the data shows that you arrive at Union City --
A. Um-hum.
Q. -- this is Exhibit 13 -- shows that you arrive at 8:50 p.m.
A. 8:50 p.m., yeah.
Q. And you leave at 9:17 p.m. and it shows you're driving at that time.
A. Here? I don't remember, you know, so I say, like -- understand. Okay. 9:17 here, like 14.
Q. Exhibit 14?
A. And I stop here. I was -- I go into the

truck stop to change the hub. And after that, I go to Union City, yeah.

Q. Well, did you mark that on your log that you stopped?

A. I make a mistake maybe. I don't remember.

Q. Well, I guess can you confirm for me -- I mean, we found several mistakes on this log.

A. Yes, several mistakes on this log.

Q. So the log that you turned in is not accurate.

A. Yeah, it's not accurate.

Q. Okay. And it's your job as the commercial motor vehicle driver to fill in an accurate log.

A. Yes.

Q. Do you remember were you hauling anything at the time of the collision?

A. I was empty.

MR. MOHS: Okay. Go ahead and mark as Exhibit 15, this is a collection of documents we received as the bill of lading.

(Whereupon, Plaintiff's Deposition Exhibit No. 15 was marked for identification.)

BY MR. MOHS:

Q. Have you seen those documents before,

Mr. Gisca?
A. Yeah, it's my -- I fill it up.
Q. Sorry?
A. It's my trip report.
Q. Okay. So you filled out this first page here that we're looking at?
A. Yes.
Q. Okay. And so it shows the day before, you're in Salem.
Is that Illinois?
A. Yeah. Salem, Illinois.
MR. O'DANIEL: Two days before.
THE WITNESS: Two days.
BY MR. MOHS:
Q. Sorry. Two days before on September 4th.
A. Yes.
Q. And you drove from Salem to Jacksonville, Florida.
A. Yes.
Q. And then from Jacksonville, you were going to Union City, Georgia.
A. Yes.
Q. And you were picking up a load in Union City and taking that to Hodgkins, Illinois.
A. Yes.

Q. Is that correct?
A. It is correct.
Q. Okay. The night after the collision, did you go to Union City and stop there for the night?
A. Yes.
Q. You didn't leave Union City?
A. I don't remember. Yeah, I think so, I stop over there.
Q. You stayed there for the night.
A. Yeah.
Q. Okay.
A. Because the load is not -- wasn't ready.
Q. And so at the time of this collision, you were empty.
A. Um-hum. Yes.
Q. And do you agree that it's counterintuitive, but brakes in commercial motor vehicles like the truck you were driving on the date of this collision, they're actually designed to be better at braking when they're loaded versus unloaded?
MR. O'DANIEL: Object to the form. Go ahead.
THE WITNESS: It's, like, when you empty, it's harder or . . .
BY MR. MOHS:
Q. Harder to brake.

Page 103

A. When you are empty?
Q. Yes, sir.
A. I don't know. Maybe yes.
Q. Have you experienced that yourself when you were driving a commercial motor vehicle?
A. It depends on the weather. But by the rules, rule says if you are empty, it's the easiest to stop this vehicle when you are loaded.
Q. It's easier to stop the vehicle when you're loaded.
A. No. When you are empty.
Q. When you're empty.
A. Yes.
Q. You never experienced that where the brakes are actually less effective -- the air brakes are less effective when --
A. It depends on the road condition.
Q. -- you're empty.
Okay. What about the road condition affects how the brakes operate?
A. If it's slippery or on ice -- when you're driving on snow or on ice when you are loaded, it's more -- the brakes are working more efficiently because they touch -- the steer touch the pavement, you know. The wheels touch. It's more efficient,

like, when you are loaded.
Q. Had you ever heard or been trained that it's harder to brake when you're empty in a commercial motor vehicle?
A. No.
Q. Okay. And you'd never been trained or told that you need to take that into account when you are driving a commercial motor vehicle that's empty, you need to be aware of the fact that it's harder to brake when you're empty.
A. No.
Q. Okay. And you've never seen any literature about that?
A. No, I didn't see.
Q. Okay. The vehicle you were driving at the time of this collision was a 2015 Freightliner Cascadia?
A. That's right.
Q. All right. And do you now own that same vehicle?
A. No.
Q. Okay. Was that the vehicle that you were leasing to purchase?
A. Yeah. No. Just lease.
Q. Okay. And you were leasing it from HMD.

A. From HMD.
Q. Okay. And what about the trailer? Was it a 53-foot trailer?
A. Yes.
Q. Okay. Was that also owned by HMD?
A. Yes.
Q. Do you know what the total vehicle weight was that day?
A. No, but if -- like, I know it's 34,000 pounds.
Q. Okay. Empty.
A. Empty, yeah, truck.
Q. That's what --
A. Truck and trailer.
Q. I looked at the weight for both the tractor and the trailer.
A. Um-hum.
Q. And I got about 34,000 approximately.
A. 44?
Q. 34.
A. 34, yeah, that's right.
Q. Okay. All right. You agree that the collision happened around 6:00 p.m.
A. Yes.
Q. All right. Why don't you tell me what

happened in the collision.
A. The -- when I drove, it was work zone. And the speed limit was 60 like I remember. And the car was on the first lane -- the broken car. And I don't remember exactly it's three or -- two or three cars or four cars -- doesn't matter -- was in -- it was, like, behind that broken car.
And when I go, I slow down. I saw the guys are messing up over there. And I slow down, slow down. And when I expect -- I didn't expect they jump, you know.
And on that time, I just drove through, you know, and when you didn't expect somebody will jump in front of you because they have enough time to jump, like, when I was uphill, you know. And when I coming close to them, the two or three cars jump in front of me, and I push on brakes and automatically I turn a little bit the wheel and go in the third lane, but not the whole truck is go in the third lane, just the part of the truck.
Q. The front part.
A. Yeah, front part. The trailer was in the second lane.
Q. Okay. Let me take you back from that point. You're approaching the area where the collision

occurs. It's Interstate 75 North, correct?
A. Correct.
Q. And it's three lanes?
A. Like, I remember the three lanes, but I'm not sure.
Q. Not for sure.
And do you remember which lane you were in?
A. Yeah, the middle lane.
Q. Okay. And there's a concrete median on the left side?
A. Yeah.
Q. Is that correct?
A. Correct.
Q. And a shoulder on the right side.
A. No shoulder on that time.
Q. No shoulder.
A. It was the -- that's why that's interesting thing. It was shoulder, I think, that broken car suppose to go on the shoulder, but it was the brick that the shoulder was closed.
Q. Okay.
A. And that's why he push the car to . . .
Q. Was there construction going on?
A. Yes.
Q. Okay. Was this a construction zone with

cones and --
A. Yeah, construction zone.
Q. Okay.
A. But without cones.
Q. How long --
A. It's just speed limit was construction and the bricks on the shoulder. You didn't have space to park on the right-hand shoulder.
Q. Okay.
A. Just on the left-hand shoulder. It was big shoulder on the left-hand.
Q. And what are you saying is on the right shoulder? Brick?
A. It's like --
MR. O'DANIEL: Barrels?
THE WITNESS: Barrel maybe. Yeah, it's like -- you know, I don't -- it's, like, when you go on the interstate, you see the middle lane and they have, like, these barrel. I don't know how to . . .
BY MR. MOHS:
Q. Was it construction barrels?
A. Yes.
Q. Okay. You were -- let me take you back. At some point did you enter a construction zone --
A. Yeah.

Q. -- on I-75 North?
A. That's right.
Q. And you knew that because there were construction barrels on the right side of the road --
A. Yeah.
Q. -- that the shoulder was closed.
A. Yes.
Q. And we're talking about the orange-and-white barrels.
A. No.
Q. No. Okay. What color were they?
A. It's a bricks like -- it was gray bricks. I don't --
MR. O'DANIEL: Like a Jersey barrier?
THE WITNESS: Barrier, yeah.
BY MR. MOHS:
Q. So it was -- were they building it, right?
A. Yeah. Yeah.
Q. Okay. So they were building a wall on the right side.
A. Yes.
Q. Okay. And was it already built or being built?
A. It's already built because they close the

shoulder, you know.
Q. Okay.
A. They close and you cannot turn on the shoulder.
Q. Okay. And how long had you been in that kind of construction zone?
A. For one mile, two miles.
Q. Before the collision.
A. No. I just -- I -- let me remember. Maybe one, two miles before the collision.
Q. Okay. But it wasn't like the collision happened right at the beginning of this --
A. No.
Q. -- construction zone.
A. No. I already was in the construction zone.
Q. And what was the speed limit?
A. 60.
Q. Okay. When you're driving a commercial motor vehicle, do you listen to radio or music?
A. No. That time, no.
Q. Not ever?
A. Sometimes maybe.
Q. Okay. But at that time, no.
A. That time, no.
Q. Okay. Let me -- do you ever use your cell

phone while driving a commercial motor vehicle?
A. I have a bluetooth.
Q. Okay. And do you use it to talk while driving a commercial motor vehicle?
A. Yes.
Q. All right. Were you talking on your phone at the time of this collision?
A. Yes.
Q. Okay.
A. On the bluetooth, not on the phone.
Q. Okay. And who were you talking to?
A. My wife.
Q. And what's your wife's name?
A. Laura.
Q. Laura Gisca?
A. No. B-i-r-c-i.
Q. B-i-r-c-i?
A. Yes.
Q. Okay. How do you pronounce that?
A. Birci.
Q. Birci?
A. Yeah.
Q. Okay. And how long had you been on a phone call with your wife before the collision?
A. I don't remember exactly. It's, like,

we -- you know, you speak with -- I speak with my wife sometimes, like, 20 minutes, 5 minutes, 10 minutes.

Q. Okay.

A. It depend what we've got.

Q. Do you have any recollection, I mean was it longer than five minutes before this collision?

A. No, but I know when the collision happen, I just push the button and I call her back later.

Q. Okay. Were you distracted by the conversation you were having with your wife at the --

A. No.

Q. Let me finish the question.

A. Okay.

Q. Were you distracted by the conversation you were having with your wife at the time of the collision?

A. No.

Q. Okay. Is that a regular practice of yours to speak on your cell phone with people via bluetooth --

A. Yes.

Q. -- while driving a commercial motor vehicle?

A. Yeah.

Q. Okay. Do you think that's distracting at all?

A. No.

Q. Do you ever text on your cell phone while driving a commercial motor vehicle?

A. No.

Q. Were you texting at the time of this collision?

A. No.

Q. Do you ever surf the internet on your phone while driving a commercial motor vehicle?

A. No.

Q. Were you surfing the internet at the time of this collision?

A. Excuse me?

Q. Were you surfing the internet on your phone at the time of this collision?

A. No.

Q. Do you ever check your emails on your phone while driving?

A. No.

Q. Were you checking your emails at the time of this collision?

A. No.

Q. What was the weather like?

A. Sunny day.
Q. Sorry?
A. Sunny.
Q. Sunny, clear?
A. Yeah.
Q. Not raining?
A. Nothing.
Q. Okay. And what was the traffic like as you approached that area?
A. It wasn't traffic over there.
Q. There wasn't any traffic?
A. Any traffic.
Q. At 6:00 p.m. on I-75 north on --
A. Over there, this wasn't traffic.
Q. Was anything obstructing your view as you approached the area where the collision occurred?
A. No.
Q. And you were talking on the phone with your wife. Were you doing anything else in the truck at the time you approached the area where the collision occurred?
A. No.
Q. Were there any vehicles in front of you?
A. No.
Q. Like how far was the next vehicle in front

of you?
A. I don't remember, but I didn't have any vehicles in front of me.
Q. And was there any vehicles to your right?
A. Couple vehicles passing me on the right --
Q. Okay.
A. -- and couple on the left, but in front of me, nothing.
Q. Okay. And how fast were you going as you approached the area where the collision occurred?
A. 55.
Q. And you were keeping a lookout ahead?
A. Yes.
Q. 12 to 15 seconds?
A. Yes.
Q. Okay. And at some point you saw a vehicle in the far right lane broken down?
A. Somebody push the car.
Q. Somebody was pushing a car?
A. Pushing a car, yeah.
Q. Okay. And you saw that up ahead.
A. Yeah.
Q. And you then saw three -- two or three or four cars behind that vehicle approaching that vehicle.

A. Yes.
Q. And at some point they moved over in front of you.
A. Yes. Right.
Q. And you tried to slow down, but you also, I think you said, naturally went to your left?
A. Yes.
MR. O'DANIEL: Object to form.
BY MR. MOHS:
Q. Okay. I don't want to put words in your mouth.
A. Um-hum.
Q. You saw the vehicles pull into the lane in front of you. What did you do?
A. I slow down.
Q. Okay. Was that the first time you slowed down?
A. No. I slow down, then I see this scene, you know, the guy start stopping, and I slow down, slow down, and I -- maybe I have, like, 35 miles an hour and I approaching them, and he just jump in front of me. It's, like, five feet -- or five -- yeah, five.
Q. So your testimony is you saw the vehicle broken down in the roadway up ahead.

A. Yeah.
Q. And you slowed down from 55 to 35.
A. Maybe 35, maybe 25. I don't remember exactly.
Q. Okay.
A. But I slow down for sure.
Q. And you were also keeping an eye on -- you knew that there were vehicles approaching that --
A. Yeah.
Q. -- broken-down vehicle.
A. Yes.
Q. And one of the things we talked about earlier is that's a situation that you see often --
A. That's right.
Q. -- where you see a hazard up ahead that maybe other vehicles don't see right away; is that fair?
A. That's right.
Q. And it wouldn't be unexpected for these vehicles to see that hazard and then move into the lane that you were in, correct?
A. Yeah.
MR. O'DANIEL: Objection.
BY MR. MOHS:
Q. And that's why you were slowing down. You

wanted to give more space --
A. Yes.
Q. -- so that you could avoid these vehicles if they did move into your lane.
A. Yes.
Q. And in this situation, they moved into your lane, and you still weren't able to slow down.
A. I still slow down, yeah.
Q. But you weren't able to slow down fast enough to avoid them.
A. Yeah.
Q. And so you had to move to your left.
A. I didn't move to the left. I just push on brake and automatically I turn a little bit. I didn't move, like, whole truck.
Q. Okay.
A. And if you -- I don't know if you know, when you push -- and the accident happen in the curve. And when I push on the brake, the truck go automatically straight. It go in the third lane.
Q. But you agree that you moved -- the truck did move left.
A. A little bit, yes.
Q. And you impacted a vehicle in the lane to the left of you.

A. Yes.
Q. The impact occurred in that lane, not in your lane.
A. Like I remember, yes, I go to the third lane.
Q. I mean, you're not contending that my client was in your lane when you --
A. No.
Q. -- struck him.
A. No.
Q. Okay.
A. She didn't -- he didn't go in my lane.
Q. All right. So are you saying it wasn't a conscious decision on your part to move to the left?
A. Unconscious, like I drove on my lane and just I push on brakes and the truck automatically go in the third lane.
Q. You were meaning to just press on brakes --
A. Yes.
Q. -- and stay in your lane.
A. It was automatic. I push very hard on brakes.
Q. You didn't intentionally move your vehicle to move left --

A. Yeah, I didn't.
Q. -- to avoid these other vehicles --
A. Yeah.
Q. Let me finish my question before you answer it.
If I'm understanding you correctly, you did not intentionally move your steering wheel left in order to move left to avoid the vehicles in front of you.
A. That's right.
Q. What happened is you slammed on your brakes after they entered your lane.
A. Yes.
Q. And because of the way your truck was moving, it moved into the left lane and struck my client's vehicle.
A. Yes.
Q. And I just want to make sure I understand the sequence of events is you saw the stalled vehicle.
A. Um-hum. Yes.
Q. You slowed down --
A. Yes.
Q. -- some, and you think it was to 30 or 35 miles per hour.

A. 25, 35 miles per hour.
Q. Then you saw the vehicles in the right lane start to slow down.
A. Yes.
Q. And then you saw them change lanes.
A. I didn't saw they change lanes.
Q. Okay. Well, how did you --
A. They jump in front of me.
Q. I mean, you saw them jump in front of you.
A. Yeah.
Q. Okay.
A. They just -- in front of me, this car just jump, that's it.
Q. Okay.
A. It was -- by the rules, I need to slow down, but I can't stop the truck on the interstate. It's make more hazard for other traffic.
Q. Well, if there's a car stopped in front of you, you need to stop your truck.
A. Yes, of course.
Q. Okay. And wouldn't this be a scenario where there's a car in front of you, you need to stop?
A. That's right.
Q. Okay.

A. But when you're driving and every traffic is driving and you push hard on brake, you know, you don't know what happen behind you.

Q. But that's the idea, right, when you see a potential hazard up ahead, that's why you slow down --

A. That's right.

Q. -- so you can avoid that hazard.

A. Right.

Q. Do you agree that -- were any other vehicles that were involved in this collision -- were any of the other vehicles commercial motor vehicles?

A. No.

Q. So of all the vehicles on the roadway, you were sitting the highest.

A. Yes.

Q. Do you agree that you were in the best position to see that stalled vehicle up ahead?

MR. O'DANIEL: Object to form.

THE WITNESS: Hmm?

BY MR. MOHS:

Q. You can answer.

A. Yes, I think so.

Q. Okay. And we talked about this before.

When you see a situation like that up ahead, that's why you're supposed to slow down enough to create a space in front of your vehicle in case other vehicles react to that hazard and come into your lane.

A. Yeah, but they didn't supposed to jump in front of me, but I slow down enough to avoid this collision.

Q. But we talked about that. I mean, that's a normal situation where they will jump in front of you to avoid the hazard once they see it.

MR. O'DANIEL: Object to form.

THE WITNESS: But it's not normal situation somebody to jump in front of the truck.

BY MR. MOHS:

Q. When there's a disabled vehicle in front of them?

A. Yeah, but I'm driving on my lane. You need to look at your mirror and see if somebody come, yeah, you can turn your signal and go in the second lane, but not to jump in front of the truck.

Q. But you understand and what we talked about as a commercial motor vehicle driver is sometimes you have to expect that other drivers are going to do things that you don't necessarily agree

with, but you still need to be prepared for them to do that and create a safety cushion of space in front of you so that you don't enter into an emergency situation.
A. There's a point I said, like, I expect somebody will jump, but not so close. I thought they would jump when I would be, like, 50 or 100 feet or 200 feet, but not in front of the truck. It was so fast, I think everybody -- if somebody was on their wheel, he did the same thing.
Q. How long between the time when you first saw the disabled vehicle in the roadway and when you had to slam on your brakes because the vehicle moved into your lane?
A. I don't remember this.
Q. Sorry?
A. I don't remember.
Q. But there was some time that elapsed between those two things.
A. Yes, because --
Q. You agree --
A. -- you know, I slow down. I do all these steps.
Q. And you're sure that you were going 55 miles per hour before you ever slowed down.

A. That's right.
Q. All right. As part of the police investigation, did you fill out a written statement --
A. Um-hum.
Q. -- to the police?
(Whereupon, Plaintiff's Deposition Exhibit No. 16 was marked for identification.)
BY MR. MOHS:
Q. I'll hand you what's been marked as Plaintiff's Exhibit Number 16.
MR. MOHS: This is 17.
BY MR. MOHS:
Q. First of all, what I've marked as Plaintiff's Exhibit Number 16, is that your written statement that you gave --
A. Yes.
Q. Let me finish the question.
Is that the written statement you gave to the police on the date of this collision?
A. Yes.
Q. Okay. And in the section that says details on the third line there.
A. Um-hum.

MR. MOHS: If we could zoom in on that.
BY MR. MOHS:
Q. When I read that, it looks to me like you wrote you were going 65 miles per hour.
A. It's 55. I put 55 there.
Q. So what I read is my name is Cristian Gisca. I drove a semi truck on I-75 on September 6th, '16 at 6:00 p.m., mile 227 to 228 about -- I see it as 65. You're saying that's a 55?
A. Yeah.
Q. Okay. Miles per hour in the middle lane.
So your testimony is that that's 55.
A. Yes.
Q. Okay. You would agree that if you're going 65, that would be going too fast.
A. It was too fast if I going, but I didn't go. It's 55.
Q. And 65 would be exceeding the speed limit.
A. Yes.
Q. One other thing you wrote on there, the last sentence, it says I have a dashcam to prove it.
A. Yeah.
Q. There was a Lytx DriveCam on your truck; is that correct?
A. That is correct.

Q. And did you expect that that captured the collision?
A. Yes, I expect this.
Q. Are you aware that on the drive -- most DriveCams, there's a button that you can press so that an event is recorded?
A. No. I thought it's automatically working.
Q. No one at HMD ever trained you on that?
A. No.
Q. If you were in a collision, to press the button on the camera?
A. No.
Q. Okay. Mr. Gisca, on Exhibit 16.
A. Okay.
Q. You signed that document in the condition that it's in right now --
A. Yes.
Q. -- correct?
Including where you say it says 55.
A. 55, yeah.
Q. Okay. You're not contending that anybody changed this report.
A. No. I remember how I put -- like I put it 60. And after that, I put 55 because I put just -- I know how -- I can wrote on the paper how I --

sometimes I change the -- like if supposed to be -- if you look, like, my -- it's five and it's on the little space over there. It just remain because when I wrote first --

Q. Did you initially write a six?

A. I wrote six.

Q. And then changed it to a five?

A. And after that, I changed to five. And after that, put one more five, yeah.

Q. And why did you initially write a six?

A. Because the speed limit was 60, and I think about the speed limit.

Q. You weren't initially going to write I was going 65 --

A. No.

Q. -- and changed your mind?

A. 55.

Q. Okay. So why did you change your mind that you were going 55 instead of 60?

A. No. I thought to put the speed limit -- just to put the speed limit, but it was 55. I drive 55.

Q. So you weren't actually trying to reflect your speed. You were just writing down the speed limit.

A. Yes.
Q. You weren't trying to say you were going 65 or 55 miles per hour?
A. No. I'm trying to say 55 miles an hour, but the speed limit was 60. That's what I'm trying to say.
Q. I guess I'm just confused. You said you were trying to write down the speed limit or were you trying to write down how fast you were going?
A. No. I'm -- I was -- my intention was to put my speed limit 55. I drive 55 on speed limit 60. That's my intention.
Q. You always -- your practice is to drive five miles under the speed limit.
A. Under the speed limit, yes.
MR. O'DANIEL: Can we take a real quick break, Brian?
MR. MOHS: Yes.
MR. O'DANIEL: I've got to go move a vehicle. I'm blocking somebody.
THE VIDEOGRAPHER: We'll go off the record. The time is 4:07 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We're back on the record at 4:15 p.m.

BY MR. MOHS:

Q. Mr. Gisca, do you think that you did anything to cause or contribute to this collision?

A. No.

Q. Do you think there's anything you could have done differently to help avoid this collision?

A. No.

Q. Your testimony is you believe you were going a reasonable speed before you saw the disabled vehicle.

A. Yes.

Q. And that you slowed down sufficiently after you saw the disabled vehicle.

A. Yes.

Q. Do you think you slowed down as soon as you could have after you saw the disabled vehicle?

A. Yes.

Q. Do you believe that my client, Mr. Glenn, who was in the vehicle in the lane to your left, did anything to cause or contribute to the collision?

A. No.

Q. Who do you blame for causing this collision?

A. The guy who jump in front of me.

Q. And do you believe he has -- he or she has a hundred percent responsibility?

A. Yes.
MR. MOHS: Have you -- let me mark as Exhibit 17 a copy of the police report.
THE WITNESS: Okay.
MR. MOHS: This is number 16.
(Whereupon, Plaintiff's Deposition Exhibit No. 17 was marked for identification.)
BY MR. MOHS:
Q. Have you seen this document before, Mr. Gisca?
A. No. One second. No. This one, no. Or just one second. No, I didn't see.
MR. O'DANIEL: Are these your boxes you put on?
MR. MOHS: Try 17. I've got it duplicated in there. All right. You can pull that down.
BY MR. MOHS:
Q. For the record, yes, there are red boxes I wanted to go through with you that I added. They were not part of the original police report.
A. Okay. Okay.
Q. First I highlighted in the red there the date of collision was September 6th of 2016, which was 6:03 on a Tuesday.
A. Yeah.

Q. Does that sound correct?
A. Yeah, sound correct.
Q. And you were listed as driver one, and my client was listed as driver two?
A. Yes.
Q. And do you agree that the posted speed limit was 60 miles per hour?
A. I agree.
Q. And under contributing factors, do you see where it says changed lanes improperly?
A. Yeah, I see.
Q. And for my client, it says no contributing factors.
A. Yes.
Q. Do you understand the police officer, based on this report, determined that you were 100 percent responsible for causing the collision?
A. Police officer, not me.
MR. O'DANIEL: Objection.
BY MR. MOHS:
Q. But do you understand that that's what he determined?
A. I go to the -- they give me the ticket and I go to the court and that's why I don't plead guilty and they cancel the ticket.

Q. Okay. Your understanding is the ticket was cancelled.
A. Yes.
Q. Okay. First of all, let me confirm with you, on Page 3 you were cited for violating OCGA 40-6-48, which is failure to maintain lane.
A. Um-hum.
Q. Do you understand that?
A. I understand.
Q. And your testimony is you did not plead guilty to that fine.
A. Yes.
MR. MOHS: Real quickly, just for the record, let me mark as Number 18.
THE WITNESS: Okay.
(Whereupon, Plaintiff's Deposition Exhibit No. 18 was marked for identification.)
BY MR. MOHS:
Q. This is your written statement to HMD, correct?
A. Correct.
Q. And do you know what date you gave that statement?
A. No, I don't remember.

Q. Was it when you got back to HMD?
A. Yeah.
Q. And when did you get back? The next day?
A. Two days, I think.
Q. Okay. But this was within a few days of the wreck that you wrote this written statement.
A. Yeah.
MR. MOHS: Okay. I'm marking as Plaintiff's Exhibit 19. This is number 20.
MR. O'DANIEL: Let me see.
MR. MOHS: Here, here's your copy. Sorry.
(Whereupon, Plaintiff's Deposition Exhibit No. 19 was marked for identification.)
BY MR. MOHS:
Q. Have you seen this document before, Mr. Gisca?
A. No.
Q. Is that your signature at the bottom of that document?
A. Yes.
Q. And was your attorney for this citation Fred Zimmerman?
A. I think so. Yeah.
Q. And this is an affidavit you gave under oath.

A. Excuse me? Can you repeat, please?
Q. This is an affidavit that you gave under oath in front of a notary.
Do you see that at the bottom?
A. Yes.
Q. And on paragraph two, it says I wish to have my attorney, Fred A. Zimmerman, enter a guilty plea on my behalf and in my absence.
Did I read that correctly?
A. Yes.
Q. So --
A. Read it correctly, but --
MR. O'DANIEL: I'll just state for the record, I got something different from the State when we asked for this, but you can certainly ask him what this is.
BY MR. MOHS:
Q. But this is an affidavit that you filled out.
A. The thing is, they give me -- I hire the attorney. And the guy, he's the broker, I think, of -- and they -- he found this guy. And he go to the court. And they said the ticket was dismissed, but I have to pay the fine and you still have to sign here. But my English wasn't so good. Maybe

that's why I didn't -- I didn't understand that I plead guilty. I don't want to be guilty in this. I'm not because . . .

Q. So your understanding was you -- the charge was dismissed, but you still had to pay a fine.

A. Yes.

Q. And why would you pay a fine if you were not guilty?

A. Because I don't want to mess up with this case.

Q. You don't want to what?

A. To messed up. You know, I don't want to -- I just want to let it go, you know. I don't want to -- I have to work, you know. And I --

Q. But is it fair to say that you didn't challenge the citation?

MR. O'DANIEL: I'm going to object because I got a document from them saying he pled nolo.

MR. MOHS: Well, let's --

THE COURT REPORTER: You got the document . . .

MR. O'DANIEL: Saying he pled nolo.

MR. MOHS: Let's mark this. This is Exhibit 20.

(Whereupon, Plaintiff's
Deposition Exhibit No. 20 was
marked for identification.)
BY MR. MOHS:
Q. This is the citation that you received on the --
A. Okay.
Q. -- first page; is that correct?
A. Yes.
MR. MOHS: This is number 19.
BY MR. MOHS:
Q. And this is a two-page document. So on the front -- first page there, that's the citation that you received at the scene from the --
A. Yes.
Q. -- police officer, correct?
A. Correct.
Q. And in the middle section there, it says failure to maintain lane 40-6-48; is that correct?
A. Yeah, correct.
Q. Okay. And then if we flip to -- and you signed it that day.
A. Yes.
Q. And if we flip to the next page, this is the disposition and sentence form at the bottom.

A. Um-hum.
MR. MOHS: Maybe we can zoom in there.
BY MR. MOHS:
Q. And this shows defendant pleads nolo.
A. Um-hum.
Q. Do you see that?
A. Yeah.
Q. And sentence amount fine or forfeiture, $140.
A. Yes.
Q. And do you understand that that means you're not -- you didn't plead not guilty.
A. Um-hum.
Q. You, instead, agreed to plead nolo and pay the fine.
A. Yes.
Q. Okay. And your understanding was that you were getting the citation dismissed.
A. Yes.
Q. That's your testimony.
A. Yeah.
Q. But your testimony is also you didn't challenge this citation.
A. What --
Q. You didn't go to court and plead not guilty.

MR. O'DANIEL: Object to form.
THE WITNESS: I didn't go to court.
BY MR. MOHS:
Q. And you also submitted this affidavit that we previously marked as Exhibit 19, which states you intend to plead guilty under oath.
MR. O'DANIEL: Object to form. The question is what he pled, not what he intends to plead. But you can answer.
BY MR. MOHS:
Q. Exhibit Number 19 is an affidavit you signed under oath.
A. I signed, but I'm not guilty.
Q. So then you gave false testimony in that affidavit?
MR. O'DANIEL: Object to form.
THE WITNESS: No, not false testimony, because I gave to the attorney, and he said he going to resolve the case and that's it.
BY MR. MOHS:
Q. That's what you wanted. You wanted to resolve the case.
A. With the ticket.
Q. Okay. The citation --
A. I don't want a ticket on my record. And

that's why I'm saying that's why I hire the attorney.
Q. You paid a fine as part of the disposition of this citation, correct?
A. Correct.
Q. Just to make sure -- I want to make sure on the record -- Exhibit 19 is an affidavit that you gave under oath, correct?
A. Under what?
Q. Under oath.
A. What is oath?
Q. You signed this document in front of a notary public swearing or affirming that everything contained --
A. I don't remember. Maybe I sign.
Q. Okay. Well, this is your signature, correct --
A. Okay.
Q. -- at the bottom?
A. Correct. Yeah.
Q. And that's a notary's seal right next to your signature.
A. Um-hum.
Q. Correct?
A. Correct.
Q. And you signed it completely understanding

what was on here.
A. Yes.
Q. Okay. Including paragraph two where it says I wish to have my attorney, Fred Zimmerman, enter a guilty plea on my behalf and in my absence.
MR. O'DANIEL: Object to form.
BY MR. MOHS:
Q. Did I read paragraph two correctly?
A. Maybe I didn't see this paragraph.
Q. So your testimony is you didn't see that paragraph, but you still signed the affidavit?
A. I don't remember. No.
Q. I mean, no one forced you to sign this affidavit.
A. No.
Q. You did it of your own free will.
A. Well, you know how it's work. I call the attorney. He found the -- I call the guy who found the attorney. I pay this guy and that's it. And he said come, sign, and that's it.
Q. Okay. And you --
A. And dismiss.
Q. You read the document before you signed it.
A. I don't remember. I didn't know I -- maybe I wrote -- yeah, maybe I read that.

Q. You read it and --
A. Yeah.
Q. -- you signed it --
A. Yeah.
Q. -- under oath in front of a notary.
A. Um-hum. Yeah.
Q. And that's Exhibit 19.
A. Yeah.
Q. Okay. And the notary that's on here is a notary that was in Illinois. That's where you signed it.
A. Yes.
Q. Okay. And the attorney that you hired was in Georgia.
A. The guy what -- the guy is from here. He's a Polish guy. It's Mark his name. And he hired that attorney.
Q. Who was in Georgia.
A. Who was in Georgia.
Q. So your friend in Illinois --
A. It's not my friend.
Q. Okay. Who is he?
A. It's a guy who found an attorney. It's a broker.
Q. An attorney broker?

A. Yes, I think so.
Q. And so you went to somebody in Illinois. And did you pay them to find an attorney for you?
A. Yes.
Q. And they found an attorney in Georgia.
A. Right.
Q. And that's Mr. Zimmerman.
A. I think so, yes.
Q. And you filled out that affidavit after Mr. Zimmerman was hired on your behalf.
A. Yes.
Q. Okay.
(Whereupon, Plaintiff's Deposition Exhibit No. 21 was marked for identification.)
BY MR. MOHS:
Q. All right. I've marked as Exhibit 21. I've just tried to take every photo that everybody's provided and put it together in a collection.
So can you scroll through these photographs and just confirm for me that those fairly and accurately depict the collision scene after the collision that day and the vehicles involved.

A. Yes.
Q. Okay. Following the collision, HMD had you fill out a statement that we previously marked, correct?
A. Correct.
Q. Did anybody at HMD tell you that they made a determination about whether the collision was your fault or not or preventable or not preventable or anything like that?
A. No.
Q. Did you receive any counselling or retraining as a result of the collision from anybody at HMD?
A. No.
Q. To your knowledge did anybody at HMD investigate the collision to try to determine what the cause was?
A. No. I just give the information because the police report, it's not -- wasn't ready yet.
Q. Okay. And you gave that written statement to whom at HMD?
A. I don't remember. It was Ovie maybe.
Q. Ovie?
A. Ovie.
Q. Okay.

A. Ovie, yeah.
Q. And did you talk with Ovie about what happened in the collision?
A. I just wrote down and I explain what happen and that's it.
Q. Okay. Earlier we talked about the Lytx DriveCam --
A. Um-hum.
Q. -- that was in the truck.
MR. MOHS: Can you pull up number 30 for me?
BY MR. MOHS:
Q. Is that what it looked like?
A. Yes.
Q. And do you see those two blue buttons on either side of it on the bottom there?
A. Um-hum.
Q. Did you -- do you know what those buttons are for?
A. No.
Q. Okay. No one at HMD ever told you that that -- if you press those buttons, you could save video?
A. No.
Q. Okay. You've never seen a dashcam video of this?

A. Of this one, no.
Q. Is it your understanding that the recorder didn't record the event?
A. I didn't understand this. I thought that the recorder it was recording because when you push hard on brake, it's recording automatically.
Q. Did someone at some point tell you that there wasn't video recorded?
A. No.
Q. All right. Do you have a Facebook account?
A. Yes.
Q. Do you have an Instagram account as well?
A. Yes.
MR. MOHS: I'll mark as Exhibit 22 and Exhibit 23.
(Whereupon, Plaintiff's Deposition Exhibit Nos. 22 & 23 were marked for identification.)
BY MR. MOHS:
Q. Are these printouts of your Facebook -- is 22 a printout of your Facebook profile?
A. Yes.
Q. And 23 a printout of your Instagram profile?
A. Yes.
Q. Okay. Earlier I asked you if you've ever recorded videos while driving a vehicle. I just

want to confirm your testimony under oath is you've never done that.
A. Yeah.
MR. MOHS: All right. Let's pull up number 37.
BY MR. MOHS:
Q. You can watch on the screen there.
Is this video that's playing a video posted to your Instagram page?
A. Um-hum. Yes.
Q. And is that a video of you driving?
A. Yes.
Q. And are you recording that video while you're driving?
A. Yes.
Q. And are you driving in heavy traffic?
A. No.
Q. And are you going over a hundred miles an hour?
A. Not a hundred. Maybe less.
MR. MOHS: Let me mark as Exhibit 24.
(Whereupon, Plaintiff's Deposition Exhibit No. 24 was marked for identification.)
BY MR. MOHS:
Q. This is a still from that same video that

was posted to your Instagram page. That shows that you're going over a hundred miles an hour, correct --
A. Okay. Correct.
Q. -- in that video?
And you recorded that video and posted it to your Instagram page.
A. Yes.
Q. Okay. You've also recorded videos while driving trucks, correct?
A. Which video?
Q. Well, I'm asking you first.
A. Hmm?
Q. You've recorded videos on your phone while driving a truck before, haven't you?
A. It depends what speed this was.
Q. I'm just saying any video. I'm not saying anything about speeding.
A. I think just one, yes.
Q. Just once.
A. Yes.
MR. MOHS: Let's pull up number 39.
BY MR. MOHS:
Q. This is a video that's posted to your Instagram page as well of you driving a truck at

3:00 a.m.; is that correct?

A. That's correct.

Q. And you recorded that video while you were driving a truck?

A. That's correct.

Q. And it shows you kind of going in between two difference lanes there, correct?

A. Excuse me?

Q. You're kind of having a hard time staying in one lane there, aren't you?

A. No.

MR. O'DANIEL: Object to form.

THE WITNESS: I drive on the normal lane. And if you see, I did not record this video. It's on the middle -- somebody on the middle.

BY MR. MOHS:

Q. So your testimony is you didn't record this video?

A. This one, no.

Q. Somebody else did?

A. Yes.

Q. All right. And the date that's on there -- let's see here -- you posted that video March 21st of 2017. That's -- is that the same day that you took the video or that --

A. I don't remember.
Q. -- somebody else took the video?
A. I don't remember.
Q. But you posted it right at or around the time you actually took it, right?
A. Maybe, yes.
Q. And your log for that day would show whether or not you had a co-driver, correct?
A. Correct.
Q. I mean, there would be documentation.
A. But maybe I don't have co-driver, but I have my wife with me.
Q. Okay. You'd still have to document that she's in the vehicle with you, correct?
A. I think so. I don't remember.
Q. Well, that's what the Federal Motor Carrier Safety Regulations require you to do.
A. Okay.
MR. O'DANIEL: Objection. Form.
BY MR. MOHS:
Q. You understand that?
A. I understand.
Q. All right. So there would be documentation showing whether or not there was anybody else in the truck with you at the time that video was taken.

A. Okay.
Q. You agree with that?
A. I agree.
Q. And your testimony here today under oath is that you did not take that video.
A. I didn't testimony. I don't remember when I took the video.
Q. You don't know whether or not you took it.
A. Yes.
Q. Okay. So it's possible you did take that video while driving a truck.
A. It's possible.
Q. Okay. And you told me a moment ago -- correct me if I'm wrong -- you've only done that once where you've videotaped.
A. Maybe once. I didn't say once. Maybe. I don't remember.
Q. Okay. Is it possible you've done it more than once?
A. I remember I did couple weeks ago.
Q. Okay. What video did you record a couple weeks ago?
A. It was wintertime and drive.
Q. And you posted that to your Facebook page, correct?

A. Yeah, because my friends drove under me.
Q. Your friends what?
A. Drove behind me.
Q. Okay.
A. And it was collision in Wyoming.
Q. Okay. And you -- that was another video.
MR. MOHS: Why don't we pull up number 40.
THE WITNESS: Yeah, this video.
BY MR. MOHS:
Q. This is the video you're talking about?
A. Yeah.
Q. And that's another video where you're driving a truck, and you recorded this yourself while operating the truck.
A. It was two miles an hour.
Q. Okay. Let me finish my question.
This is a video you took and recorded on your phone while operating a commercial motor vehicle.
A. Yes.
Q. And you posted it to your Facebook page.
A. Yes.
Q. Okay. And is it your testimony that that's not a regular practice of yours to record videos of yourself driving?

A. Not regular practice.
Q. How many more times do you think you've done it other than these two times that we've gone through?
A. Just these two times maybe.
Q. Those are the only two times you've ever recorded --
A. I don't remember.
Q. The first video we watched of the truck, you're confirming that that's you driving in that video.
A. Yes, I am driving.
Q. And you don't remember whether or not you recorded it or --
A. Yes.
Q. -- do you now confirm that you did record that?
A. What do you mean? Like . . .
Q. Was it you on the phone recording it?
A. I don't remember.
Q. Okay.
A. That's what I'm saying.
Q. What is your current address?
A. 2620 Rockport Lane.
Q. 2620?

A. Rockport Lane.
Q. Okay.
A. Naperville, Illinois.
Q. And is there an apartment number?
A. 203.
Q. How long have you lived there?
A. Seven, eight months.
Q. Do you have any relatives or friends or connections in Georgia?
A. No.
Q. My understanding is you moved here to the U.S. from Moldova when you were 19?
A. Yes.
Q. Did you -- other than the truck driving school in Washington, did you receive any education here in America?
A. No.
Q. Did you graduate high school or the equivalent in Moldova?
A. In Moldova, yes.
Q. Okay. Did you go to any colleges in Moldova?
A. No. Just high school.
Q. Okay. Have you ever served in the military?
A. No.
Q. Are you a part of any professional or

religious or union organizations?
A. No.
Q. Have you ever been involved in any other lawsuits?
A. No.
Q. Have you ever been arrested?
A. No.
Q. At the time of this collision and in the months leading up to this collision, did you have any health conditions that you regularly saw a physician for?
A. No.
Q. Were you on -- were you taking any medications regularly around that time?
A. No.
Q. Did you have any health condition that may have affected your job, no matter how slight?
A. No.
Q. At the time around the collision, did you regularly drink alcohol?
A. No.
Q. Did you ingest marijuana?
A. No.
Q. Did you ingest any prescription or illegal drugs around that time?

A. No.
Q. Have you ever had any eye-related or vision problems?
A. No.
Q. Have you ever had your eyes tested?
A. Excuse me?
Q. Have you ever had your eyes tested, your vision tested?
A. No. Maybe, yes, when I did medical . . .
Q. Certificate?
A. Yeah, certificate for truck.
Q. They test your eyes then.
A. Yes, of course.
Q. Do you remember what your vision was?
A. The last lane. I see the last lane, like small lane.
Q. Um-hum.
A. I see the small lane.
Q. Do you remember the -- it's called visual acuity. Did they tell you what it was? 20/20?
A. They said I have perfect vision.
Q. Okay.
A. Super perfect.
Q. Okay. Super perfect vision.
A. Yes.

Q. Okay. And earlier you told me that you were on -- at the time of this collision, you were on a phone call with your wife.
A. Right.
Q. You don't remember how long you had been on that call before the collision.
A. Right.
Q. Do you remember what you were talking to her about?
A. No.
MR. MOHS: Let's take a quick break. I think we're pretty close.
THE WITNESS: Okay.
THE VIDEOGRAPHER: We'll go off the record. The time is 4:41 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We're back on the record at 4:48 p.m.
BY MR. MOHS:
Q. Mr. Gisca, have you understood my questions today?
A. Yes.
Q. And is there any answer that you've given today that you want to explain further or change?
A. No.

Q. And is there any other information about this collision or my client's lawsuit that you think we need to have here today?
A. No.
Q. Or that we need to know about?
A. No.
MR. MOHS: Okay. I do not have any other questions. Thank you.
THE WITNESS: Thank you.
MR. O'DANIEL: We're good.
THE VIDEOGRAPHER: We are going off the record at 4:48 p.m. and this concludes today's testimony given by Cristian Gisca. The total number of media units was two and will be retained by Veritext Legal Solutions.
(Deposition concluded at 4:48 p.m.)

STATE OF ILLINOIS )
) SS:
COUNTY OF GRUNDY )

I, JEANETTE A. SANDEI, an Officer of the Court, do hereby certify that heretofore, to-wit, on February 25, 2019, personally appeared before me, at 10031 Virginia Avenue, Chicago Ridge, Illinois, CRISTIAN GISCA, in a cause now pending and undetermined in the United States District Court for the Northern District of Georgia, Atlanta Division, wherein Robert Glenn is the Plaintiff, and HMD Trucking, Inc., Cristian Gisca, and RLI Insurance Company are the Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to digital format by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was not waived by counsel for

the respective parties.

I further certify that the taking of this deposition was pursuant to notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my verified digital signature this 11th day of March, 2019.

Illinois Certified Shorthand Reporter

TO: CLAY S. O'DANIEL
Re: Signature of Deponent Cristian Gisca
Date Errata due back at our offices: 04/12/2019

Greetings:
The deponent has reserved the right to read and sign. Please have the deponent review the attached PDF transcript, noting any changes or corrections on the attached PDF Errata. The deponent may fill out the Errata electronically or print and fill out manually.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Veritext (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time above, the original transcript may be filed with the court without the signature of the deponent.

Please send completed Errata to:
Veritext Production Facility
20 Mansell Court
Suite 300
Roswell, GA 30076
(770) 343-9696

ERRATA for ASSIGNMENT #

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

___ There are no changes noted.

___ The following changes are noted:

Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them. To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

Page _____ Line ______ Change ___________________________

_________________________________________________________

Reason for change _______________________________________

Page _____ Line ______ Change ___________________________

_________________________________________________________

Reason for change _______________________________________

Page _____ Line ______ Change ___________________________

_________________________________________________________

Reason for change _______________________________________

Page _____ Line ______ Change ___________________________

_________________________________________________________

Reason for change _______________________________________

Page _____ Line ______ Change ___________________________

_________________________________________________________

Reason for change _______________________________________

3

Page _____ Line ______ Change _________________________
_______________________________________________________
Reason for change _____________________________________
Page _____ Line ______ Change _________________________
_______________________________________________________
Reason for change _____________________________________
Page _____ Line ______ Change _________________________
_______________________________________________________
Reason for change _____________________________________
Page _____ Line ______ Change _________________________
_______________________________________________________
Reason for change _____________________________________
Page _____ Line ______ Change _________________________
_______________________________________________________
Reason for change _____________________________________
Page _____ Line ______ Change _________________________
_______________________________________________________
Reason for change _____________________________________

_____________________________________
DEPONENT'S SIGNATURE

Sworn to and subscribed before me this ___ day of
_________________, _______.

__________________________________
NOTARY PUBLIC
My Commission Expires:_____________

**&**

**&** 51:23 146:16

**0**

**04/12/2019** 161:3
**04410** 1:7 5:18
**084-003685** 1:25

**1**

**1** 3:10 12:13,17 16:7 54:14 161:1
**10** 3:19 27:3 48:3 48:4,5 78:16,19,22 89:24 90:1 91:8 112:2
**100** 3:24 59:1,4,6 66:19 75:13 124:7 132:16
**10031** 1:18 5:20 159:7
**10:00** 95:20
**10:15** 93:18,25 99:8
**11** 3:20 96:7,11,19
**11-14** 96:5
**110** 85:10
**11:00** 90:24 93:25 95:20
**11th** 160:10
**12** 3:10,21 32:10 49:11 77:8 81:10 96:7,11 97:5,15 115:14
**125** 3:25
**13** 3:22 89:21 96:8 96:11 99:17
**131** 4:3
**133** 4:4
**134** 4:5
**137** 4:6
**13th** 66:1
**14** 3:23 96:8,12 98:4 99:23,24
**140** 138:9
**143** 4:7
**146** 4:8,9
**147** 4:10
**15** 3:24 24:9 77:8 81:10 100:18,22 115:14
**1500** 2:4
**15241** 160:13
**15th** 67:15
**16** 3:25 125:8,12 125:16 126:7 127:13 131:5
**16th** 90:17
**17** 4:3 125:13 131:3,7,15
**18** 4:4 133:14,17
**18th** 67:24
**19** 4:5 54:15 55:20 134:9,13 137:10 139:5,11 140:6 142:7 154:12
**19th** 54:17
**1:18** 1:7 5:18
**1st** 54:19,22 55:14

**2**

**2** 3:11 32:15,18 162:1
**2,000** 26:16
**20** 4:6 39:14 112:2 134:9 136:23 137:2 161:20
**20/20** 156:20
**200** 124:8
**2014** 17:19
**2015** 24:2,3,15,17 24:18,18 25:1,2 27:5,24 44:23 55:14,16 104:16
**2016** 7:18,24 27:25 29:18,23 49:5 54:22 61:5 64:13 67:15,24 69:19 72:1,7 90:18 131:23
**2017** 29:24,25 30:2 30:23 149:24
**2018** 47:12
**2019** 1:20 5:3 159:6 160:11
**203** 154:5
**20th** 61:5
**21** 4:7 143:14,17
**210** 2:17
**21st** 149:24
**22** 4:8 146:14,16 146:20
**227** 126:8
**228** 126:8
**23** 4:9 146:14,16 146:22
**24** 4:10 89:3 147:20,22
**244-1449** 14:23
**25** 1:19 117:3 121:1 159:6
**250** 68:16
**250,000** 68:17,17
**25th** 5:2 69:18
**2620** 153:24,25
**28** 24:24,25
**28th** 25:1
**294** 46:16
**2:05** 1:20 5:2

**3**

**3** 3:12 37:11,13 133:5 163:1
**30** 120:24 145:10 162:6
**300** 54:8 161:21
**30076** 161:22
**30326** 2:5
**30342** 2:11
**30350** 2:17
**31** 96:20
**310-6127** 2:11
**32** 3:11 97:6
**33** 97:16
**34** 105:20,21
**34,000** 105:9,18
**343-9696** 161:23
**35** 116:20 117:2,3 120:25 121:1
**3550** 2:4
**37** 3:12 147:4
**39** 148:22
**3:00** 95:12 149:1
**3:15** 92:7
**3:20** 87:15
**3:27** 87:18
**3:45** 92:13

**4**

**4** 3:13 41:3,7 64:25,25
**40** 152:7
**40-6-48** 133:6 137:19
**404** 2:5,18
**41** 3:13
**419-6300** 2:18
**425** 14:23
**44** 105:19
**45** 62:25 98:24
**48** 3:14
**49** 3:15
**4:00** 93:1 95:10
**4:07** 129:22
**4:15** 129:25
**4:41** 157:15

**4:48** 157:18 158:12,17
**4th** 101:15

**5**

**5** 3:14 48:20,22 50:20 52:14 55:5 78:22 112:2
**5/24/16** 41:18
**50** 3:16 47:2 65:18 124:7
**500,000** 68:16,18
**51** 3:17,18
**53** 105:3
**5447** 2:10
**55** 62:24 115:11 117:2 124:25 126:5,5,9,12,17 127:19,20,24 128:17,19,21,22 129:3,4,11,11
**591-1800** 2:5
**5th** 64:13

**6**

**6** 3:15 24:9 49:14 49:18 50:20 52:14 55:5 93:4 94:8,22
**60** 78:12 106:3 110:17 127:24 128:11,19 129:5 129:12 132:7
**65** 126:4,9,15,18 128:14 129:3
**678** 2:11
**6:00** 93:10,11 95:6 95:11 105:23 114:13 126:8
**6:03** 131:24
**6:23** 96:23
**6th** 7:18,24 72:1,7 126:7 131:23

**7**

**7** 3:4,16 50:6,9,16 52:10 53:9 71:17 71:24 72:3 94:22 162:6
**75** 39:11 107:1 109:1 114:13 126:7
**770** 161:23
**7:00** 93:3,8,13 95:7
**7:31** 97:5,6 98:19

**8**

**8** 3:17 51:23 52:2 52:14
**80,000** 62:23
**800** 26:6
**8010** 2:16
**89** 3:19
**8:50** 97:22 99:18 99:19

**9**

**9** 3:18 51:23 52:5 52:15
**9-11-30** 162:7
**90** 22:19
**96** 3:20,21,22,23
**9:17** 98:7 99:20,23

**a**

**a.m.** 90:24 95:20 95:20 149:1
**able** 64:3 79:13 118:7,9
**absence** 135:8 141:5
**accept** 85:15
**acceptable** 74:9 84:23 85:7,11 88:15,19
**accident** 7:21 38:21,22 43:18,19 43:19 45:11 46:12 92:22,25 93:3,4,7 93:10 94:7 95:4 98:18,18 118:18
**accidents** 77:23
**account** 104:7 146:10,12
**accurate** 50:7 95:1 95:23 100:10,11 100:13
**accurately** 51:5 71:25 72:6 143:23
**acknowledge** 37:18 88:6
**acknowledged** 95:3
**acknowledgment** 3:12 37:16
**action** 5:25 81:24
**acuity** 156:20
**added** 131:19
**additional** 35:22 162:9
**address** 153:23
**adjust** 78:5
**adjustment** 59:2 64:15 66:7
**advice** 86:13
**affidavit** 4:5 134:25 135:2,18 139:4,11,15 140:6 141:11,14 143:9
**affiliations** 6:3
**affirming** 140:12
**aforesaid** 159:17 159:23
**afternoon** 5:1
**agency** 10:6
**agent** 32:12
**aging** 58:20 60:17
**ago** 28:11 151:13 151:20,22
**agree** 5:11 51:4,7 52:17,18 60:1,21 63:17 67:9,10 69:11,15 70:24 71:2 72:9,12,15 73:16 74:8,18 75:7,11,19 77:6 84:21 85:1,4,6,7 85:10,16 88:14,19 102:16 105:22 118:21 122:10,18 123:25 124:21 126:14 132:6,8 151:2,3
**agreeable** 6:23,24
**agreed** 138:14
**agreement** 3:11 6:16 7:22 9:2 32:13,14,16,22
**ahead** 37:10 59:18 76:18,23 77:1,8,23 81:10,11,18 82:5 82:18 83:13,19 84:11 87:11 100:18 102:21 115:12,21 116:25 117:15 122:5,19 123:1
**aided** 159:20
**air** 21:20,22 64:16 103:15
**alabama** 47:23
**alcohol** 36:20 155:20
**alcoholic** 89:4
**alexandria** 18:1

**allowed** 6:19
**alsip** 23:16,18,23
**alslip** 23:19
**alternative** 90:10
**america** 16:3,6 154:16
**amount** 138:8
**annual** 3:14 49:4 51:3 71:22,23
**answer** 6:22 8:16 9:3,8 21:22 28:6 60:23 83:1 88:2 120:5 122:23 139:9 157:23
**answering** 8:21 12:7
**answers** 8:5 10:1 12:24
**anticipate** 8:12,19 82:19
**anticipation** 82:13
**anybody** 11:7 33:18 71:8,13 127:21 144:6,13 144:15 150:24
**apartment** 154:4
**appearances** 2:1 6:3
**appeared** 159:6
**application** 13:18 13:21,25 14:15 33:25 34:1,1
**applies** 11:12
**apply** 73:3,6
**approached** 114:9 114:16,20 115:10
**approaching** 106:25 115:24 116:21 117:8
**approximately** 105:18
**april** 66:1 67:15 67:24
**area** 16:25 17:21 97:2 106:25 114:9 114:16,20 115:10
**arizona** 53:12 54:4 55:2
**arrested** 155:6
**arrive** 99:14,18
**asked** 48:12 135:15 146:24
**asking** 60:19 74:13 94:5 148:12
**aslip** 23:17
**assignment** 162:1
**assist** 162:8
**atlanta** 1:3 2:5,11 2:17 5:18 159:10
**attach** 162:9
**attached** 161:6,7
**attempt** 22:22
**attempted** 10:20 11:9 42:17
**attention** 75:14
**attorney** 7:15 8:2 38:8 40:10,11,12 40:14 44:15 54:4 54:6 134:22 135:7 135:21 139:18 140:1 141:4,18,19 142:13,17,23,25 143:3,5 161:12
**attorneys** 11:2,15 160:4
**audio** 5:9,10
**august** 25:9,10,11 27:9 29:17 49:5
**authority** 10:13 67:3
**authorization** 42:23,24 43:6,9
**automatic** 20:25 119:22
**automatically** 106:18 118:14,20 119:17 127:7 146:6
**avenue** 1:19 5:20 159:7
**avoid** 75:8 76:9 77:3,13 82:15 118:3,10 120:2,8 122:8 123:7,11 130:6
**aware** 52:20 71:16 87:23 104:9 127:4

**b**

**b** 3:8 4:1 111:16 111:17
**back** 22:17,19 27:16 47:3 87:17 92:12 95:22 98:23 106:24 108:23 112:9 129:24 134:1,3 157:17 161:3
**background** 10:3 13:12,14
**bad** 18:7 48:11 55:19 57:12,13,13 68:24
**barrel** 108:16,19
**barrels** 108:15,21 109:4,10
**barrier** 109:15,16
**based** 132:15
**bed** 89:16,19
**beginning** 53:25 110:12
**behalf** 6:6,7 135:8 141:5 143:10
**belief** 58:17
**believe** 130:8,18 130:24
**bellevue** 19:5
**belt** 53:13,20,24 54:5 56:14
**best** 8:20 9:1 30:15 79:16 87:24 122:18
**better** 26:20 102:19
**beverages** 89:4
**big** 72:17 79:3 108:11
**bill** 3:24 100:20
**birci** 111:20,21
**birth** 91:10
**bit** 9:22 10:3 21:4 26:18 42:15 62:3 94:20 106:18 118:14,23
**black** 53:16
**blame** 130:22
**blind** 80:6,16,22 80:24
**blinking** 62:9,10 63:23
**blocking** 129:20
**blow** 66:20
**blue** 15:16,17 145:14
**bluetooth** 15:14 15:19 111:2,10 112:22
**books** 36:25 37:5
**born** 15:24
**bottom** 55:10 134:19 135:4 137:25 140:18 145:15

**bought** 30:6,7,8,9
**boxes** 131:14,18
**brake** 47:15 59:2 64:16 66:6,18 102:25 104:3,10 118:14,19 122:2 146:6
**brakes** 21:20,23 47:17 64:15 102:17 103:15,16 103:20,23 106:17 119:17,19,23 120:12 124:13
**braking** 102:20
**break** 9:7,11 50:24 87:12 129:16 157:11
**brian** 2:3,6 6:5 7:15 129:17
**brick** 70:13 107:20 108:13
**bricks** 70:14 108:7 109:13,13
**bridge** 53:16
**broke** 29:9 59:3 66:20
**broken** 63:11 86:24 106:4,7 107:19 115:17 116:25 117:10
**broker** 70:9 135:21 142:24,25
**brought** 16:6
**building** 109:18 109:20
**built** 109:23,24,25
**bunch** 90:11
**bungees** 57:16,17 57:20 59:23 65:5
**business** 30:14,15 30:15
**button** 112:9 127:5,11
**buttons** 145:14,17 145:21

**c**

**c** 16:20 31:8,9 92:1 111:16,17
**cab** 19:22
**california** 26:16 65:25 66:1 67:5
**call** 29:15 68:25 86:24 111:24 112:9 141:17,18 157:3,6
**called** 1:13 7:6 12:8,18 84:3 156:19
**camera** 127:11
**cancel** 44:15 132:25
**cancelled** 16:16 38:9 133:2
**captured** 127:1
**car** 30:14,17,22 45:3,19 46:10,13 46:14 53:23 72:14 72:18,19,25 73:1,6 79:4,10 80:11 85:23 106:4,4,7 107:19,22 115:18 115:19,20 121:12 121:18,22
**care** 46:5 63:2
**career** 31:4,6,12
**cargo** 36:15
**carrier** 10:12 31:3 31:7,9,12,18,19,21 31:22,23 32:4,7 58:2 67:3 73:21 74:5 150:16
**cars** 21:4 47:18 84:15 106:6,6,16 115:24
**cascadia** 104:17
**case** 5:18 11:8,9 12:9 57:5 79:20 123:3 136:11 139:19,22
**cause** 130:3,20 144:17 159:8,16
**causing** 130:22 132:17
**cdl** 18:12 19:9 20:10,11 22:24 24:23,24 32:4 48:16 54:17,20 73:23 76:21 77:11 86:12
**cell** 5:7 14:22 15:1 15:4 36:15 110:25 112:21 113:4
**cellular** 5:6
**central** 94:16
**certain** 74:17
**certainly** 135:15
**certificate** 35:11 35:11 156:10,11
**certified** 1:17 160:14
**certify** 159:5,14 159:24 160:2,6 162:2
**challenge** 61:21 136:17 138:23
**chance** 71:6
**change** 30:20 43:4 62:17,18 68:25 88:24 91:24 100:1 121:5,6 128:1,18 157:24 162:11,13 162:14,16,17,19 162:20,22,23,25 163:1,3,4,6,7,9,10 163:12,13,15,16 163:18
**changed** 28:10 30:25 127:22 128:7,8,16 132:10
**changes** 161:7 162:4,5,7
**charge** 38:6 136:5
**charges** 51:5 52:25 60:1 64:19
**chart** 3:16 50:5,19 51:9 52:8,11 53:10
**check** 71:20 79:24 113:19
**checking** 113:22
**chicago** 1:19 5:21 17:21 26:16 44:7 44:11 159:7
**choice** 58:22
**chose** 58:8
**citation** 4:6 39:20 44:13,14,16,20 47:20 51:2 53:2 54:7,9 63:4,5,6 134:22 136:17 137:5,13 138:18 138:23 139:24 140:3
**citations** 48:15 60:2,21 65:20 66:9,24
**cited** 38:13,15 39:3 133:5
**city** 18:25 39:12 39:18 92:20,23 93:20 99:12,15 100:2 101:21,24 102:4,6

**civil** 1:14 6:19 162:6
**claim** 10:23
**claiming** 45:19
**clamp** 59:2
**clarify** 50:11
**class** 20:12,16 35:2 35:7,18
**classes** 35:12,15
**classroom** 19:21
**clay** 2:16 6:7 161:1
**clear** 11:1 51:18 71:4 114:4
**client** 10:20 11:9 119:7 130:18 132:4,12
**client's** 120:16 158:2
**close** 19:2 38:16 40:8 61:19 62:12 62:15,17 106:16 109:25 110:3 124:6 157:12
**closed** 16:13 107:20 109:7
**closely** 39:3 40:7
**coast** 27:21 94:16
**codaniel** 2:18
**colby** 2:24 5:22
**collection** 100:19 143:20
**college** 16:10,11 16:13,17,18
**colleges** 154:21
**collision** 7:17,22 7:23 9:21 10:5,17 14:22 15:9 39:5 40:25 44:6,17,25 46:8,15,19,23 47:10,12 48:7 88:25 89:3,13 93:20 97:2 100:16 102:3,13,19 104:16 105:23 106:1,25 110:8,10 110:11 111:7,24 112:7,8,18 113:8 113:14,17,23 114:16,21 115:10 122:11 123:8 125:21 127:2,10 130:3,6,20,22 131:23 132:17 143:23,24 144:2,7 144:12,16 145:3 152:5 155:8,9,19 157:2,6 158:2
**collisions** 46:9 47:9 48:6,8
**color** 109:12
**come** 77:13 83:9 123:4,20 141:20
**coming** 42:9 55:21 82:7 83:5,21 106:16
**commercial** 23:7 41:10 44:2 53:13 53:24 54:5 62:22 70:25 72:13,24 74:9,14 75:12,19 76:4,15,22 77:6,17 79:23 81:4 82:2 83:3,24 84:8,20,24 85:2,8,14 94:23 100:12 102:17 103:5 104:4,8 110:18 111:1,4 112:24 113:5,11 122:12 123:23 152:18
**commission** 163:25
**companies** 18:19 32:8
**company** 1:10 5:16 12:1 13:19 15:16 23:6 25:5 26:21,24,25 28:10 28:19 30:11,13,20 31:2 35:1,4,16,18 36:8,14,19 40:10 40:18 57:11,20 66:11,11 70:6 91:24 159:13
**complaint** 12:3,5
**completed** 161:18
**completely** 140:25
**comply** 73:23 74:1 74:5
**computer** 159:20
**concept** 84:10
**concluded** 158:16
**concludes** 158:12
**concrete** 107:9
**condition** 58:6 103:17,19 127:15 155:16
**conditions** 47:1 78:6,23,24 155:10
**cones** 108:1,4
**confirm** 51:14 71:25 72:5 100:6 133:4 143:22 147:1 153:16
**confirming** 153:10
**confused** 129:7
**connecticut** 70:4
**connections** 154:9
**conscious** 119:14
**construction** 18:18 26:8 82:4 107:23,25 108:2,6 108:21,24 109:4 110:6,14,15
**contained** 140:13
**contending** 119:6 127:21
**continue** 5:10
**continued** 4:1
**contractor** 10:8 29:17
**contribute** 130:3 130:20
**contributing** 132:9,12
**conversation** 8:18 112:11,16
**conversations** 5:6 11:2,14
**conway** 91:23,23 92:1
**cooper** 2:9,10,12 6:5 7:16
**cooperspencela...** 2:12
**copies** 36:7 161:12
**copy** 32:15 41:10 49:2 90:1 131:3 134:11
**correct** 10:6,7 12:25 32:13,14 41:23,25 42:1 50:14 56:6 58:2 60:15 61:9 80:17 81:7 95:5 97:13 98:12 102:1,2 107:1,2,12,13 117:21 126:24,25 127:18 132:1,2 133:21,22 137:8 137:16,17,19,20 140:3,4,7,16,19,23

140:24 144:4,5 148:3,4,10 149:1,2 149:5,7 150:8,9,14 151:14,25 159:22
**corrections** 161:7 162:9
**correctly** 120:6 135:9,12 141:8
**correlates** 97:1
**corsello** 2:25 6:9,9
**counsel** 5:14 6:2 6:16 7:16 159:25 160:6
**counselling** 144:11
**counter** 89:10
**counterintuitive** 102:16
**country** 21:4 28:1 28:2,3
**county** 159:3
**couple** 21:10,14 22:15,16 115:5,7 151:20,21
**courier** 31:6,15,16
**course** 10:5 20:18 47:10 72:15 75:16 75:18 79:6 80:1 84:22 121:20 156:13
**court** 1:1 5:17,24 6:11 8:10 53:21 54:1 56:25 63:3 87:23 132:24 135:23 136:21 138:25 139:2 159:4,9 161:15,20
**courts** 1:15
**cover** 57:18 70:8
**covered** 62:8 70:16
**covers** 10:17
**crash** 43:15,15,19
**create** 84:14 123:2 124:2
**creating** 83:9
**criminal** 54:6
**cristian** 1:9,13 3:3 5:13,15 6:15 7:5 7:12 126:6 158:13 159:8,12 161:2
**cross** 6:18
**csr** 1:24
**current** 41:10 153:23
**currently** 28:7
**curve** 47:5,5 118:19
**curves** 72:21
**cushion** 84:14 124:2
**cut** 8:19,20 43:17
**cv** 1:7 5:18

**d**

**d** 3:1
**d.c.** 17:25,25 18:9
**dashcam** 126:21 145:24
**data** 3:20,21,22,23 96:14 99:14
**date** 41:18,23 54:24 55:4,13 66:15 102:18 125:21 131:23 133:23 149:22 161:3
**dates** 51:6
**day** 16:16 19:12 20:3,4,5 22:10 29:8 34:11,24 57:13 58:4,9 61:14 90:24 92:4 95:10 99:9 101:8 105:8 114:1 134:3 137:22 143:24 149:24 150:7 160:10 163:21
**days** 20:2,6,7 34:10 48:11 67:24 68:9,12 101:12,13 101:15 134:4,5
**deal** 39:22
**december** 54:14 54:19 55:14
**decided** 26:7,9,10 30:10
**decision** 119:14
**dedicated** 27:20
**defective** 61:16 62:1 63:14
**defendant** 138:4
**defendants** 1:11 2:19 6:8 159:13
**defensive** 75:20,23 76:5 82:10
**degrees** 22:19
**delta** 23:11,12,13 23:14,14,14,15
**department** 44:11
**depend** 70:20 112:5
**depends** 19:14 103:6,17 148:16
**depict** 143:23
**deponent** 161:2,6 161:6,7,9,15
**deponent's** 163:20
**deposition** 1:13 5:8,13,19 6:14 9:17 11:13,17 12:13 32:18 37:13 41:7 48:22 49:18 50:9 51:23 89:24 96:5 100:22 125:8 131:7 133:17 134:13 137:2 143:14 146:16 147:22 158:16 159:25 160:3,4 162:8
**depositions** 1:16
**description** 3:9 4:2
**designed** 102:19
**desire** 162:7
**details** 125:24
**determination** 144:7
**determine** 144:16
**determined** 132:16,22
**device** 85:12,17
**dewalt** 26:14
**difference** 149:7
**differences** 72:16
**different** 72:24,25 73:3 90:13 94:14 135:14
**differently** 75:4,6 130:6
**digital** 159:20 160:10
**directed** 12:19
**director** 6:10
**disabled** 77:21 123:16 124:12 130:10,13,16
**discipline** 40:21 40:24
**disciplined** 37:25
**discover** 29:10
**discovery** 6:18
**discussing** 7:21

**dismiss** 44:15 57:5 141:22
**dismissed** 40:16 40:17 135:23 136:5 138:18
**dispatch** 33:14,15 33:16
**disposition** 3:18 52:5 137:25 140:2
**distance** 34:7 76:2 77:12 79:3,4,13 85:5
**distracted** 85:8 88:20 112:10,16
**distracting** 113:1
**district** 1:1,2,15 5:17,17 159:9,10
**division** 1:3 5:18 159:11
**dm** 30:20
**dmv** 21:19,25
**document** 12:22 14:10 49:2,24 50:1 72:5 127:15 131:10 134:16,20 136:19,21 137:12 140:11 141:23 150:13
**documentation** 150:10,23
**documented** 87:7
**documents** 11:19 11:20,21 13:9,10 13:17 14:3,5,6,13 17:10 96:11 100:19,25
**doing** 21:7 34:10 82:23 114:19
**downhill** 62:23
**drifting** 47:5
**drink** 89:4 155:20
**drive** 21:4 22:16 34:7 45:1 53:23 58:23,25 59:5 64:24 66:19 69:2 73:17 75:3 80:13 85:25 86:13 87:3 88:9 91:17 94:11 127:4 128:22 129:11,13 149:13 151:23
**drivecam** 126:23 145:7
**drivecams** 127:5
**driver** 13:14,15,23 20:16 21:9 23:7 25:5 37:18 43:6 48:14 58:4 65:14 70:25 71:21 73:4 73:16 74:9,14 75:13,20,20,23 76:4,5,15 78:5 79:24 80:15 82:2 82:10 83:3,24 84:8,13,20 85:20 85:21 86:1,4,8 87:6 88:9 94:24 100:13 123:23 132:3,4 150:8,11
**driver's** 3:13 37:19 41:11 42:13 43:3
**drivers** 23:11 73:6 76:22 77:7,17 86:6 123:24
**driving** 3:14 18:13 18:15,21 19:15 20:9 25:12 27:13 27:16 28:20 34:18 44:17 46:13 49:4 59:8,15 70:5 71:1 71:25 72:6,12,13 72:23,24 73:1,11 75:14,15 78:2,6,20 78:21 80:11 81:4 85:8,12,17,19,23 86:20,25 88:20 93:1,15,16,17,24 95:9,10,12 97:10 99:9,21 102:18 103:5,22 104:8,15 110:18 111:1,4 112:24 113:5,11 113:20 122:1,2 123:18 146:25 147:10,13,15 148:10,15,25 149:4 151:11 152:13,25 153:10 153:12 154:14
**drop** 91:18
**drove** 47:2 57:25 62:15,23 68:22 92:7 99:7 101:17 106:2,12 119:16 126:7 152:1,3
**drug** 36:19 87:5 89:7
**drugs** 89:10 155:25
**due** 161:3
**duly** 7:6 159:15
**duplicated** 131:15
**duties** 72:25 74:17 74:19
**duty** 28:17 58:4 74:14 84:19 88:9 90:23 92:9,12 93:12,24 95:19

**e**

**e** 3:1,8 4:1 17:2,3 31:9,18 33:7 94:18 162:6,7
**earlier** 79:8 81:9 117:13 145:6 146:24 157:1
**easier** 94:17 103:9
**easiest** 103:7
**east** 27:21 94:15
**eastern** 91:1,2
**easy** 21:5
**education** 154:15
**effective** 103:15 103:16
**efficient** 103:25
**efficiently** 103:23
**eight** 19:18 51:19 51:21 154:7
**either** 82:12 145:15
**elapsed** 124:18
**electronically** 161:8
**elr** 1:7 5:18
**email** 42:7
**emails** 113:19,22
**emergency** 76:12 77:2 79:20 83:9 124:4
**empty** 91:19 100:17 102:14,22 103:1,7,11,12,18 104:3,9,10 105:11 105:12
**encountered** 82:1
**endanger** 74:10,20
**endangering** 75:8
**english** 135:25
**enter** 80:24 108:24 124:3 135:7 141:5

**entered** 120:12 162:8
**entitled** 11:4
**entity** 10:11 44:8 44:10
**equipment** 57:12 57:13,14 58:15,17 60:13,16,25 64:16 64:22
**equivalent** 154:19
**errata** 161:3,7,8,9 161:11,13,14,18 162:1
**evasive** 81:24
**evening** 16:14,15
**event** 76:12 127:6 146:3
**events** 120:19
**everybody** 81:19 124:9
**everybody's** 143:19
**evidence** 6:20
**exactly** 44:18 106:5 111:25 117:4
**exam** 21:18,18,19 22:9,10
**examination** 1:14 3:2 6:18 7:8
**examined** 7:7
**exams** 22:10
**exceed** 84:23 88:15
**exceeding** 126:18
**exclusively** 10:12
**excuse** 32:5 113:15 135:1 149:8 156:6
**exhibit** 3:10,11,12 3:13,14,15,16,17 3:18,19,20,21,22 3:23,24,25 4:3,4,5 4:6,7,8,9,10 12:13 12:17,25 32:15,18 37:11,13 41:3,7 48:20,22 49:14,18 50:6,9,16 51:23 52:2,5,10,14,14,14 52:15 55:5 71:17 71:24 72:3 89:24 90:1 96:5 97:5,5 97:15 98:4 99:17 99:24 100:18,22 125:8,12,16 127:13 131:3,7 133:17 134:9,13 136:23 137:2 139:5,11 140:6 142:7 143:14,17 146:14,14,16 147:20,22
**exhibits** 50:20 90:14 96:3,11
**expect** 75:25 76:15 106:10,10,13 123:24 124:5 127:1,3
**expensive** 23:4
**experience** 18:7
**experienced** 103:4 103:14
**expired** 66:14
**expires** 163:25
**explain** 20:23 42:3 44:24 45:1,12 46:7 53:20 56:25 61:23,24 64:21 68:24 70:2 71:6,9 71:13 145:4 157:24
**explanation** 72:22
**express** 23:14,15
**eye** 117:7 156:2
**eyes** 156:5,7,12

**f**

**f** 2:9,10
**facebook** 4:8 146:10,19,20 151:24 152:21
**facility** 70:7 161:19
**fact** 104:9
**factors** 132:9,13
**failing** 53:12 54:5 64:21
**failure** 64:15 133:6 137:19
**fair** 9:25 35:16 76:3 77:3,19 78:2 81:1,2 83:14 84:17 117:17 136:16
**fairburn** 97:24 98:9
**fairly** 143:23
**fall** 65:11
**false** 139:14,17
**far** 76:23 77:1,12 81:10 84:11 114:25 115:17
**fast** 46:25 72:20 115:9 118:9 124:9 126:15,16 129:9
**faster** 85:1
**father** 17:11
**fault** 56:7 60:24,25 90:6 144:8
**february** 1:19 5:2 64:13 159:6
**federal** 6:19,20 58:1 73:20 150:16 162:6
**feel** 58:12
**feet** 116:22 124:8 124:8
**felt** 47:3 60:16
**field** 72:19
**figure** 99:6
**file** 13:23 48:14 161:12
**filed** 5:16 11:8 161:15
**fill** 33:24 49:7 50:2 95:1 100:13 101:2 125:3 144:3 161:7 161:8
**filled** 101:5 135:18 143:9
**finally** 9:6
**financially** 6:1
**find** 9:21,22 74:18 80:20 143:3
**findings** 61:22
**fine** 7:3 54:3,8 57:2,6,7 65:20,21 133:11 135:24 136:6,8 138:8,15 140:2
**fines** 52:24
**finish** 8:15 17:9 71:11 82:21,24 87:25 98:10 112:14 120:4 125:19 152:16
**firm** 5:22,24
**first** 6:23 7:6 8:5 9:19 10:4 17:23 18:6 22:22 23:6 23:24 24:11 26:22 27:15 35:13 38:12 41:20 42:22 53:11 53:12 54:10,25

55:3,13,20 56:14 60:9 61:3 90:16 92:4 96:19 99:2 101:5 106:4 116:16 124:11 125:15 128:4 131:22 133:4 137:8,13 148:12 153:9 159:15
**five** 20:2 34:12 49:15 63:22 68:15 68:15 90:13 112:7 116:22,22,23 128:2,7,8,9 129:14
**fix** 29:7 69:17
**flat** 59:9,11 68:20
**flatbed** 25:18 57:16 64:25 65:3
**flip** 137:21,24
**florida** 91:4 101:18
**fly** 42:12
**fmcsrs** 37:3
**follow** 71:1 72:25 73:20
**following** 38:16 39:3 40:7,8,25 54:22 61:19 62:12 62:16 144:2 162:5
**follows** 7:7
**foot** 105:3
**football** 72:19
**forced** 141:13
**foregoing** 159:21 159:25
**forfeiture** 138:8
**form** 6:21 60:22 102:21 116:8 122:20 123:12 137:25 139:1,7,16 141:6 149:12
150:19 162:7,9
**format** 159:20
**forward** 161:12
**found** 61:14 68:10 68:12 100:7 135:22 141:18,18 142:23 143:5
**four** 48:19 63:21 69:4 96:2,10 106:6 115:24
**fourteen** 98:7
**fred** 134:23 135:7 141:4
**free** 141:16
**freightliner** 104:16
**frg** 2:6
**fried** 2:3
**friend** 23:3 86:23 86:24 142:20,21
**friends** 42:6 86:23 152:1,2 154:8
**front** 45:3,11 47:16 62:13,14,20 62:25 79:17 106:14,17,21,22 114:23,25 115:3,7 116:2,14,22 120:9 121:8,9,12,18,22 123:3,7,10,14,16 123:21 124:3,8 130:23 135:3 137:13 140:11 142:5
**fuel** 53:3 67:19 68:8 92:14
**fueled** 92:15
**full** 7:10,12 8:15 8:16 47:18
**furnish** 162:9
**further** 79:7 157:24 159:14,24 160:2,6

**g**

**g** 16:7
**ga** 161:22
**galaxy** 15:12
**gears** 88:24
**general** 21:22 23:8
**generally** 60:9
**georgia** 1:2 2:5,11 2:17 5:17 7:18 38:18 39:11 92:5 92:17,20 97:24 101:21 142:14,18 142:19 143:5 154:9 159:10
**getting** 138:18
**gisca** 1:9,13 3:3 4:4 5:13,15 6:15 7:5,13,14,14 14:21 72:9,10 87:20 90:17 96:10 101:1 111:15 126:6 127:13 130:2 131:11 134:17 157:20 158:13 159:8,12 161:2
**give** 10:1,2 17:12 23:3 25:20,24 26:1,15 35:10 39:19 42:15 43:25 44:14,20 46:6 47:19 57:15 65:21 66:12 68:18 70:6 75:13 77:12 79:12 83:8 86:13 118:1 132:23 135:20 144:18
**given** 8:2 9:17 40:17 157:23
158:13 159:17,22 162:8
**glenn** 1:5 5:14 6:6 7:17 130:18 159:11
**go** 5:11 16:10,13 17:7,8,11,13 19:12 19:13 20:14 21:19 21:25 22:6,9,10,12 22:15,17,19 24:25 26:8,11,13 28:4 29:7,7,13,15 30:11 30:12 34:8,8 35:2 35:6 37:10 42:22 47:4 48:12,15 50:25 53:5,21 54:1 56:11,25 58:8 59:6,10,11,12 62:13,23 63:2,8 70:4,5 73:11 86:19 87:1,11,14 88:7 94:15,16,16 98:9 99:25 100:1 100:18 102:4,21 106:8,18,19 107:19 108:17 118:19,20 119:4 119:12,18 123:20 126:17 129:19,21 131:19 132:23,24 135:22 136:14 138:25 139:2 154:21 157:14
**going** 5:2 8:12,13 8:19 19:12 20:2 29:8 46:25 47:3 50:6 56:19 59:3,8 59:24 62:3 63:3 75:25 78:13 79:16 79:25 81:23 82:6 85:2,3 96:3

101:20 107:23 115:9 123:25 124:24 126:4,15 126:15,16 128:13 128:14,19 129:2,9 130:9 136:18 139:18 147:17 148:2 149:6 158:11
**goldberg** 2:3
**good** 5:1 59:2 64:7 64:10 82:23 135:25 158:10
**gotcha** 55:24
**graduate** 21:15 154:18
**gray** 109:13
**green** 31:3,4,23 37:5
**greetings** 161:5
**ground** 8:2
**grundy** 159:3
**guess** 35:13 39:2 49:10 60:8 61:2 94:5 99:6 100:6 129:7
**guide** 37:19
**guilty** 52:24 132:25 133:11 135:7 136:2,2,9 138:12,25 139:6 139:13 141:5
**guy** 25:6 26:13 43:22 45:3,10,16 46:2,6 53:15 56:25 62:13,19,24 63:20 65:9 76:1 85:22 86:11 116:19 130:23 135:21,22 141:18 141:19 142:15,15 142:16,23
**guys** 21:14 42:15 70:7 106:9

**h**

**h** 3:8 4:1
**half** 19:25 24:5 92:10,11
**hand** 12:16 32:10 108:8,10,11 125:11
**hand's** 55:6
**handbook** 3:12 37:20,22
**handheld** 38:13 85:12,17
**happen** 38:17 44:22 46:15 57:1 59:1,16 75:25 80:8 82:6 93:4 94:7 112:8 118:18 122:3 145:5
**happened** 9:21 44:24 46:19 67:16 93:10 105:23 106:1 110:12 120:11 145:3
**happening** 93:8
**happens** 83:23
**hard** 21:18 27:23 94:20 119:22 122:2 146:6 149:9
**harder** 102:23,25 104:3,10
**hauling** 30:14,17 30:22 100:15
**hazard** 77:1 81:18 81:23 82:13,18 83:4,20 84:3 117:15,20 121:17 122:5,8 123:4,11
**hazards** 76:6,10 76:19 77:3,13,18 77:24 80:21 83:13 83:17 84:3,12
**head** 8:9 36:12 83:4
**headlamp** 62:6,7
**headset** 15:21,22
**health** 155:10,16
**heard** 104:2
**heavy** 78:8,25 79:1 147:15
**held** 5:19
**help** 50:1 86:12 130:6
**hereinbefore** 160:5
**heretofore** 159:5
**hereunto** 160:9
**high** 25:20 154:18 154:22
**higher** 81:5
**highest** 122:16
**highlighted** 131:22
**highway** 75:9
**hire** 35:17 44:15 54:4,6 71:20 135:20 140:1
**hired** 33:19 40:10 40:11,12,14 48:17 49:5 51:16 52:22 71:14 142:13,16 143:10
**history** 14:1 72:1 72:6
**hit** 43:21 45:16 46:2,5,22 47:8,18
**hmd** 1:8 2:25 4:4 5:15,19 6:10 10:6 10:16,17 12:1 27:13,14 28:4,22 29:17,20 32:9,12 32:24 33:2,19 34:25 35:15,22 36:8 37:25 40:18 40:20,22,25 48:14 48:17 49:3 50:17 51:15 52:19 71:8 71:13,14 86:2,4 96:15 104:25 105:1,5 127:8 133:20 134:1 144:2,6,13,15,21 145:20 159:12
**hmm** 122:21 148:13
**hodgkins** 101:24
**hold** 14:5 85:16
**home** 87:1
**hope** 38:10
**hour** 47:3 62:24 92:10,11 94:4,12 94:13 95:17,18,22 98:23 99:8 116:21 120:25 121:1 124:25 126:4,11 129:3,4 132:7 147:18 148:2 152:15
**hours** 34:12,12 36:25 37:19 89:3 89:14 91:8 94:11 94:12 99:1
**hub** 59:3 66:4,5,17 100:1
**huh** 47:25
**hum** 9:24 11:6,16 17:24 38:7 49:6 49:12 50:21 51:11 51:13 52:4,12,16 60:24 64:14 67:21

67:25 70:15 72:4 72:11 76:24 77:22 79:19 81:8,12,20 84:4 88:1 90:3 93:2 96:13,22,25 97:9 98:6,11 99:16 102:15 105:17 116:12 120:21 125:5,25 133:7 138:1,5,13 140:22 142:6 145:8,16 147:9 156:17
**hundred** 68:15 130:25 147:17,19 148:2
**hydroplaning** 46:20

**i**

**ice** 103:21,22
**idea** 122:4
**identification** 12:14 32:19 37:14 41:8 48:23 49:19 50:10 51:24 89:25 96:6 100:23 125:9 131:8 133:18 134:14 137:3 143:15 146:17 147:23
**identified** 28:7 32:3,7
**ifta** 67:20,22
**illegal** 59:24 89:7 89:10 155:24
**illinois** 1:18,19 5:21 16:21 18:9 18:18 23:2,16 42:18 46:17 101:10,11,24 142:10,20 143:2
154:3 159:1,7 160:14
**impact** 119:2
**impacted** 118:24
**important** 84:19
**impossible** 54:19
**improperly** 132:10
**inaccuracies** 90:20
**incident** 7:21
**include** 19:21 58:15
**included** 51:2 52:7
**including** 34:15,15 76:22 77:21 127:19 141:3
**incorrect** 95:4,5
**independent** 10:8 29:17
**industry** 74:1
**infinity** 26:22 27:2 27:24 28:16,21,24 57:11 58:1,18 60:11
**information** 144:18 158:1
**ingest** 89:6 155:22 155:24
**initial** 35:21
**initially** 17:20 128:5,10,13
**injuries** 47:19
**inoperative** 61:16 61:17,25 63:14
**inspect** 66:25
**inspected** 66:21 67:2
**inspection** 22:13 22:14 29:4 53:1,2 58:12,24 61:7,13 65:23 67:7 68:6
68:12,22 69:10
**inspections** 29:11
**instagram** 4:9,10 146:12,22 147:8 148:1,7,25
**instance** 37:7 61:2 82:4 96:18
**insurance** 1:10 5:16 10:16,16 68:13,14 159:13
**intend** 139:6
**intends** 139:8
**intention** 129:10 129:12
**intentionally** 119:24 120:7
**interested** 6:1 160:8
**interesting** 29:1 62:16 68:7 107:18
**interfere** 5:8
**interference** 5:6
**internet** 113:10,13 113:16
**interrogatories** 3:10 12:8,18 13:3 48:13
**interrogatory** 24:1
**interstate** 27:17 28:2 48:5 62:14 107:1 108:18 121:16
**investigate** 144:16
**investigated** 44:8
**investigation** 125:3
**involved** 7:17 43:14 46:9 48:8 122:11 143:25 155:3
**iowa** 68:2,9
**issue** 41:18,23 44:13 66:17,18 69:21

**j**

**j.j.** 36:23,24 37:4
**jacksonville** 89:17 89:19 91:4,21 92:5 101:17,20
**january** 28:10 61:5
**jeanette** 1:17,24 5:24 159:4
**jersey** 109:15
**job** 18:6 80:19 82:23 100:12 155:17
**joined** 30:23
**joining** 28:21
**july** 24:24,25 25:1 25:2
**jump** 62:13,14,19 62:24 106:11,14 106:15,17 116:21 121:8,9,13 123:6 123:10,14,21 124:6,7 130:23
**june** 27:12 29:23 30:23,24 54:15,17 55:15,20 69:18

**k**

**keep** 41:13 76:18 76:23 77:25 79:3 84:2,10
**keeping** 115:12 117:7
**keller** 36:23,24 37:4
**kind** 8:18 12:10 38:1 60:9 87:23

88:3 110:6 149:6 149:9
**knew** 51:15 59:18 109:3 117:8
**know** 8:1,9,24 9:7 9:20 10:2 11:1,4,5 11:13 14:8,13 15:11,17 16:6,25 19:20,20 21:5 25:5,24 26:13,16 31:13 33:9,10,11 33:18 34:6,8,21 35:6 38:5,10 43:25 44:9 45:4 45:10 47:23 51:11 54:14 56:10,11,13 56:22 57:15,16 58:3 59:1,3,5,11 59:12,15,20,21,25 62:7,11 63:1,21 65:1,14,18,19 66:12 68:11 70:13 70:17 71:2,3,21 73:23 74:1,5 76:1 79:16 80:15 81:22 85:23 86:11,12,22 87:1,3 89:12 94:15,20,20 99:5 99:22 103:3,25 105:7,9 106:11,13 106:15 108:17,19 110:1 112:1,8 116:19 118:17,17 122:2,3 124:22 127:25 133:23 136:13,14,15 141:17,24 145:17 151:8 158:5
**knowledge** 21:22 144:15

**l**

**l** 17:2,3 23:21,22
**lading** 3:24 100:20
**lane** 45:1,4,5,6,7,8 45:9 47:24 62:17 62:19 63:2 82:7 82:11,12 83:5,9,21 99:2,2 106:4,19,20 106:23 107:7,8 108:18 115:17 116:13 117:21 118:4,7,20,24 119:2,3,5,7,12,16 119:18,21 120:12 120:15 121:3 123:5,18,21 124:14 126:11 130:19 133:6 137:19 149:10,13 153:24 154:1 156:15,15,16,18
**lanes** 45:2 82:5,16 107:3,4 121:5,6 132:10 149:7
**large** 80:16
**laura** 111:14,15
**law** 2:9
**law.com** 2:6
**laws** 65:19 69:22 71:1,2
**lawsuit** 11:8,25 12:2 13:2 89:2 158:2
**lawsuits** 155:4
**lead** 60:17 83:4,13 83:19
**leading** 155:9
**lease** 3:11 30:10 32:13,14,16,22 104:24
**leasing** 104:23,25
**leave** 25:17 26:9 26:10 28:24 30:3 30:4 57:11,20 99:20 102:6
**left** 25:15 26:11 29:16 62:9 96:24 98:1,9,18 99:7 107:10 108:10,11 115:7 116:6 118:12,13,22,25 119:15,25 120:8,8 120:15 130:19
**legal** 5:23 65:9,10 66:12 158:15
**legally** 62:24
**legitimate** 60:2,21 64:19 66:9,18,22 68:6 69:24 74:24
**lenox** 2:4
**lessons** 16:14
**license** 1:25 3:13 22:2,2 41:11 42:13 43:4,6 56:9 66:6,11,13 71:21
**lifeguard** 18:3
**light** 31:3,4,23 56:22
**limit** 78:16,21 84:24 88:15 106:3 108:6 110:16 126:18 128:11,12 128:20,21,25 129:5,8,11,11,14 129:15 132:7
**limit's** 78:12
**limits** 10:23 11:10
**line** 125:24 162:11 162:14,17,20,23 163:1,4,7,10,13,16
**listed** 49:9 51:3 52:14 55:13 68:5 132:3,4
**listen** 110:19
**lists** 52:13
**literature** 104:12
**little** 9:22 10:2 21:3 26:18 31:25 42:15 62:3 94:20 96:24 106:18 118:14,23 128:3
**live** 41:16
**lived** 154:6
**living** 42:6
**load** 57:17,18 59:22 65:1 69:21 70:5,8,10 101:23 102:12
**loaded** 47:18 102:20 103:8,10 103:22 104:1
**loads** 57:16
**local** 69:22,22
**located** 5:20
**location** 91:22 97:7
**log** 3:19 87:9 89:22 90:2,17,21 93:7,12 95:1,4,15 98:14 99:7 100:3 100:7,8,9,13 150:7
**logbooks** 20:13 94:18
**logistics** 28:14,15 28:21,25 57:12
**long** 19:9 27:1 108:5 110:5 111:23 124:11 154:6 157:5
**longer** 29:20 79:9 85:2 112:7

**look** 14:8 22:16 24:12 37:9 41:4 50:24 55:4,5,10 57:23 76:25 77:8 81:10 94:21 96:18 97:15 98:14 123:19 128:2
**looked** 105:15 145:12
**looking** 101:6
**lookout** 76:6,18,23 77:18,25 84:2,11 115:12
**looks** 49:3 92:4,9 92:12,15 126:3
**loose** 62:3
**lose** 56:9
**lot** 21:21 34:9 79:9
**louisiana** 47:22
**lytx** 3:20,21,22,23 96:14 126:23 145:6

**m**

**mail** 161:10
**mailbox** 42:7
**main** 87:5
**maintain** 34:7 41:13 76:2 133:6 137:19
**making** 162:8,8
**man** 86:25
**manager** 33:12
**maneuver** 79:21
**manner** 73:18
**mansell** 161:20
**manual** 20:10,11 73:24 76:21 77:11
**manually** 161:8
**map** 98:1
**march** 149:24 160:10
**marijuana** 89:6 155:22
**mark** 32:15 36:13 37:11 39:14 41:3 47:22 48:20 49:14 50:6 51:20 90:1,8 96:2,3 100:3,18 131:2 133:14 136:23 142:16 146:14 147:20
**marked** 12:14,16 32:19 37:14 41:8 48:23 49:19 50:10 51:24 52:2 89:25 92:25 95:6 96:6 96:10 98:21 100:23 125:9,11 125:15 131:8 133:18 134:14 137:3 139:5 143:15,17 144:3 146:17 147:23
**marking** 134:8
**match** 98:16
**matches** 90:8
**materials** 36:25
**matter** 5:14 106:6 155:17
**mcdonald** 2:15
**mean** 10:24 29:24 36:14 44:10 50:24 59:21 65:19 66:15 74:12,22 75:22 86:16 100:7 112:6 119:6 121:9 123:9 141:13 150:10 153:18
**meaning** 119:19
**means** 8:9 51:10 63:14 75:24 78:8 97:10 138:11
**meant** 9:3
**media** 5:12 87:18 158:13
**median** 107:9
**medical** 156:9
**medication** 9:13
**medications** 155:14
**meet** 17:15
**meetings** 36:1,2,4 36:6
**members** 64:2 74:20
**memory** 14:12 35:14,21
**mentioned** 160:5
**mess** 136:10
**messed** 24:7 136:13
**messing** 106:9
**met** 8:1
**microphones** 5:4,8
**middle** 16:16 45:4 107:8 108:18 126:11 137:18 149:15,15
**mile** 39:14 47:3,22 110:7 126:8
**miles** 22:16,16 25:19,19,23 26:17 26:17 59:1,4,6 62:24 66:19 78:16 78:19,22 110:7,10 116:20 120:25 121:1 124:25 126:4,11 129:3,4 129:14 132:7 147:17 148:2 152:15
**military** 154:23
**mind** 128:16,18
**mine** 32:23
**minimum** 91:8
**minor** 43:19
**minutes** 98:24 112:2,2,3,7
**mirror** 80:13 123:19
**mirrors** 22:17 79:24
**mishear** 40:2
**misordered** 56:1
**misread** 24:6
**missing** 90:14
**mistake** 93:6 94:4 95:2 100:5
**mistake's** 94:7
**mistakes** 94:6,9,14 100:7,8
**mmj** 23:9,24 24:13 24:14 25:7,8 26:11 27:16 44:3 44:4
**model** 15:11
**mohs** 2:3 3:4 6:5,5 6:14,25 7:3,9,15 12:11,15 24:8 31:16,20 32:10,11 32:15,20 37:9,15 40:1 41:2,9 48:19 49:1,13,20 50:4,14 50:16,19,22 52:1 56:9,12,15 60:6 61:1 87:11,19 89:21 90:1,5,7,10 90:13,15 96:2,7,9 97:19,21 100:18 100:24 101:14 102:24 108:20 109:17 116:9 117:24 122:22

123:15 125:10,13 125:14 126:1,2 129:18 130:1 131:2,5,9,15,17 132:20 133:13,19 134:8,11,15 135:17 136:20,23 137:4,10,11 138:2 138:3 139:3,10,20 141:7 143:16 145:10,11 146:14 146:18 147:4,5,20 147:24 148:22,23 149:16 150:20 152:7,9 157:11,19 158:7
**moldova** 15:24 17:9 154:12,19,20 154:21
**moment** 151:13
**money** 17:12 23:3 23:5 26:4,17 43:13
**month** 19:10,13,24 19:25 24:5,19,20 24:22,25 25:4 28:11 30:25 32:1 32:2 46:12 57:2 67:18
**months** 19:14,17 19:18 27:3 38:19 38:20,22 49:11 154:7 155:9
**morning** 66:25 68:21 91:14
**motor** 10:12 23:7 32:3,7 44:2 53:13 53:24 54:6 58:1 62:22 67:2 70:25 72:13,24 73:20 74:4,9,14 75:12,19 76:4,15,22 77:6,17 79:23 81:4 82:2 83:3,24 84:8,20,24 85:2,8,14 94:24 100:13 102:17 103:5 104:4,8 110:19 111:1,4 112:24 113:5,11 122:12 123:23 150:16 152:18
**motoring** 64:2
**mouth** 116:11
**move** 17:21 18:8 21:6 28:19 54:7 63:1 71:24 82:11 82:12,16 95:22 117:20 118:4,12 118:13,15,22 119:14,24,25 120:7,8 129:19
**moved** 16:3 17:16 18:10,17 27:13 45:8 99:1 116:2 118:6,21 120:15 124:14 154:11
**moving** 120:15
**music** 110:19

**n**

**n** 3:1 16:20 92:1
**n.e.** 2:4,10
**nadia** 2:25 6:9
**nail** 59:6,7,14
**name** 5:22 7:10,12 7:12,14 15:16 18:20 23:8 26:21 26:22 33:3,8 42:7 48:2 80:5 91:24 111:13 126:6 142:16
**naperville** 154:3
**naturally** 116:6
**necessarily** 123:25
**necessary** 162:9
**need** 8:5 21:19,22 21:25 33:23 35:18 42:21 63:2 64:3 65:2 72:20,25 73:8 74:5 75:13 75:20,25 76:1,2,5 76:9,25 78:9,12,21 79:13,20 82:15 86:12 87:22 104:7 104:9 121:15,19 121:22 123:19 124:1 158:3,5
**needlessly** 74:10 74:20,22
**never** 38:10,14 40:5 53:23 74:8 74:19 85:7,11,16 88:14,16,19 90:8 103:14 104:6,12 145:24 147:2
**new** 23:11 35:17 64:10 67:18
**nice** 65:6
**night** 89:13 102:3 102:4,9
**nine** 50:5 51:21
**nineteen** 17:17
**nod** 8:9
**nolo** 136:19,22 138:4,14
**noon** 92:7
**normal** 8:18 72:14 78:23,24 79:10 123:10,13 149:13
**north** 107:1 109:1 114:13
**northern** 1:2 5:17 159:10
**nos** 51:23 96:5 146:16
**notarized** 161:9
**notary** 7:3 135:3 140:12 142:5,9,10 163:24
**notary's** 140:20
**note** 5:4
**noted** 162:4,5
**notice** 6:15 160:3
**notified** 10:19 11:7
**noting** 161:7
**number** 3:9 4:2 5:18 12:11,17 14:22 15:2 28:17 41:2 48:19 49:15 50:5,6,16,20,20 52:10 53:9 55:5,5 56:3 72:3 83:12 83:16 89:21 96:20 97:16 125:12,16 131:5 133:14 134:9 137:10 139:11 145:10 147:4 148:22 152:7 154:4 158:13

**o**

**o** 16:20 17:2,3 31:8 33:7 92:1
**o'clock** 93:4 94:8 94:22,22
**o'daniel** 2:15,16 6:7,7,24 7:2,4 24:7 31:12,14,17 39:24 50:11,15,18 56:8 60:4,22 87:13 90:4,6,9,12 97:17 101:12 102:21 108:15

109:15 116:8 117:23 122:20 123:12 129:16,19 131:14 132:19 134:10 135:13 136:18,22 139:1,7 139:16 141:6 149:12 150:19 158:10 161:1
**oath** 134:25 135:3 139:6,12 140:7,9 140:10 142:5 147:1 151:4
**object** 60:22 102:21 116:8 122:20 123:12 136:18 139:1,7,16 141:6 149:12
**objection** 117:23 132:19 150:19
**objections** 6:21
**observing** 21:8,11 34:19
**obstructing** 114:15
**occur** 86:15
**occurred** 7:23 86:17 97:2 114:16 114:21 115:10 119:2
**occurs** 81:3,17 107:1
**ocga** 133:6 162:7
**october** 24:3,5,15 24:18 25:15 27:4 27:24
**odmclaw.com** 2:18
**officer** 39:19 45:9 45:15 46:1 61:13 61:22 62:18 70:11 132:15,18 137:16 159:4
**offices** 161:3,10
**oh** 11:3 17:1 24:14 31:17,21 54:15 89:20
**ohio** 3:18 52:5,6 53:3 67:15 68:8 68:11,14
**okay** 7:3,4,19,25 8:7,11,14,17,22,25 9:5,10,11,17,20 10:11,15,19 11:3 11:12,19,21,24 12:2,5,20,24 13:2 13:7,9,16,20 14:3 14:17,19,21 15:1,4 15:8,13,15,23 16:7 16:9,11,18,21,23 16:24 17:5,14,18 17:20 18:2,5,11,20 19:3,6,8,11,16,21 19:24 20:1,6,8,15 20:21 21:2,7,13,24 22:8,20,24 23:2,6 23:8,10,23 24:10 24:21 25:3,9,25 26:5,19,23 27:1,11 27:15,19,22 28:9 28:24 29:3,6,10,13 29:16,20 30:1,5,12 30:16,21 31:14,23 32:9 33:1,10,13,17 34:5,13,15,23 35:3 35:9,20,25 36:7,11 37:17,24 38:3,17 39:2,7,12,17 40:4 40:9,12,20,24 41:2 41:5,18 42:11,17 42:20 43:2,7,14,18 43:20,23 44:13,16 44:19,22,24 45:14 45:17,25 46:2,4,8 46:11,21,25 47:7,9 47:13 48:10,18,19 49:16,24 50:1,4,15 51:1,8,18 52:6,19 53:6,8,11,18,22 54:1,9,11,18,21 55:9,12,15,18,22 56:5,12,16,24 57:4 57:22 58:22,24,25 59:15 61:4,6,8,12 61:15,18,20,24,25 62:20 63:7,9,13,16 63:18,25 64:5,9,18 64:23 65:22 66:2 67:1,4,13 68:3,8 68:22 69:8,14 70:19,24 71:12,16 71:19 74:8 75:2,5 75:11 77:16 78:23 78:25 79:15,22 80:4,10,15 81:16 82:22,25 83:12,18 84:6,10,19 85:16 85:21 86:1,4,6,8 86:15,21 87:2,4,11 87:13 88:4,19 89:1,12,18 90:20 90:23 91:3,13,16 91:22 92:1,19 93:5,7,12 94:9,21 95:25 97:12,20 98:15,20,22 99:4 99:23 100:12,18 101:5,8 102:3,11 103:19 104:6,12 104:15,22,25 105:2,5,11,22 106:24 107:9,21 107:25 108:3,9,23 109:12,20,23 110:2,5,11,18,23 110:25 111:3,9,11 111:19,23 112:4 112:10,15,20 113:1 114:8 115:6 115:9,16,21 116:10,16 117:5 118:16 119:11 121:7,11,14,21,25 122:25 125:23 126:11,14 127:13 127:14,21 128:18 131:4,21,21 133:1 133:4,15 134:5,8 137:7,21 138:17 139:24 140:15,17 141:3,21 142:9,13 142:22 143:12 144:2,20,25 145:6 145:20,24 146:24 148:4,9 150:13,18 151:1,10,13,18,21 152:4,6,16,23 153:21 154:2,21 154:23 156:22,24 157:1,13 158:7
**old** 17:16,17 29:2 47:15 60:16 62:6
**older** 58:20
**once** 30:9 81:22 82:5,19 123:11 148:20 151:15,16 151:16,19 161:9
**ones** 60:4,7 64:7
**oos** 51:10
**open** 26:25 28:17
**operate** 103:20
**operating** 10:12 32:24 53:13 54:5 58:5 74:4 152:14

152:18
**opinion** 68:14
**opportunity** 10:1 26:2,3
**option** 20:24
**orange** 109:9
**order** 56:2 75:11 76:3 77:7 78:4,9 84:13 120:8
**ordering** 161:13
**oregon** 61:11 63:8
**organizations** 155:1
**orientation** 33:20
**original** 41:21 131:20 161:12,15
**outcome** 6:1 160:8
**ovie** 33:5 34:22,23 144:22,23,24 145:1,2
**ovie's** 33:11
**owned** 105:5

**p**

**p** 23:21,22
**p.m.** 1:20 5:2 87:15,18 95:10,12 96:23 97:5,6,22 98:7,19 99:18,19 99:20 105:23 114:13 126:8 129:22,25 157:15 157:18 158:12,17
**pacific** 18:22,23 18:24 94:16
**page** 3:9 4:2,10 8:4 24:9 101:5 133:5 137:8,12,13 137:24 147:8 148:1,7,25 151:24 152:21 162:11,14 162:17,20,23 163:1,4,7,10,13,16
**pages** 162:9
**paid** 63:5 140:2
**paint** 46:3
**paper** 13:11 33:23 35:10 42:9 127:25
**paperwork** 11:23
**paragraph** 135:6 141:3,8,9,11
**parallel** 22:19
**parents** 17:10
**park** 19:19 108:8
**parking** 22:18,19 34:9
**parrot** 15:16,17
**part** 20:16 62:1 64:1 74:13 106:20 106:21,22 119:14 125:2 131:20 140:2 154:25
**particular** 69:6 77:16,18
**particularly** 77:24
**parties** 5:11 160:1 160:7 161:13
**party** 5:25
**pass** 22:20 45:8
**passed** 45:22
**passenger** 72:14
**passing** 115:5
**pavement** 103:24
**pay** 25:19,20 26:18 52:24 53:3 54:3,8,9 57:2,6,7 63:3,6 65:20 135:24 136:5,8 138:14 141:19 143:3
**pdf** 161:6,7
**pen** 94:19
**pending** 9:9 159:8
**people** 19:17 75:8 76:21 81:7 112:21
**percent** 75:13 85:10 130:25 132:16
**perception** 84:3
**perfect** 156:21,23 156:24
**performed** 58:11 61:13
**permit** 22:4,5,6 53:4 65:8,9 67:19 68:8
**personal** 46:13,14
**personally** 159:6
**pertaining** 1:16
**phone** 14:22 15:1 15:8 36:15 38:2 39:20 40:6 94:21 111:1,6,10,24 112:21 113:4,11 113:17,20 114:18 148:14 152:18 153:19 157:3
**phones** 5:7 15:4
**photo** 143:18
**photographs** 13:4 13:6 143:22
**photos** 4:7
**phrase** 75:4,6
**physician** 155:11
**pick** 5:5 91:18
**picking** 101:23
**picture** 14:15
**piece** 63:11
**place** 5:7,11 23:24 27:19 44:6 47:21 92:22
**plaintiff** 1:6 2:7,13 5:14 6:6 159:11
**plaintiff's** 12:12 12:17 32:17 37:12 41:6 48:21 49:17 50:6,8 51:22 89:23 96:4,11 100:21 125:7,12 125:16 131:6 133:16 134:8,12 137:1 143:13 146:15 147:21
**plan** 17:7,8 76:9 77:13
**plant** 94:13
**plastic** 42:9,14,16 62:2,2
**plate** 66:6,11
**plates** 66:13
**playing** 147:7
**plea** 135:8 141:5
**plead** 52:24 132:24 133:10 136:2 138:12,14 138:25 139:6,8
**pleads** 138:4
**please** 5:4,6 6:12 7:10 8:24 41:3 72:2 74:11 83:15 135:1 161:6,10,18 162:9,9
**pled** 136:19,22 139:8
**pm** 94:2
**point** 15:24 16:3 17:21 18:8 21:16 92:15 106:24 108:24 115:16 116:2 124:5 146:7
**police** 4:3 13:5,8 14:16 38:13 39:13 39:19 43:21 44:1 44:8,11,21 45:8,15

46:1 62:17 70:11 125:2,6,21 131:3 131:20 132:15,18 137:16 144:19
**policies** 36:8 74:6
**policy** 10:23 11:10 36:14,15,17,20 38:5
**polish** 142:16
**pool** 18:4
**position** 33:11 122:19
**possible** 151:10,12 151:18
**posted** 78:21 132:6 147:8 148:1 148:6,24 149:23 150:4 151:24 152:21
**potential** 76:6,10 76:18 77:1,13,24 80:21 81:18,23 82:18 83:4,12,16 84:11 122:5
**pounds** 62:23 105:10
**practical** 20:15 21:8,19 34:16
**practice** 19:18 20:11,14 22:7 34:9 42:5 86:14 112:20 129:13 152:24 153:1
**pre** 22:13,14 29:11 58:24 68:21 90:8
**preparation** 13:4
**prepare** 11:17 17:10
**prepared** 52:11 75:24 124:1
**prescription** 89:9 155:24
**presence** 159:19
**present** 2:23 6:2 67:11 69:11 78:6 160:4
**press** 119:19 127:5 127:10 145:21
**pretty** 157:12
**preventable** 144:8 144:8
**previously** 139:5 144:3
**primary** 33:1
**print** 161:8
**printout** 146:20 146:22
**printouts** 96:14 146:19
**prior** 28:21
**private** 5:5
**probably** 8:1 14:8 14:9
**problem** 8:11 9:12 90:7
**problems** 156:3
**procedure** 1:15 6:20 162:7
**procedures** 74:6
**process** 16:6
**produced** 50:12 50:17
**production** 161:19
**professional** 154:25
**profile** 4:8,9 146:20,22
**program** 19:9
**prohibit** 9:14
**pronounce** 111:19
**pronouncing** 16:1
**proper** 59:22
**properly** 63:24
**prove** 53:21 126:21
**provide** 18:6 21:25 49:21,23
**provided** 20:9 48:14 49:3,14 58:18 96:15 143:19
**provider** 14:24 15:2
**psp** 3:15 49:15 51:3 55:10 68:1,6 71:23
**pti** 22:11,13
**public** 58:11 64:3 74:10,20 140:12 163:24
**pull** 12:11 41:2 48:19 53:9 89:22 116:13 131:16 145:10 147:4 148:22 152:7
**pulled** 39:2 53:10
**punished** 37:25
**purchase** 104:23
**purposes** 6:17,19
**pursuant** 1:14 6:15 32:13 160:3 162:6
**push** 47:17 106:17 107:22 112:9 115:18 118:13,18 118:19 119:17,22 122:2 146:5
**pushing** 115:19,20
**put** 15:18 23:11 42:6 51:9 59:23 59:24 62:4 65:1,2 65:4,8,10 70:8 96:7 116:10 126:5 127:23,23,24,24 128:9,20,21 129:11 131:14 143:19

**q**

**qualification** 13:23 48:14
**question** 6:21 8:15 8:16,21 9:8 29:1 60:23 71:11 75:1 82:21,24 87:25 112:14 120:4 125:19 139:7 152:16
**questions** 8:13,23 9:3 12:8,10,19 21:21 33:24 157:20 158:8
**quick** 87:12 129:16 157:11
**quickly** 133:13
**quizzes** 34:3,10,15

**r**

**r** 31:9,9,9,18,18 111:16,17
**radio** 110:19
**raining** 114:6
**rate** 25:20
**react** 81:23 84:12 123:4
**reacting** 83:20
**reaction** 84:5
**read** 126:3,6 135:9 135:12 141:8,23 141:25 142:1 161:6 162:2
**ready** 102:12 144:19

**real** 129:16 133:13
**realize** 82:6
**really** 93:10
**reason** 9:14 57:11 57:20 60:20 63:1 74:19,24,25 75:8 79:16 80:20 162:13,16,19,22 162:25 163:3,6,9 163:12,15,18
**reasonable** 58:6 73:17 84:21 88:10 130:9
**reasonably** 75:12 76:4 77:7 78:5,10 84:13
**reasons** 162:8
**receipt** 3:12 37:18 37:19
**receive** 33:20 34:24 36:9 40:24 144:11 154:15
**received** 35:22 38:11 39:10 40:21 48:16,16 49:10 60:3 61:7 100:19 137:5,14
**receiving** 36:7,14 36:22 37:22
**recess** 87:16 129:23 157:16
**recollection** 112:6
**record** 3:14 5:2,12 6:4 7:11 40:13 49:4 50:11 52:10 63:9 87:14,17 94:18 129:21,24 131:18 133:13 135:13 139:25 140:6 146:3 149:14,17 151:21 152:24 153:16 157:14,17 158:11
**recorded** 5:13 85:19 99:5 127:6 146:8,25 148:6,9 148:14 149:3 152:13,17 153:7 153:14
**recorder** 146:2,5
**recording** 5:10 146:5,6 147:12 153:19
**records** 13:15
**red** 70:13 96:24 131:18,22
**reduced** 159:20
**referring** 7:23
**reflect** 128:23
**reflected** 51:5
**reflects** 71:25 72:6
**registration** 66:5 66:10,13
**regs** 63:14
**regular** 73:6 112:20 152:24 153:1
**regularly** 86:2 155:10,14,20
**regulation** 65:7
**regulations** 20:14 36:19 58:2 73:21 150:17
**related** 5:25 60:10 60:13 156:2 160:7
**relatives** 154:8
**religious** 155:1
**remain** 128:3
**remake** 42:13
**remember** 12:7 13:9,17 14:4,9 18:1,16,20,25 21:20 26:21 27:12 35:24,25 36:3,5,7 36:9,11,12,14,22 37:2,6,22,23,24 38:11 39:12 44:18 48:2 67:16 68:4 89:15,18 91:9,13 94:3 95:13 99:22 100:5,15 102:7 106:3,5 107:4,7 110:9 111:25 115:2 117:3 119:4 124:15,17 127:23 133:25 140:14 141:12,24 144:22 150:1,3,15 151:6 151:17,20 153:8 153:13,20 156:14 156:19 157:5,8
**remembered** 51:20
**rent** 10:10
**repeat** 72:2 74:11 83:15 135:1
**rephrase** 9:1
**report** 3:15 4:3 13:5,8 14:16 44:1 44:21 49:15 55:11 67:8 68:6 71:21 71:22 101:4 127:22 131:3,20 132:16 144:19
**reported** 1:24 159:18
**reporter** 1:18 5:24 6:12 8:10 87:23 136:21 160:14
**represent** 7:16
**representing** 2:7 2:13,19
**require** 150:17
**reserve** 7:2
**reserved** 6:22 161:6
**resolve** 10:21 11:9 139:19,22
**respective** 160:1
**responses** 24:1
**responsibilities** 74:17
**responsibility** 65:12 66:12 94:24 130:25
**responsible** 70:25 132:17
**responsiveness** 6:22
**rest** 99:9
**restricted** 54:13 54:17 56:16
**result** 144:12
**retained** 158:14
**retraining** 144:12
**returned** 161:11 161:14
**review** 3:14 11:19 11:20,21 12:6 49:4 51:3 71:22 161:6
**reviewed** 12:2,22 13:3,17,22 14:10
**reviewing** 14:4
**ridge** 1:19 5:21 44:7,11 159:7
**right** 7:14 10:14 13:1,16 15:25 16:1 19:23 22:14 23:25 25:16 27:6 28:12 29:18,19 30:24 31:5,24 32:3,25 34:17

35:5,20 36:10 38:15 39:22 40:8 40:19 41:12,19,22 41:24 42:2,23 43:1,10 48:12 49:13 50:4 53:5 54:11,24 55:6 57:8 58:13,16 60:12 61:12 62:9 64:12 69:3,16 72:8,9 73:2,5,7,22 73:25 74:3,7 76:13,17,20 77:5 77:10,15 78:3,7,11 79:11,14 80:2,18 82:8,20 83:11,25 84:9,12,16 85:13 85:18 86:10 87:10 88:11,21,24 89:15 90:16,25 91:5,24 92:18,24 93:22,23 94:2,3,17 96:10,18 97:3,4,14 98:8 99:13 104:18,19 105:21,22,25 107:14 108:8,12 109:2,4,18,21 110:12 111:6 115:4,5,17 116:4 117:14,16,18 119:13 120:10 121:2,24 122:4,7,9 125:1,2 127:16 131:16 140:20 143:6,17 146:10 147:4 149:22 150:4,5,23 157:4,7 161:6
**rli** 1:10 5:16 10:16 159:12
**road** 2:4,10,16 22:15 25:21 29:8 29:14 34:9 48:2 58:8,23 59:16 68:25 86:19,24 103:17,19 109:5
**roadway** 74:21 77:9 78:2,6 84:15 116:25 122:15 124:12
**robert** 1:5 6:6 7:17 159:11
**rockport** 153:24 154:1
**rogers** 2:3
**room** 6:2 8:8
**rope** 57:18
**ross** 2:24 5:22
**roswell** 2:10,16 161:22
**route** 25:22,23 27:20
**rule** 9:7 11:12 53:25 103:7 162:6
**rules** 1:14 6:19,20 8:2 65:19 73:3 103:7 121:15 162:6

**s**

**s** 2:16 3:8 4:1 16:20 17:2,3 23:21,22 28:7 161:1
**s6** 15:12
**safe** 38:10 58:6,12 70:17 73:17 75:12 76:4 77:8 78:5,10 84:13,21 88:10
**safety** 6:9 35:2,6 35:12,15,18 36:1,2 36:4,6 58:2 73:21 84:14 124:2 150:17
**salem** 101:9,11,17
**samsung** 15:10
**sandei** 1:17,24 5:24 159:4
**save** 145:21
**saw** 13:8,12 14:2 62:15 68:23,23 106:8 115:16,21 115:23 116:13,24 120:19 121:2,5,6,9 124:12 130:9,13 130:16 155:10
**saying** 31:15 36:10 41:25 62:15 108:12 119:13 126:9 136:19,22 140:1 148:17,17 153:22
**says** 24:10,12 37:18 41:18 49:10 55:13 68:1 77:11 91:3 96:23 103:7 125:23 126:21 127:19 132:10,12 135:6 137:18 141:4
**scale** 68:23
**scenario** 121:21
**scene** 98:18,18 99:7 116:18 137:14 143:23
**school** 18:14,15,21 18:22 19:9 20:9 22:7 23:4 35:2 42:5,21 73:12 154:15,18,22
**scope** 10:5
**scratch** 46:2
**scratches** 43:24 45:23
**screen** 41:4 90:2 147:6
**scroll** 143:21
**sdm** 24:10 28:8 30:19,23 47:14
**seal** 140:20 161:11
**seat** 53:13,20,24 54:5 56:14
**seatbelt** 53:17
**seattle** 19:2,4
**second** 14:5 29:8 55:18 106:23 123:21 131:12,13
**seconds** 77:8 81:10 115:14
**section** 125:23 137:18
**secure** 57:17 64:16 64:22 65:5
**securement** 59:22 69:21 70:13
**security** 36:17
**see** 24:6 45:10,13 49:10 59:7,8 62:8 62:10 63:19,20 64:3,6 68:7 77:1,3 77:12 78:19 79:24 80:8,12,14 81:8,11 81:18,23 82:13,14 82:18,19 83:4,13 94:6,10,21 96:23 97:8 98:17 99:10 104:14 108:18 116:18 117:13,15 117:16,20 122:4 122:19 123:1,11 123:19 126:8 131:13 132:9,11 134:10 135:4

138:6 141:9,10 145:14 149:14,23 156:15,18
**seen** 49:24 81:21 96:16 100:25 104:12 131:10 134:16 145:24
**semi** 126:7
**send** 11:22,22 13:6 14:16 161:12,18
**sensitive** 5:5
**sentence** 24:13 126:21 137:25 138:8
**separate** 10:11
**september** 7:18,24 24:4,16,18 25:10 25:12 72:1,7 90:17 101:15 126:7 131:23
**sequence** 120:19
**served** 154:23
**service** 29:4 37:1 37:19 51:11,12 57:24 68:25 69:2 69:4
**set** 64:12 160:9
**seven** 51:19 154:7
**sheet** 50:2
**shift** 20:24 21:1,5
**shifts** 21:3
**shirt** 53:16
**shop** 29:15
**shops** 29:7
**shorthand** 1:17 160:14
**shot** 4:10
**shoulder** 99:3 107:14,15,16,18 107:19,20 108:7,8 108:10,11,13 109:7 110:1,4
**show** 14:6,7 20:22 46:1 59:13 150:7
**showing** 150:24
**shows** 90:23 93:7 93:12,17,24 96:20 97:4,6 99:7,8,12 99:14,17,20 101:8 138:4 148:1 149:6
**sick** 17:12
**side** 80:5 98:1 107:10,14 109:4 109:21 145:15
**sides** 14:16 80:2
**sign** 37:8 56:22 135:25 140:14 141:13,20 161:6
**signal** 61:17 62:5 63:19,22,23 64:2 123:20
**signature** 7:1,2 134:19 140:15,21 159:24 160:10,13 161:2,15 163:20
**signed** 127:15 137:22 139:12,13 140:11,25 141:11 141:23 142:3,11 161:9,11,14
**simple** 54:7 56:21
**single** 46:23
**sir** 7:10 103:2
**sit** 35:20
**site** 93:20
**sitting** 81:5 122:16
**situation** 81:3,17 82:1 83:10,14,19 117:13 118:6 123:1,10,13 124:4
**six** 19:17 20:6,7 34:11 38:18,20,22 55:5 57:1 128:5,6 128:10
**skill** 22:1
**skills** 19:15
**slam** 124:13
**slammed** 120:11
**sleep** 89:12 91:8 91:10
**sleeper** 91:10
**slept** 91:6
**slight** 155:17
**slippery** 103:21
**slow** 47:4,4 62:21 78:9,16 82:12,14 82:20 83:5,7 106:8,9,10 116:5 116:15,18,19,20 117:6 118:7,8,9 121:3,15 122:5 123:2,7 124:22
**slowed** 116:16 117:2 120:22 124:25 130:12,15
**slower** 78:13
**slowing** 79:5 84:12 117:25
**small** 25:20,21,21 25:23 66:20 72:18 156:16,18
**smd** 28:7,8
**smoke** 89:6
**snow** 103:22
**social** 43:8
**solex** 17:2
**solutions** 5:23 158:15
**somebody** 11:22 11:25 30:10 34:18 85:24 86:18 106:13 115:18,19 123:14,19 124:6,9 129:20 143:2 149:15,20 150:2
**sonic** 16:12,20 17:1
**sonique** 16:19
**soon** 130:15
**sorry** 17:1,6 22:5 30:2 56:4 71:12 72:10 73:15 78:18 81:15 82:23 90:5 91:7 97:6,19 101:3,15 114:2 124:16 134:11
**sort** 14:1
**sound** 29:18 132:1 132:2
**sounds** 14:14
**space** 47:17 62:25 65:2,4 72:20 83:8 108:7 118:1 123:3 124:2 128:3
**speak** 38:2 112:1,1 112:21
**specialized** 73:8
**speed** 78:12,16,21 84:21,24 88:10,15 106:3 108:6 110:16 126:18 128:11,12,20,21 128:24,24 129:5,8 129:11,11,14,15 130:9 132:6 148:16
**speeding** 148:18
**spell** 33:6
**spence** 2:9,10 6:5 7:16 31:15
**spoke** 88:8
**sponsor** 23:3
**sponsors** 17:11

**spot** 80:6,24
**spots** 80:16,22
**sprint** 14:25
**ss** 159:2
**stalled** 120:19 122:19
**standards** 74:2
**stands** 22:13
**start** 9:13 22:6 27:13 47:5 54:13 59:15 82:7 95:9 95:12 97:4,7 98:7 98:17 116:19 121:3
**started** 25:12 29:16 91:17 92:25 97:10
**starting** 22:18 27:4 86:20,20
**state** 1:18 6:3 7:10 47:24 52:3 70:20 71:1,3 86:25 135:13,14 159:1
**statement** 3:25 4:4 52:17 77:4,19 83:14 84:17 125:4 125:17,20 133:20 133:24 134:6 144:3,20 162:8
**states** 1:1,15 5:16 64:24 65:7,9,14,18 68:16 70:17,18 139:5 159:9
**station** 59:12,13 67:17
**stay** 18:17 99:1 119:21
**stayed** 102:9
**staying** 149:9
**steer** 103:24
**steering** 120:7
**stenographically** 159:18
**step** 56:11,11
**steps** 124:23
**stick** 20:24 21:1,3 21:5
**stockbridge** 97:1
**stop** 43:21 45:2,2 45:12,16 47:16,17 59:13 63:1 68:24 69:6 70:11 72:20 76:1 79:9,13 85:3 92:20 99:12,25 100:1 102:4,8 103:8,9 121:16,19 121:23
**stopped** 53:19 95:11 96:21 100:4 121:18
**stopping** 43:11 59:25 72:19 116:19
**straight** 22:19 118:20
**strike** 35:13 36:12 91:7
**struck** 45:19 119:9 120:15
**studied** 20:25
**study** 17:9,13 20:24
**studying** 19:17
**stuff** 13:13 14:1 19:19 20:12,22 21:6 22:17 34:6 43:8 57:23 69:1 72:21 76:2 90:14
**subject** 58:1 89:2
**submitted** 139:4
**subscribed** 163:21
**substance** 162:7
**sufficiently** 130:12
**suit** 160:7
**suite** 2:4,17 161:21
**sundays** 20:5
**sunny** 114:1,3,4
**super** 156:23,24
**supervision** 57:2
**supervisor** 20:19 20:20 33:1
**supervisors** 33:13
**suppose** 46:2 57:2 62:20 70:8 91:2,8 95:18 107:19
**supposed** 25:24 55:19 70:5 74:19 78:17 81:10 94:11 94:12 123:2,6 128:1
**sure** 8:3 9:25 11:1 19:4 32:6,21 35:1 35:4 38:12 42:4 50:7 51:4,8,15 52:19 54:23 58:5 70:3 71:4,16 83:16 88:7 107:5 107:6 117:6 120:18 124:24 140:5,5
**surf** 113:10
**surfing** 113:13,16
**swear** 6:12
**swearing** 140:12
**sworn** 6:13 7:7 9:18 159:15 163:21
**symbol** 96:24
**system** 64:16

**t**

**t** 2:3 3:8 4:1 53:16
**take** 5:11 9:6,11 19:13,14 21:3,16 21:18,19 22:10 34:11 42:22 44:6 47:17,21 50:24 53:7 61:3 81:24 85:3,17,24 86:13 87:1,11 89:9 98:23,25 104:7 106:24 108:23 129:16 143:18 151:5,10 157:11
**taken** 1:16 5:13 6:15,17 87:16 129:23 150:25 157:16
**takes** 79:9
**talk** 38:25 43:15 47:10 48:7 88:25 111:3 145:2
**talked** 60:8 74:15 79:8 81:9 88:8 117:12 122:25 123:9,22 145:6
**talking** 54:25 58:14 60:4,8 84:2 87:24 88:3 109:9 111:6,11 114:18 152:10 157:8
**tarp** 59:24 70:8,12 70:18,21
**tarps** 57:16
**task** 75:14
**tell** 16:5 19:8 33:22 46:19 47:13 54:12 56:19 57:9 76:25 105:25 144:6 146:7 156:20

**telling** 9:15 58:9
**tells** 76:21
**temporary** 42:8 42:13,13,14
**ten** 89:14 90:4,5
**terminated** 30:3
**test** 21:16 22:1 34:9 87:5 156:12
**tested** 156:5,7,8
**testified** 7:7
**testify** 159:15
**testimony** 9:18 59:17 60:15 116:24 126:12 130:8 133:10 138:20,22 139:14 139:17 141:10 147:1 149:17 151:4,6 152:23 158:12 159:17,22 160:9 162:2,7
**text** 113:4
**texting** 113:7
**thank** 6:11 48:24 158:8,9
**theirself** 94:19
**theoretically** 20:12
**thereof** 160:8
**thing** 8:12 10:25 23:8 25:18 53:15 55:13 56:6 62:7,8 62:16 66:10,20 68:7,11 70:23 77:16 78:4 87:22 107:18 124:10 126:20 135:20
**things** 59:18 76:14 82:9,15,17 83:2 117:12 123:25 124:19
**think** 14:6,18,20 15:12 16:12 24:1 24:9 27:10 28:6 29:23,25 31:16 33:12 36:2 44:12 49:13 54:24 57:5 68:2 88:2 89:17 89:21 91:6,24 94:10 95:12,14,19 95:23 96:19 102:7 107:18 113:1 116:6 120:24 122:24 124:9 128:12 130:2,5,15 134:4,24 135:21 143:1,8 148:19 150:15 153:2 157:11 158:3
**third** 24:12 99:2 106:19,20 118:20 119:4,18 125:24
**thirteen** 90:4 97:17,18,19
**thought** 39:22 59:23 124:6 127:7 128:20 146:4
**thousand** 72:22
**three** 19:13,14 21:19 35:8 41:3 47:18 48:6 61:14 63:21 67:23 68:9 68:12 69:3 70:23 86:14 94:11,11 106:5,6,16 107:3,4 115:23,23
**tick** 63:23,23,23 63:24,24,25,25
**ticket** 3:17 14:18 38:4,4,6,9 39:9,10 40:6,9,15 44:1 46:6 52:3 54:16 132:23,25 133:1 135:23 139:23,25
**tickets** 13:12 29:5 56:11
**tifton** 92:5,17,23
**time** 1:20 9:7,9,19 10:4 14:22 15:6,9 17:23 20:1 35:17 40:22 41:20 42:22 43:13 46:6 48:16 48:17 51:16 52:22 53:7 55:17 57:19 58:25 59:19 60:2 60:10 63:8 67:7 69:10 71:20 77:2 77:12 83:8 85:5 87:15 89:18 91:1 91:2,13 94:16,16 94:20 95:4 96:20 97:5,7 98:7,17 99:21 100:16 102:13 104:16 106:12,14 107:15 110:20,23,24 111:7 112:17 113:7,13,17,22 114:20 116:16 124:11,18 129:22 149:9 150:5,25 155:8,14,19,25 157:2,15 161:14
**timeframe** 94:13
**times** 19:13 35:8 82:2 153:2,3,5,6
**tire** 59:7,8,11,14 68:20,23,24 69:1
**today** 7:20 8:3,6 9:3,15,21 10:1 11:17 13:4 151:4 157:21,24 158:3
**today's** 158:12
**told** 39:23 63:10 104:7 145:20 151:13 157:1
**top** 24:9 36:11 96:24
**total** 105:7 158:13
**touch** 103:24,24 103:25
**tough** 21:21
**tractor** 105:16
**traffic** 3:17 47:16 48:15 52:2 56:21 78:9 114:8,10,11 114:12,14 121:17 122:1 147:15
**traffic's** 78:25 79:1
**trailer** 70:6 91:18 105:2,3,14,16 106:22
**trailers** 25:18 64:25 70:6
**train** 85:23
**trained** 76:14 77:8 77:17,25 79:15,23 82:9,17 83:2 84:1 84:8 104:2,6 127:8
**training** 19:22,22 21:8 24:25,25 25:4 33:20 34:25 35:22,23 73:9 86:18
**trans** 28:15,21,25 57:12
**transcript** 159:22 161:7,12,15 162:2
**transcription** 159:21

**transfer** 42:17
**transferring** 43:11
**transmission** 20:25
**transport** 24:10 30:19 47:14
**travel** 16:8 45:5 84:20
**travelling** 27:16
**travels** 16:8
**trick** 9:23
**tried** 45:12 116:5 143:18
**trip** 22:13,14 29:11 58:24 68:21 92:4,22 96:20,21 97:4,7,22 98:7,10 98:17 101:4
**trouble** 42:15 56:8 57:13,19
**truck** 10:10 18:13 18:15,21 20:8 22:11 28:19 30:6 30:7,8,9 34:18 43:25 46:3 59:5 62:6 67:11,22 72:12,17,18,23 73:4,11,16,17 79:9 79:9 80:12,13,15 82:10 84:13 85:24 85:25 86:23 88:9 99:1 100:1 102:18 105:12,14 106:19 106:20 114:20 118:15,19,21 119:17 120:14 121:16,19 123:14 123:21 124:8 126:7,23 145:9 148:15,25 149:4 150:25 151:11 152:13,14 153:9 154:14 156:11
**trucking** 1:8 2:25 5:15,20 6:10 10:6 18:22 19:8 30:15 34:25 78:20 80:13 159:12
**trucks** 26:14,14,24 28:16 29:2 47:15 148:10
**true** 159:21
**truth** 9:15 159:15 159:16,16
**try** 8:20 45:15 75:4,6 80:20 87:24 131:15 144:16
**trying** 79:12 99:6 128:23 129:2,4,5,8 129:9
**tuesday** 131:24
**turn** 5:7 45:6 54:13,16 56:22 61:17 62:5,9 63:18,22 64:2 72:20 106:18 110:3 118:14 123:20
**turned** 100:9
**turning** 45:7
**turns** 56:16
**two** 12:11 19:14 20:12,24 31:18 45:2 47:9,18 51:19 52:7 56:3 60:9 63:21 69:3 69:22 77:23 82:5 86:14 87:18 98:25 101:12,13,15 106:5,16 110:7,10 115:23 124:19 132:4 134:4 135:6 137:12 141:3,8 145:14 149:7 152:15 153:3,5,6 158:14
**type** 15:8
**types** 77:18,24

**u**

**u** 31:8 54:13,16 56:16,22
**u.s.** 17:16 42:7,7 42:25 43:5 68:1 154:12
**uh** 47:25
**um** 9:24 11:6,16 17:24 38:7 49:6 49:12 50:21 51:11 51:13 52:4,12,16 60:24 64:14 67:21 67:25 70:15 72:4 72:11 76:24 77:22 79:19 81:8,12,20 84:4 88:1 90:3 93:2 96:13,22,25 97:9 98:6,11 99:16 102:15 105:17 116:12 120:21 125:5,25 133:7 138:1,5,13 140:22 142:6 145:8,16 147:9 156:17
**unconscious** 119:16
**undersigned** 162:2
**understand** 8:23 9:5 10:15,18 14:9 15:23 38:12 51:9 57:25 60:19 63:13 64:1,4 74:23 75:1 90:9 94:23 99:23 120:18 123:22 132:15,21 133:8,9 136:1 138:11 146:4 150:21,22
**understanding** 120:6 133:1 136:4 138:17 140:25 146:2 154:11
**understood** 9:3 10:9 157:20
**underwent** 61:7
**undetermined** 159:9
**unexpected** 76:16 117:19
**union** 92:20,23 93:20 99:12,15 100:2 101:21,23 102:4,6 155:1
**unit** 5:12 87:18
**united** 1:1,15 5:16 28:14,15,21,25 57:11 159:9
**units** 158:14
**unloaded** 102:20
**unsafe** 75:17
**uphill** 106:15
**upside** 96:7
**usa** 17:23
**use** 6:23 50:1 53:12,16 54:5 57:18 67:19 85:11 110:25 111:3 162:9

**v**

**v** 33:7
**val** 39:14
**valdosta** 39:15
**valdostar** 39:14
**valid** 60:2

**validity** 61:21
**vehicle** 23:7 44:2 46:23,24 53:14,24 54:6 58:5,12 62:22 64:16,22 69:12 70:25 72:13 72:24 74:9,14 75:12,20 76:4,15 76:22 77:7,17 79:17,18,24 80:16 81:4 82:2 83:3,24 84:8,20,24 85:2,9 85:14 88:17,18,22 88:23 91:11 94:24 96:21 97:10 100:13 103:5,8,9 104:4,8,15,20,22 105:7 110:19 111:1,4 112:24 113:5,11 114:25 115:16,24,25 116:24 117:10 118:24 119:24 120:16,20 122:19 123:3,16,23 124:12,13 129:19 130:10,13,16,19 146:25 150:14 152:19
**vehicles** 58:23 77:21 79:2 80:21 81:22 82:6,19 83:5,20 102:17 114:23 115:3,4,5 116:13 117:8,16 117:20 118:3 120:2,8 121:2 122:11,12,13,15 123:4 143:24
**verbal** 8:5 40:17
**verified** 160:10
**veritext** 5:23,25 158:14 161:10,19
**versus** 5:15 102:20
**video** 1:13 4:10 5:10,12 145:22,24 146:8 147:7,7,10 147:12,25 148:5,6 148:11,17,24 149:3,14,18,23,25 150:2,25 151:5,7 151:11,21 152:6,8 152:10,12,17 153:9,11
**videographer** 2:24 5:1,23 6:11 87:14 87:17 129:21,24 157:14,17 158:11
**videos** 85:17,19 146:25 148:9,14 152:25
**videotaped** 151:15
**view** 114:15
**violating** 133:5
**violation** 50:2 51:12 54:25 57:10 59:20 64:17 66:6 66:7 67:19 68:10 68:13,19 69:22
**violations** 29:5,10 37:25 38:6 49:9 51:15,19 52:13,20 57:9 58:14,15 59:18 60:17,20 61:14 64:13 67:8 67:9,23 68:5 69:4 69:11,22 70:1,22 70:23 71:5,9,14,17
**virginia** 1:18 5:20 159:7
**visa** 16:7
**vision** 156:3,8,14 156:21,24
**visual** 156:19
**vs** 1:7

**w**

**w** 92:1
**waived** 159:25
**wake** 68:20
**wall** 46:22 47:8 109:20
**want** 6:25 8:3 9:6 9:25 10:25 11:1,5 11:13 14:12 32:6 32:21 36:13 42:3 48:15 50:7,23,24 51:4,14 74:18 88:7 116:10 120:18 136:2,10 136:12,13,14,15 139:25 140:5 147:1 157:24
**wanted** 10:2 14:13 54:12 57:9 118:1 131:19 139:21,21
**warning** 40:18,20
**washington** 3:17 17:25 18:10,11,17 18:21 19:1 22:25 41:14,16 42:12 43:5 52:3 54:14 55:3,19 56:17 154:15
**watch** 20:21 147:6
**watched** 153:9
**way** 51:9 58:9 72:22 92:19 120:14 160:7,8
**we've** 32:6 37:10 60:7 66:3,5 71:5 84:2 96:10 112:5 153:3
**weak** 62:11
**weather** 103:6 113:25
**week** 19:14 20:2,6 20:7 26:6
**weeks** 86:14 151:20,22
**weigh** 59:11,12 67:17
**weight** 105:7,15
**went** 18:13,21 20:15 25:3,4 58:23 89:15,18 92:9 116:6 143:2
**wheel** 66:5,17 106:18 120:7 124:10
**wheeling** 16:12 17:6
**wheels** 103:25
**whereof** 160:9
**whispering** 5:5
**white** 109:10
**wide** 72:21
**wife** 17:15 111:12 111:24 112:2,11 112:17 114:19 150:12 157:3
**wife's** 111:13
**windshield** 61:16 61:25 62:2
**wintertime** 151:23
**wiper** 61:25
**wipers** 61:16 63:10
**wish** 135:6 141:4
**wit** 159:5
**witness** 3:2 6:12 6:13 7:6 31:13,18 41:5 48:24 49:16

50:21 56:10,13 60:24 90:3 97:18 97:20 101:13 102:22 108:16 109:16 122:21 123:13 131:4 133:15 139:2,17 149:13 152:8 157:13 158:9 159:14,18,19,23
**woke** 91:13
**wood** 64:25 65:2,5 65:8
**woods** 65:10
**words** 116:10
**work** 16:7,8 17:13 18:3,18 20:5 22:25 26:15 27:23 28:7 31:2 42:23 42:23,25 43:6,9 47:15 106:2 136:15 141:17
**worked** 23:7,24 24:2 32:4
**working** 25:19 27:1 29:16 32:12 34:6 62:1,4,5,10 62:11 63:10,19,21 63:22,24 64:2 103:23 127:7
**wreck** 134:6
**write** 31:9,11,14 128:5,10,13 129:8 129:9
**writing** 128:24
**written** 3:25 4:4 12:8,19 125:3,16 125:20 133:20 134:6 144:20
**wrong** 54:16 55:16 60:16 151:14
**wrote** 126:4,20 127:25 128:4,6 134:6 141:25 145:4
**wyoming** 152:5

**x**

**x** 3:1,8 4:1 17:2,3
**xpo** 91:25

**y**

**y** 92:3
**yeah** 10:14,18 13:11,15 14:11 15:20,22,25 16:2 16:24 17:4,8,25 18:15,24 19:2 20:7,7,11,18,20,23 21:10,12,14,18 22:5,5 23:14,20,25 24:14,20 25:11 26:3,10,22 27:6 28:1,8,15,15 29:23 30:2,8,24 31:1,22 32:2,2,8,8 33:16 33:18 34:14,17 35:11 37:21 39:16 40:3,8,19 41:24 42:1 44:5,14 45:7 45:23 46:18,24 48:5 49:14 52:9 52:23 53:15 54:15 55:1,18,18,20,25 56:2,4,9,12,21 57:8 59:20,21 60:7,12,14 61:10 65:13,18 67:6,12 67:14,17 68:2,7 69:5,7 71:7,23,23 74:16 75:5 76:11 77:5,15 78:1,3,11 78:14,24 79:1 80:18,25 81:2,6,25 82:8 84:18 87:21 91:18,23 92:6,16 93:9,11,14,19,21 94:1,25 97:18 98:3,13 99:11,13 99:19 100:2,11 101:2,11 102:7,10 104:24 105:12,21 106:22 107:8,11 108:2,16,25 109:6 109:16,19,19 111:22 112:25 114:5 115:20,22 116:23 117:1,9,22 118:8,11 120:1,3 121:10 123:6,18 123:20 126:10,22 127:20 128:9 131:25 132:2,11 134:2,7,24 137:20 138:7,21 140:19 141:25 142:2,4,6,8 145:1 147:3 152:1 152:8,11 156:11
**year** 18:18 42:10 67:18
**years** 17:17
**yellow** 62:7,8
**yep** 69:20 80:23 97:25

**z**

**zimmerman** 134:23 135:7 141:4 143:7,10
**zone** 106:2 107:25 108:2,24 110:6,14 110:15
**zoom** 126:1 138:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.